COOPER, WHITE & COOPER LLP
STEPHEN KAUS (SBN 57454)
skaus@cwclaw.com
JIE-MING CHOU (SBN 211346)
jchou@cwclaw.com
201 California Street, 17th Floor
San Francisco, California 94111
Telephone: (415) 433-1900
Facsimile: (415) 433-5530

Attorneys for Defendant
AMERICAN AIRLINES, INC.

FILED
JAN 31 PM 1:14
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

BZ

| | |
|---|---|
| KATHLEEN HANNI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN AIRLINES, INC., and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. C 08 0732<br><br>**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1332(d) (Class Action Fairness Act of 2005) & 1441(b) (Diversity)** |

TO THE CLERK OF THE COURT OF THE NORTHERN DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that Defendant AMERICAN AIRLINES, INC. ("American") hereby removes to this Court the state court action described below:

1. Although American has not yet been served with process, it has become aware that on December 28, 2007, an action was commenced in the Superior Court of the State of California in and for the County of Napa, entitled *Kathleen Hanni, individually and on behalf of all others similarly situated v. American Airlines, Inc. and DOES 1 through 20, Inclusive*, as Case Number 26-40576 ("Complaint") attached hereto as Exhibit "A".

2. This removal is timely under 28 U.S.C. § 1446(b) because American has not yet been served with process in the state court action.

3. Jurisdiction. This Court has jurisdiction over this civil action, which is filed as a class action, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) and under this Court's ordinary diversity of citizenship and supplemental jurisdiction, 28 U.S.C. §§ 1332(a) and 1367(a) in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

**Removal Pursuant to the Class Action Fairness Act of 2005**

4. This Court has jurisdiction over this civil action, which is filed as a class action, pursuant to 28 U.S.C. § 1332(d) because:

(A) Plaintiff, Kathleen Hanni, is a citizen of the State of California.

(B) Defendant American is a corporation incorporated under the laws of the State of Delaware that has its principal place of business in Forth Worth, Texas.

(C) At least one member of the class of plaintiffs is a citizen of a State different from American within the meaning of 28 U.S.C. § 1332(d)(2)(A). Specifically, Plaintiff is a citizen of the State of California.

(D) Plaintiff filed this action as a "class action" within the meaning of 28 U.S.C. § 1332(d)(1)(b) in that plaintiff pleads that this civil action should be certified as a class action under California Code of Civil Procedure 382.

(E) The claims asserted by the plaintiff class, aggregated as required by 28 U.S.C. § 1332(d)(2), exceed the sum of $5,000,000 within the meaning of 28 U.S.C. § 1332(d)(2). More specifically, Plaintiff's Complaint pleads that there are approximately 12,000 members of the alleged class. Plaintiff pleads that "the monetary damages at issue in this case are within the jurisdictional requirements of this court". Complaint at ¶3. Accordingly, Plaintiff has placed in controversy individual damages in excess of the sum of $25,000. On behalf of an alleged class of 12,000 members, the total amount in controversy aggregates in excess of $5,000,000. Indeed, the jurisdictional amount is met if each member of the putative class seeks even $420 in damages. In addition, plaintiff also seeks, on behalf of the class, punitive damages and attorneys' fees. In determining the amount in controversy, both punitive damages and attorneys' fees are considered. *E.g., Bell v. Preferred Life Assurance Society,* 320 U.S. 238, 240 (1943) (punitive damages); *Galt*

*G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155-56 (9th Cir. 1998) (attorneys' fees). Adding plaintiffs' request for punitive damages and attorneys' fees pushes the amount in controversy in this action well above $5,000,000.

(F) The class of unnamed plaintiffs exceeds 100 in number within the meaning of 28 U.S.C. § 1332(d)(5)(B).

(G) The sole defendant is not a State, State official, or other governmental entity within the meaning of 28 U.S.C. § 1332(d)(5)(A).

5. Accordingly, American removes this action from the Superior Court for the State of California, County of Napa, pursuant to 28 U.S.C. § 1453(b).

**Removal Pursuant to Diversity of Citizenship and Supplemental Jurisdiction**

6. This Court would have original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

(A) Plaintiff is a citizen of the State of California. Defendant American is a corporation organized under the laws of the State of Delaware and having its principal place of business in the State of Texas. Accordingly, this action is between citizens of different States.

(B) It is apparent from the face of Plaintiff's Class Action Complaint that the amount in controversy between Plaintiff and Defendant American exceeds $75,000, exclusive of interest and costs. Plaintiff requests attorneys' fees and punitive damages, and those additional claims must be aggregated with Plaintiffs' request for actual damages to determine the total amount in controversy. *See Bell*, 320 U.S. at 240 (punitive damages); *Galt G/S*, 142 F.3d at 1155-56 (attorneys' fees). With attorneys' fees and punitive damages also in controversy between Plaintiff and American, the total amount in controversy exceeds $75,000, exclusive of interest and costs.

(C) American has attached the Declaration of James M. Wagstaffe to this Notice of Removal. Said declaration states that on Plaintiff's personal case alone, not including moving for class certification or dealing with other class action matters, Plaintiff will place in controversy at least $105,000 in attorneys' fees. In determining the jurisdictional amount, that amount must be added to Plaintiff's claim for compensatory and exemplary damages.

(D) To the extent this action is properly brought as an alleged class action, this Court has supplemental jurisdiction over the alleged claims of all members of the alleged class pursuant to 28 U.S.C. § 1367(a). *See ExxonMobil Corporation v. Allapattah Services, Inc.*, 125 S.Ct. 2611 (2005).

7. Accordingly, American also removes this action to this Court pursuant to 28 U.S.C. § 1441(b).

8. Intradistrict Assignment. This complaint has been removed to the San Francisco Division of the Northern District because the original state court action was filed in the County of Napa.

DATED: January 31, 2008

COOPER, WHITE & COOPER LLP

By: ______________________
Jie-Ming Chou
Attorneys for Defendant

COOPER, WHITE & COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111

**EXHIBIT A**

LAW OFFICES OF PAUL S. HUDSON P.C.
4411 Bee Ridge Road #274.
Sarasota, Florida 34233
Telephone: 410-940-8934
Facsimile: 240-391-1923

DAVID G. RAMOS (Bar No. 116456)
LAW OFFICES OF DAVID G. RAMOS
3266 Villa Lane
Napa, California 94558
Telephone: 707-255-1700
Facsimile: 707-255-3660

Attorneys for Plaintiff KATHLEEN HANNI.
Individually and on behalf of all others similarly situated

FILED
DEC 2 8 2007
Clerk of the Napa Superior Court
By: [signature]
Deputy

CASE MANAGEMENT CONFERENCE
DATE: 6-05-2008
TIME: 8:30am
PLACE: Courtroom A
825 Brown Street, Napa CA 94559

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF NAPA

KATHLEEN HANNI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

AMERICAN AIRLINES, INC.; and DOES 1 through 20, inclusive,

Defendants.

No. 26-40576

**CLASS ACTION**

**COMPLAINT FOR FALSE IMPRISONMENT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, NEGLIGENCE, BREACH OF CONTRACT, INTENTIONAL MISREPRESENTATION**

Plaintiff KATHLEEN HANNI, individually, and on behalf of all others similarly situated, complains against Defendants, and each of them, and alleges as follows:

**Parties**

1. Plaintiff is a citizen and resident of Napa, Napa County, California.

2. Defendant American Airlines, Inc. (hereinafter "AA") is a corporation organized under the laws of Delaware with a principal place of business in Fort Worth, Texas. At all relevant times hereto, AA was, and is currently, doing in business in the State of California.

3. The monetary damages at issue in this case are within the jurisdictional requirements of this court.

**Class Action Allegations**

4. This cause of action is being maintained as a class action pursuant to California Code of Civil Procedure § 382. In that regard, the Plaintiff, on her own behalf and on behalf of a class, alleges the following:

a. Approximately 12,000 people were affected by the actions of the Defendant as set forth below and therefore the class is so numerous that joinder of all members is impracticable;

b. There are common issues of law and fact common to the class;

c. The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications among individuals, which may be dispositive of other members claims, thereby impairing or prejudicing the interests of individual class members;

d. The claims of Kathleen Hanni are typical of the claims of the class members; and

e. Kathleen Hanni has agreed to serve as class representative and has agreed to fairly and adequately protect the interests of the class.

5. In support of the class action allegations, Plaintiff incorporates by reference the statements and allegations that follow.

**Events of December 29th, 2006**

6. Plaintiff, her husband and her two children purchased tickets for air transportation on AA flight 1348 scheduled to depart from San Francisco, California on December 29th, 2006, at 6:05 AM (Pacific Time) to Dallas (DFW), Texas, connecting to AA flight # 3821 scheduled to depart DFW at 1:20 PM (Central Time) to arrive in Mobile, Alabama at 2:55 PM (Central Time), for a total expected travel time of 7 hours from

departure airport to destination airport. However, the trip actually took over 50 hours due to Defendant's misconduct detailed below.

7. Plaintiff boarded the AA aircraft with her family members at 6:20 AM (Pacific Time) which departed from San Francisco at about 7:00 AM after a short delay due to mechanical problems.

8. In route the AA pilot announced the aircraft was being diverted to Austin, Texas due to weather "but only for a brief time, to allow waves or fingers of weather to move through" and that "we will be landing in Austin to wait for clearance at DFW so we can be on our way."

9. At noon Central Time AA Flight 1348, a filled to capacity MD80, landed in Austin with Plaintiff and approximately 140 other passengers and flight crew, taxied to an area away from the terminal that upon information and belief was an AA maintenance ramp.

10. Plaintiff could see that gates were empty at the terminal, but the AA pilot reassured the passengers that they would only be 10 to 15 minutes and they would be on their way.

11. AA captain Jesse Fodero announces every 15 minutes for 2 ½ hours that it will be just a few more minutes, but at 1:00 pm another AA airliner Flight 1008 pulled up beside Flight 1348, followed by AA flights 2414 and 534.

12. At 2:30 PM (Central Time), AA captain Fodero announced that he had asked for buses to bring food and potable water to the aircraft and to allow passengers with destinations near Austin and anyone who wanted to to go to the terminal. Captain Fodero states that they still expected to take off but had not gotten clearance yet. He promised to update passengers again in 30 minutes.

13. A bus arrived at about 2:45 PM, but Captain Fodero ordered that only elderly, folks with children and disabled will be allowed to deplane, until further buses arrive. Many passengers stampede to the back of the aircraft to exit, but upon information and belief the bus only had capacity for 15 passengers and all passengers who do not have

Austin as a final destination were rejected and forced to remain in the aircraft against their will.

14. Captain Fodero then stated that he is very sure that they will take off shortly and that anyone who exits the aircraft will not be able to get another flight and will not receive their baggage.

15. At 3:00 PM (Central Time) Captain Fodero stated that he had received clearance to take off and land at DFW, but, although the sky was clear and sunny, he stated he was concerned about lightning and would not take off yet, but expected to soon.

16. Plaintiff observed as of 3:00 PM there were 13 other AA aircraft lined up and parked in the same maintenance area as her flight.

17. At 3:30 PM (Central Time) AA Captain Fodero announced that "this bird is not going to fly" and then revealed that buses he requested are not coming and that an AA manager, who upon information and belief is named Al Tinsley, was refusing to permit AA aircraft to go to a gate to allow passengers to exit the aircraft.

18. Plaintiff and other passengers express their desire to exit the aircraft but Captain Fodero claims to be powerless to permit deboarding due to AA management.

19. At this time, passengers started calling for help on their cell phones, even though the flight crew had instructed them not to, and some passengers began talking about popping the emergency exits and running for the terminal, which terrified Plaintiff and other passengers.

20. At about 5:00 PM, the Captain opened the cockpit door and allowed some passengers to hear his communications with AA management and other parked aircraft. Plaintiff overheard one captain on another parked aircraft state that Hazmat had been called because a dog had defecated on some passengers and other passengers were getting sick from the smell. Plaintiff also overheard that all parked aircraft were being told by AA management that they could not come to the terminal.

21. At about 6:00 PM toilets were backed up; flight attendants served a half Dixie cup of water, which upon information and belief was nonpotable water from the

lavatory sinks and made some passengers sick, and a small bag of pretzels with about 45 calories.

22. One passenger told Plaintiff he had missed a funeral and others were expressing their anger and frustration and anxiety at being imprisoned on the aircraft without any justification.

23. At about 7:00 PM, Captain Fodero announced that he was embarrassed that AA management would not allow the aircraft to have a gate to return to the terminal and that he did not know what to say anymore.

24. Plaintiff observed that AA gates 24 and 25 were empty and available as well as gates of other airlines, but Captain Fodero continued to insist that they could not go to them as did other flight crew members without explanation.

25. Plaintiff observed that another parked aircraft flight 534 had its cabin lights out and someone was flashing SOS, and that a group of men passengers who the Plaintiff later learned were US Marines were being arrested on the tarmac for, Plaintiff is informed and believes, getting into a fight to get off their aircraft which had terrified other passengers.

26. At about 8:00 PM passengers on Plaintiff's flight were speaking out loudly and angrily and the flight attendants ceased circulating through the cabin to ask people to remain calm but huddled at the front of the aircraft as though they were frightened.

27. Captain Fodero continued to repeat that buses and food were coming but nothing came. The Captain also stated that he was talking to the airport managers to get passengers to the terminal, but nothing happened.

28. Plaintiff needed to go to the bathroom and went to the first class lavatory as the coach class bathrooms were inoperable, but was told by Captain Fodero who was just exiting the first class lavatory not to enter or enter at her own risk. Plaintiff had to use a disgusting lavatory which was not operable, with the toilet bowl filled with excrement and vomit.

29. Plaintiff who had recently been victim of an assault then suffered a mild panic attack and a tightening in her chest and informed the Captain Fodero. Captain Fodero stated that even if she had a heart attack that they would not allow passengers to leave the aircraft, they would just take her off the plane as they were doing with a paraplegic diabetic on another parked aircraft after they had suffering from an attack.

30. Plaintiff observed a pregnant woman with a baby making a diaper out of tee shirt and many other acts of naked survival and physical and emotional distress on the aircraft caused by inhuman conditions being inflicted on her and others similarly situated.

31. As plaintiff was exiting the first class lavatory she overheard Captain Fodero saying that he could not understand why AA would not send anyone to empty the toilets and then he told Plaintiff that the only way that passengers could return to the terminal without AA management permission was if he declared an on board emergency.

32. At about 9:04 PM Captain Fodero declared, upon information and belief after his maximum flight time on duty had expired, an on board emergency and stating that he might lose his job for doing so.

33. Plaintiff's aircraft then proceeded through a series of hair raising turns on active and inactive runways to the terminal where passengers were deplaned at 9:30 PM, after 9.5 hours confined on the tarmac in Austin, over 16 hours without food.

34. In one last announcement, Captain Fodero stated "Please go to baggage claim 3, I promise we will get your bags off this plane quickly and efficiently so you may be on your way. There will be someone from American to help you when you get off the plane." However, there was no one to help, all food service places were closed, and after waiting at the baggage claim area for another 2.5 hours at 11:00 PM the Plaintiff's baggage and others was not unloaded.

35. In the terminal AA personnel informed Plaintiff and other passengers that their bags would not be unloaded and that the flight would be "resumed" at 6:00 AM on December 30th, 2006.

36. Defendant provided no vouchers or money for food, lodging, or anything else except a $10 hotel discount coupon for passengers who waited in a long line.

37. Plaintiff returned after 4 hours at a hotel to find 1,000 people from the stranded flights all trying to get through ticketing and security as Defendant had issued no tickets or boarding passes to its stranded passengers.

38. Plaintiff was finally advised to get on another flight 1108 by Captain Fodero who stated that "this bird (flight 1348) is not going to fly."

39. Arriving at DFW 20 minutes before the only AA flight to Mobile, Plaintiff was refused boarding even though she had a confirmed reservation by an AA gate agent who also rudely informed her that her baggage was on the flight to Mobile, she and her family would not be allowed to board as the flight was oversold, unless she was "the Queen of England and you are obviously not the Queen of England." Plaintiff then became violently sick to her stomach and vomited.

40. Plaintiff then politely asked that her baggage be removed, but the AA pilot stated that due to weight of too many bags he was involuntarily removing 14 passengers but would not remove any baggage.

41. Plaintiff then politely asked the gate agent and pilot for a hotel voucher, who responded in unison, "Don't blame us for the weather" and summarily rejected her request and neither paid or offered to pay any compensation for being denied boarding.

42. This was in flagrant violation of US DOT bumping rules that require on the spot cash compensation of $400 for the inconvenience plus a ticket refund and alternate transportation and also violated AA's own customer service plan.

43. Plaintiff was then forced to spend another night in a hotel at her expense and finally got on an AA flight on December 31st, 2006 to Mobile to retrieve her baggage, over 50 hours after departing from San Francisco, ruining her vacation, and her husband's business trip.

44. Plaintiff was confined to the aircraft against her will on the ground in Austin Texas for approximately 9.5 hours by Defendant, and was not permitted by AA to exit the aircraft until 9:30 PM (Central Time), over 13 hours after boarding the aircraft.

45. While confined in the plane on the ground in Austin, Plaintiff was subjected to harsh and abusive treatment and conditions. The toilets became full and would not flush and the stench of human excrement and body odor filled the plane.

46. Plaintiff and other passengers were deprived of adequate food and water.

47. Plaintiff and other passengers were also deprived of access to medications, nutritional supplements and needs, and hydration especially needed by infirm, elderly and children.

48. Plaintiff and other passengers were forced to witness the physical and emotional distress and panic of other passengers causing all passengers to suffer emotional distress and endangering the physical safety of Plaintiff and all passengers.

49. The distress of the confined passengers in overcrowded conditions in the aircraft was witnessed by AA flight crew employees and was also reported to AA ground personnel and to Austin airport authorities.

50. Approximately 12,000 passengers involving about 100 flights on December 29th, 2006 were confined to aircraft diverted from Dallas by Defendant to other airports and confined for 3 to 12 hours on the aircraft in poor to deplorable conditions by Defendant.

51. Plaintiff and other stranded passengers suffered hunger, thirst, anxiety, physical illness, emotional distress and monetary losses as a result of Defendant's failure to permit passengers to exit the aircraft to the airport terminals or to supply the parked aircraft with essentials of water, food, sanitary waste removal, light, and breathable or fresh air at normal temperatures.

52. Defendant knew or should have known that passengers needed to be supplied with essential means of comfort and survival on board aircraft, but failed and refused to do so.

53. Defendant had ample advanced warning of weather conditions at Dallas and knew or should have known that it was not able to land aircraft at Dallas (DFW) airport at the capacity it had scheduled on December 29th, 2006 due to transient thunder storms and could have cancelled or delayed from departing many of the flights that it diverted and stranded, thereby preventing the diversions and confinements.

54. With the exception of a few passengers whose destination was the Austin Texas area, AA refused to permit passengers to exit the aircraft even though buses and available gates at the terminal were available to AA.

55. After AA finally permitted Plaintiff and other passengers to exit the aircraft at about 9:30 PM on December 29th, 2006, it "continued" the flight to the next morning and refused to return checked baggage to the passengers.

56. AA then refused to provide payment for overnight lodging, meals, ground transportation, telephone or other passenger expenses and losses caused by its diversion and stranding.

57. The next morning, after more delays, Plaintiff and other passengers from the flight were flown to Dallas (DWF) airport, where their baggage awaited them.

58. Some passengers who had been diverted, confined and stranded overnight were then denied boarding on connecting flights, and were stranded for another day in Dallas.

**Pattern and Practice of AA Misconduct**

59. Defendant AA has not provided reimbursement for passenger expenses, ticket refunds and other forms of compensation to passengers that it diverted and confined on December 29th and 30th, 2006. Defendant has offered only a restricted voucher for future travel and a letter of apology.

60. Defendant did not advise stranded passengers that they could use their AA tickets on another airline for travel to their destinations on December 29th or subsequent thereto, even though an industry convention and rule provides for such when a flight is cancelled or excessively delayed.

61. Defendant did not provide ticket refunds or other compensation to passengers that it stranded on December 29th and 30th, 2006.

62. Defendant knowingly misrepresented the reasons for the delays and confinements by falsely asserting to passengers and the public that aircraft were not able to take off due to weather or congestion.

63. The delays on December 29th, 2006 were actually due to causes within the control of AA and included intentional or negligent lack of personnel, equipment, and planning for ordinary weather disruptions by AA.

64. The confinements by AA, upon information and belief, were to avoid expenses and lawful obligations to passengers associated with strandings, diversions and canceled flights and for AA's and its officers, employees, agents and stockholders own pecuniary gain at the expense of Plaintiff and other passengers.

65. While Plaintiff and other passengers were confined to their aircraft in Austin and other diverted airports, other flights of Defendant and other airlines were taking off and landing without significant delays.

66. Upon information and belief, the Dallas (DFW) airport was only closed to air traffic for approximately 2.5 hours from 2:00 PM to 4:30 PM on December 29th, 2006.

67. Upon information and belief, AA has a corporate policy, practice and pattern of confining and imprisoning passengers on aircraft of excessively delayed or cancelled flights for excessive periods of time to prevent "passenger migration" and this unlawful practice was used against Plaintiff and other similarly situated passengers by Defendant's employees and agents on December 29th, 2006.

68. Upon information and belief, AA has inflicted its practices of confining and imprisoning passengers for over 3 hours to prevent "passenger migration" on over ten thousand other passengers since December 29th, 2006, including another mass stranding in April 2007.

69. By unlawfully confining Plaintiff and other passengers diverted from Dallas on December 29th, 2006 in inhuman conditions, AA avoided ticket refunds, overnight

lodging and meal expenses for passengers, alternate transportation expenses, including on other airlines that under an industry convention and practice will honor tickets of a defaulting airline and back charge the defaulting airline, ground transportation expenses, terminal employee overtime and staffing expenses, and other expenses normally associated with mass strandings and cancellations.

70. Defendant could have permitted passengers to exit the aircraft after the diversions on December 29th, 2006 but failed and declined to do so for its own pecuniary gain.

71. Upon information and belief, some passengers after the confinements ended were forced by Defendant to fly to destinations that they not longer wished or needed to travel to, but were forced to do so by Defendant who did not permit them to exit the aircraft and obtain alternate transportation to another destination or to return home.

72. Other passengers were forced under duress not to abandon their travel with AA on December 29th and 30th, 2006 because AA refused to return their checked baggage, even after promising to do so after finally permitting passengers to exit the aircraft the evening of December 29th, 2006.

73. Passengers on the Defendant's diverted flights had their travel delayed up to 3 days after December 29th, 2006 due to non-weather conditions that were within the control of Defendant without compensation for passenger expenses and losses by AA.

74. Upon information and belief, Defendant was not prevented or prohibited from permitting passengers to exit or re-supply and service the aircraft in Austin or other diverted airports by the Federal Aviation Administration air or ground controllers or by airport management, or other government authorities.

**FIRST CAUSE OF ACTION**

(False Imprisonment)

75. Plaintiff hereby incorporates by reference as though set forth in full, the allegations of paragraphs 1 through 74, inclusive.

76. Plaintiff and other passengers similarly situated were deprived of their personal liberty by Defendant for over 3 hours against their will without legal justification.

77. As a proximate result of the false imprisonment of Plaintiff and others similarly situated, Plaintiff and others similarly situated suffered serious injury to their persons, emotional distress, loss of time, physical discomfort, inconvenience and missed employment opportunities, all to their damage in an amount within the jurisdiction of this court to be established according to proof at trial.

78. The actions of Defendant herein alleged were fraudulent, malicious and oppressive and, consequently Plaintiffs, and those similarly situated, are entitled to an award of punitive damages.

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

**SECOND CAUSE OF ACTION**

(Intentional Infliction of Emotional Distress)

79. Plaintiff hereby incorporates by reference as though set forth in full, the allegations of paragraphs 1 through 78, inclusive.

80. Defendant intended or knew or should have known that emotional distress to Plaintiff and others similarly situated was the likely result of its conduct.

81. Defendant's conduct was outrageous, extreme, beyond the bounds of decency and is intolerable in a civilized community.

82. The acts and/or omissions of the Defendant were the cause of Plaintiff's distress and the distress of others similarly situated.

83. The emotional distress was so severe that no reasonable person could be expected to endure it, wherefore Defendant is guilty of the tort of outrage, intentional or negligent infliction of emotional distress or prima facie tort.

84. The acts and/or omissions of the Defendant as set forth above were the proximate cause of damages to Plaintiff and others similarly situated, which damages are in an amount in excess of the jurisdictional limits of this Court, the exact amount of which will be established according to proof at trial.

85. In doing the acts herein alleged, the defendants acted with fraud, malice and oppression and Plaintiff, and all those similarly situated, are therefore entitled to an award of punitive damages according to proof at trial.

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

**THIRD CAUSE OF ACTION**

(Negligence)

86. Plaintiff hereby incorporates by this reference as though set forth in full, the allegations of paragraphs 1 through 85, inclusive.

87. Defendant as an operator offering air transportation to the general public owed a duty to Plaintiff and others similarly situated of due care, to use best efforts to bring passengers safely to their destinations, to plan for weather related disturbances in its flight operations, and to refrain from mistreatment of them with unjustified involuntary confinement, deprivation of passengers' baggage and stranding in remote locations.

88. Defendant breached its duties to Plaintiff and others similarly situated on December 29th and 30th, 2006, and its conduct was in reckless disregard its duty owed to Plaintiff and similarly situated passengers.

89. Defendant's conduct was the proximate cause of damage and losses to the Plaintiff and others similarly situated.

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

**FOURTH CAUSE OF ACTION**

(Breach of Contract)

90. Plaintiffs hereby incorporate as though set forth in full, the allegations of paragraphs 1 through 89, inclusive.

91. Defendant has filed with the US Department of Transportation, published on its web site, and referenced on its tickets "conditions of carriage" and a "Customer Service Plan". These documents cannot be copied at this time, but will be made available to the Court and the Defendant.

92. Upon information and belief, the aforementioned documents form a contract between the Defendant and Plaintiff and others similarly situated. Plaintiff and others similarly situated have performed all obligation to be performed on their part under the terms of the contract.

93. Defendant, by its conduct on December 29th, 2006 and subsequent thereto, breached its Contract with Plaintiff and others similarly situated in various ways, including but not limited to breach of the implied covenant of good faith and fair dealing, provisions relating to Delays, Cancellations, and Diversion Events, Essential Customer Needs During Extraordinary Delays, Ticket Refunds, Flights with Oversales, and Baggage Delivery and Liability.

94. As a result of Defendant's breach of contract, Plaintiff and others similarly situated have sustained damages as more fully set forth below.

WHEREFORE, plaintiff prays for judgment as hereinafter set forth.

**FIFTH CAUSE OF ACTION**

(Deceit/Fraud)

95. Plaintiffs hereby incorporate as though set forth in full, the allegations of paragraphs 1 through 94, inclusive.

96. Plaintiff knowingly deceived Plaintiff and others similarly situated when It made representations as to the causes and justifications for the diversions (paragraphs 8 & 41 above), schedule changes (paragraph 8 above), confinements (paragraphs 12, 18, 27 and 29 above), expected departure times (paragraphs 11, 12, 14, 15 & 35), and baggage delivery (paragraph 34) on December 29th and 30th, 2006. The statements were in fact false.

97. Plaintiff and others similarly situated, at the time the statements were made by Defendant were ignorant of the falsity of the statements made by Defendant and relied to their detriment on the false and deceptive statements of Defendants.

98. Defendant, upon information and belief, sought to deceive and defraud Plaintiff and others similarly situated for Defendant's pecuniary gain, and specifically with intent to fraudulently invoke a Force Majeure clause in its contract with Plaintiff by falsely

asserting a weather emergency as justification for the extreme delays, confinements, and other mistreatment of passengers and to avoid other liabilities to Plaintiff for its misconduct.

99. As a proximate result of the fraudulent conduct of the Defendant, Plaintiff and those similarly situated have been damaged in an amount which satisfies the jurisdictional limits of this court in an amount to be established according to proof at trial.

100. The aforementioned conduct was an intentional misrepresentation, deceit and/or concealment of facts known to Defendant in conscious disregard of Plaintiffs rights and well being such as to constitute oppression, fraud or malice entitling Plaintiff and those similarly situated to an award of punitive damages according to proof.

WHEREFORE, plaintiffs pray for judgment against defendants, and each of them, as follows:

1. For general and compensatory damages on all causes of action according to proof at trial;

2. For punitive and exemplary damages on the First, Second, and Fifth causes of action according to proof at trial;

3. For reasonable attorneys fees according to law and proof at trial;

4. For costs of suit herein; and

5. For such other and further relief as the Court may deem just and proper.

Dated: December 28, 2007

LAW OFFICES OF DAVID G. RAMOS

By: ______________________
DAVID G. RAMOS
Attorneys for Plaintiff KATHLEEN HANNI, individually and on behalf of all others similarly situated

**PROOF OF SERVICE**

I am a resident of the State of California. I am over the age of eighteen years, and not a party to this action. My business address is 201 California Street, Seventeenth Floor, San Francisco, California 94111-5002.

On January 31, 2008, I served the following document(s):

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1332(D) (CLASS ACTION FAIRNESS ACT OF 2005) & 1441(B) (DIVERSITY)**

on each of the parties listed below at the following addresses:

Law Offices of Paul S. Hudson P.C.
4411 Bee Ridge Road #274
Sarasota, Florida 34233

David G. Ramos, Esq.
Law Offices of David G. Ramos
3266 Villa Lane
Napa, California 94558

**BY FEDEX:** On the date specified above in San Francisco County, as to each of the parties identified in the above service list, I deposited in a box or other facility regularly maintained by the overnight service carrier, or delivered to a courier or driver authorized by said overnight service carrier to receive documents on its behalf, a true copy of the above-referenced document(s) in a sealed envelope or package designated by the overnight service carrier, with delivery fees paid or provided for.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 31, 2008, at San Francisco, California.

Melissa Batchelder