1  PAUL S. HUDSON (pro hoc vice admission pending)
   LAW OFFICES OF PAUL S. HUDSON P.C.
2   globetrotter1947@hotmail.com
   4411 Bee Ridge Road #274.
3  Sarasota, Florida 34233
   Telephone: 410-940-8934
4  Facsimile: 240-391-1923

5  DAVID G. RAMOS (Bar No. 116456)
   LAW OFFICES OF DAVID G. RAMOS
6   barram@i-cafe.net
   3266 Villa Lane
7  Napa, California  94558
   Telephone:  707-255-1700
8  Facsimile:  707-255-3660

9  Attorneys for Plaintiff KATHLEEN HANNI.
   Individually and on behalf of all others similarly situated

10

11

12              UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

14

15  KATHLEEN HANNI, individually and on ) No.           C08-00732 CW
    behalf of all others similarly situated, )
16                                          ) **FIRST   AMENDED   CLASS   ACTION**
                  Plaintiff,                ) **COMPLAINT**
17                                          )
    v.                                      )
18                                          )
    AMERICAN AIRLINES, INC.; and DOES 1 )
19  through 20, inclusive,                  )
                                            )
20               Defendants.                )
                                            )
21  _____ )

22          Plaintiff Kathleen Hanni on behalf of herself and all others similarly situated, by

23  and through her attorneys, Paul S. Hudson, Esq. (pro hac vice) and David G. Ramos, Esq., state

24  and allege as and for a First Amended Class Action Complaint as follows:

25                        **Parties and Jurisdiction**

26          1.  Plaintiff is a citizen and resident of Napa, Napa County, California.

27

28

1        2.  Defendant American Airlines, Inc. (hereinafter AA) is a corporation organized

2    under the laws of Delaware with its headquarters in Fort Worth, Texas. At all relevant times

3    hereto, AA was doing substantial business in the State of California.

4        3.   The monetary damages at issue in this case are within the jurisdictional

5    requirements of this court.

6                        **Class Action Allegations**

7        4.  This cause of action is being maintained as a class action pursuant to Rule

8    23 of the Federal Rules of Civil Procedure. In that regard, the Plaintiff alleges the following:

9        a.  The proposed class consists of 3,000 to 12,000 airline passengers confined on

10            aircraft by Defendants for 3 to 11 hours on December 29th, 2006, and who were

11            otherwise affected by related actions of the Defendant as set forth below;

12            accordingly the class is so numerous that joinder of members is impracticable;

13       b.  There are common issues of law and fact common to the class;

14       c.  The claims of Kathleen Hanni are typical of the claims of the class members;

15       d.  Kathleen Hanni has agreed to serve as class representative and has agreed to fairly

16            and adequately protect the interests of the class.

17       5.  In support of the class action allegations, Plaintiff incorporates by reference

18   the statements and allegations that follow.

19                    **Events of December 29th, 2006**

20       6.  Plaintiff, her husband and her two children purchased tickets for air

21   transportation on AA flight 1348 scheduled to depart from San Francisco, California on

22   December 29th, 2006, at 6:20 AM  (Pacific Time) to Dallas (DFW), Texas, connecting to AA

23   flight 3821 scheduled to depart  DFW at 1:20 PM (Central Time) to arrive in Mobile,

24   Alabama at 2:55 PM (Central Time), for a total expected travel time of 7 hours from

25   departure airport to destination airport. However, the trip actually took 57 hours due to

26   Defendant's misconduct detailed below.

27

28

7.   Plaintiff boarded the AA aircraft with her family members at 6:20 AM (Pacific Time) which departed from San Francisco at about 7:00 AM after a delay due to mechanical problems.

8.   En route the AA pilot announced the aircraft was being diverted to Austin, Texas due to weather "but only for a brief time, to allow fingers of weather to move through" and that "we will be landing in Austin to wait for clearance at DFW so we can be on our way."

9.   At noon Central Time AA Flight 1348, a filled to capacity MD80, landed in Austin with Plaintiff and approximately 140 other passengers and flight crew, taxied to an area away from the terminal that upon information and belief was an AA maintenance ramp.

10.   Plaintiff could see that gates were empty at the terminal, but the AA pilot reassured the passengers that they would only be 10 to 15 minutes and they would be on their way.

11.   AA captain Jesse Fodero announced every 15 minutes for 2 ½ hours that it will be just a few more minutes, but at 1:00 pm another AA airliner, Flight 1008, pulled up beside, then another and another, AA flights 2412 and 534.

12.   At 2:30 PM (Central Time), AA captain Fodero announced that he has asked for buses to bring food and potable water to the aircraft and so that passengers with destinations near Austin and anyone who wants to can go to the terminal.  Captain Fodero stated that they still expected to take off but have not gotten clearance yet, and he will update passengers again in 30 minutes.

13.   A bus soon arrived at about 2:45 PM, but captain Fodero ordered that only elderly, folks with children and disabled will be allowed to deplane, until further buses arrive.  Many passengers stampede to the back of the aircraft to exit, but upon information and belief  the bus only has capacity for 15 passengers and all passengers who do not have Austin as a final destination are rejected and forced to remain in the aircraft against their will.

14.  Captain Fodero also stated that he is very sure that they will take off shortly and that anyone who exits the aircraft will not be able to get another flight and will not receive their baggage.

15.  At 3:00 PM (Central Time) Captain Fodero stated that he has received clearance to take off and land at DFW, but that although the sky is clear and sunny he states he is concerned about lightning and will not take off yet, but will soon.

16.  Plaintiff observed as of 3:00 PM there were 13 other AA aircraft lined up and parked in the same maintenance area as her flight.

17.  At 3:30 PM (Central Time) AA Captain Fodero announced that "this bird is not going to fly" and then reveals that buses he requested are not coming and that an AA manager, who upon information and belief is named Al Tinsley (aka Doe #1), is refusing to permit AA aircraft to go to a gate to allow passengers to exit the aircraft.

18.  Plaintiff and other passengers expressed their desire to exit the aircraft but Captain Fodero claimed to be powerless due to AA management.

19. Passengers started calling for help on their cell phones even though the flight crew had instructed them not to, and some passengers began talking about popping the emergency exits and running for the terminal, which terrified Plaintiff and other passengers.

20.  At about 5:00 PM the captain opened the cockpit door and allowed some passengers to hear his communications with AA management and other parked aircraft. Plaintiff overheard one captain on another parked aircraft state that Hazmat had been called because a dog with diarrhea  had defecated on some passengers and other passengers were getting sick from the smell.  Plaintiff also overheard that all parked aircraft were being told by AA management that they could not come to the terminal.

21.  At about 6:00 PM toilets were backed up; flight attendants served a half Dixie cup of water, which upon information and belief, was non-potable water from the lavatory sinks and made some passengers sick, and a small bag of pretzels with about 45 calories.

FIRST AMENDED CLASS ACTION COMPLAINT
- C08-00732CW                                          4

22. One passenger told Plaintiff he had missed a funeral and others were expressing their anger and frustration and anxiety at being imprisoned on the aircraft without any justification.

23. At about 7:00 PM, Captain Fodero announced that he was embarrassed that AA had not emptied the toilets or serviced the aircraft and AA management would not allow the aircraft to have any available gate to return to the terminal and that he did not know what to say anymore.

24. Plaintiff observed that AA gates 24 and 25 were empty and available as well as gates of other airlines, but Captain Fodero continued to insist that they could not go to them as did other flight crew members without explanation.

25. Plaintiff observed that another parked aircraft flight 534 had its cabin lights out and someone was flashing SOS, and that a group of men passengers who the Plaintiff later learned were US Marines were being arrested on the tarmac upon information and belief, that had gotten into a fight in order to get off their aircraft which had terrified other passengers.

26. At about 8:00 PM passengers on Plaintiff's flight were speaking out loudly and angrily and the flight attendants ceased circulating through the cabin to ask people to remain calm, but huddled frightened at the front of the aircraft.

27. Captain Fodero continued to repeat that buses and food were coming but nothing came and that he was talking to the airport managers to get passengers to the terminal, but nothing happened.

28. Plaintiff needed to go to the bathroom and went to the first class lavatory as the coach class bathrooms were inoperable, but was told by Captain Fodero who was just exiting the first class lavatory not to enter or enter at her own risk. Plaintiff had to use a disgusting lavatory which was not operable, with the toilet bowl filled with excrement and vomit.

29. Plaintiff who had recently been victim of an violent assault and was being treated for post traumatic shock syndrome, then suffered a mild panic attack and a tightening

1  in her chest and informed the Captain Fodero.  Captain Fodero stated that even if she had a

2  heart attack that they would not allow passengers to leave the aircraft, they would just take

3  her off the plane as they were doing with a paraplegic diabetic on another parked aircraft

4  suffering from an attack.

5        30.  Plaintiff observed a pregnant woman with a baby making a diaper out of

6  tee shirt and many other acts of naked survival and physical and emotional distress on the

7  aircraft caused by inhuman conditions being inflicted on her and others similarly situated.

8        31.  As plaintiff was exiting the first class lavatory she overheard Captain

9  Fodero saying that he could not understand why AA would not send anyone to empty the

10  toilets and then he told Plaintiff that the only way that passengers could return to the

11  terminal without AA management permission was if he declared an on board emergency.

12        32.  At about 9:04 PM Captain Fodero declared, upon information and belief,

13  after his and other pilots' maximum flight time on duty had expired, an on board emergency

14  and stated that he might lose his job for doing so.

15        33.  Plaintiff's aircraft then proceeded through a series of hair raising turns on

16  active and inactive runways to the terminal where passengers were deplaned at 9:30 PM,

17  after 9.5 hours confined on the tarmac in Austin, over 16 hours without food.

18        34.  In one last announcement, Captain Fodero stated "Please go to baggage

19  claim 3, I promise we will get your bags off this plane quickly and efficiently so you may be

20  on your way.  There will be someone from American to help you when you get off the

21  plane."  However, there was no one to help, all food service places were closed, and after

22  waiting at the baggage claim area for another 2.5 hours at midnight, the Plaintiff's baggage

23  and others was not unloaded, .

24        35.  Rather AA personnel informed Plaintiff and other passengers that their

25  bags would not be unloaded and that the flight would be "resumed" at 6:00 AM on

26  December 30th, 2006.

27

28

36.  Defendant provided no vouchers or money for food, lodging, or anything else to most class members except a $10 hotel discount coupon for passengers who waited in a long line for several hours.

37.  Plaintiff returned after 4 hours at a hotel to find 1,000 people from the stranded flights all trying to get through ticketing at the Austin airport and security as Defendant had issued no tickets or boarding passes to its stranded passengers.

38.  Plaintiff was finally advised to get on another flight 1008 by Captain Fodero who states that "this bird (flight 1348) is not going to fly."

39.  Arriving at DFW 20 minutes before the only AA flight to Mobile, Plaintiff was refused boarding even though she had a confirmed reservation by an AA gate agent who also rudely informed her that her baggage was on the flight to Mobile, she and her family would not be allowed to board as the flight was oversold, unless she was "the Queen of England and you are obviously not the Queen of England."  Plaintiff then became violently sick to her stomach and nearly vomited.

40.  Plaintiff then politely asked that her baggage be removed, but the AA pilot stated that due to weight of too many bags he was involuntarily removing 14 passengers but would not remove any baggage.

41.  Plaintiff then politely asked the gate agent and pilot for a hotel voucher, who responded in unison, "Don't blame us for the weather" and summarily rejected her request and neither paid or offer to pay any compensation for being denied boarding.

42.  Plaintiff was then forced to spend another night in a hotel at her expense and finally got on an AA flight on December 31st, 2006 to Mobile to retrieve her baggage over 50 hours after departing from San Francisco, ruining her vacation, and her husband's business trip.

43.  Plaintiff was confined to the aircraft against her will on the ground in Austin Texas for approximately 9.5  hours by Defendant, and was not permitted by AA to exit the aircraft until 9:30 PM (Central Time), over 13 hours after boarding the aircraft.

1    44.  While confined on the ground in Austin, the toilets became full and

2  would not flush and the stench of human excrement and body odor filled the plane.

3    45.  Plaintiff and other passengers were deprived of adequate food and potable

4  water.

5    46.  Plaintiff and other passengers were also deprived of access to

6  medications, nutritional supplements and needs, and hydration especially needed by infirm,

7  elderly and children and infants.

8    47.  Plaintiff and other passengers were forced to witness the physical and

9  severe emotional distress and panic of other passengers causing all passengers to suffer

10  emotional distress and endangering the physical safety of Plaintiff and all passengers.

11    48.  The distress of the confined passengers in overcrowded conditions in the

12  aircraft was witnessed by AA flight crew employees and was also reported to AA ground

13  personnel and to Austin airport authorities.

14    49.  As many as 12,000 passengers involving as many as 124 flights on

15  December 29th , 2006 were confined to aircraft diverted from Dallas by Defendant  to 17

16  other airports and confined for 3 to 12 hours on the aircraft in poor to deplorable conditions

17  by Defendant.

18    50.  Plaintiff and other stranded passengers suffered hunger, thirst, anxiety,

19  physical illness, emotional distress and monetary losses as a result of Defendant's failure to

20  permit passengers to exit the aircraft to the airport terminals or to supply the parked aircraft

21  with essentials of water, food, sanitary waste removal, light, and breathable or fresh air at

22  normal temperatures.

23    51.  Defendant knew or should have known that passengers needed to be

24  supplied with essential rescue and survival conditions on board aircraft, but failed and

25  refused to do so.

26    52.  Defendant had ample advanced warning of weather conditions at Dallas

27  and knew or should have known that it was not able to land aircraft at Dallas (DFW) airport

28  at the capacity it had scheduled on December 29th, 2006, due to transient thunder storms

1  and could have cancelled or delayed from departing many of the flights that it diverted and

2  stranded, thereby preventing the diversions and confinements.

3          53.  With the exception of a few passengers whose destination was the Austin

4  Texas area, AA refused to permit passengers to exit the aircraft even though buses and

5  available gates at the terminal were available to AA.

6          54.  After AA finally permitted Plaintiff and other passengers to exit the aircraft

7  at about 9:30 PM on December 29th, 2006, it "continued" the flight to the next morning and

8  refused to return checked baggage to the passengers.

9          55.  AA then refused to provide payment for overnight lodging, meals, ground

10  transportation, telephone or other passenger expenses and losses caused by its diversion and

11  stranding.

12          56.  The next morning after more delays Plaintiff and other passengers were

13  flown to Dallas (DWF) airport, where their baggage had been loaded onto the Mobile flight

14  that Plaintiff was involuntarily denied boarding.

15          57.  Other class members who had been diverted, confined and stranded

16  overnight were then denied boarding on connecting flights, and were stranded for another

17  day in Dallas.

18          58.  Intentionally omitted.

19  **Factual Allegations and Experiences  of  Others Similarly Situated in the Proposed Class**

20          59.  The following is a small sample of the experiences of others similarly

21  situated who would be in the proposed class (those identified with initials would have their

22  names not divulged in public filings at this time, but their identities are available to the court

23  *in camera* and to the Defendant upon the filing an appropriate protective order or

24  stipulation.):

25          a) Paul Ziots residing 8 miles south of San Francisco on Flight 1348 suffered

26  intestinal infection and distress from the water served and/or infection received on the

27  aircraft, that required a two day stay in Austin at his expense cost of over $500 in out-of -

28  pocket expenses, causing cancellation of a vacation in Mexico, and when he tried to use an

1   AA trip voucher from for another vacation to Florida, another lengthy delay required

2   cancellation of that trip also.

3           b) TD of Los Altos Hills, California on Flight 1348 on a trip to Belize on AA

4   from San Francisco had out-of-pocket expenses over $600, had to drive from Austin to Dallas

5   at his expense, will confirm that no water or food was delivered to the aircraft and

6   passengers were forbidden to leave the aircraft after a small group of passengers with Austin

7   as destination were allowed to deplane early on, that the toilets became disgusting and filthy

8   and were not serviced, open gates were obviously available in plain sight while the AA

9   captain continue to say none were available.

10          c) Mark Vail of Mardera, California on Flight 534 from Fresno to Dallas was

11  suffering from claustrophobia and is required to take medication daily for epilepsy.  I) His

12  flight was diverted to Austin and he and his fellow passenger were confined against their will

13  for over 7 hours on the ground, plus 3 hours in the air.  ii) He was deprived of medication

14  which was in his baggage that AA refused to return on December 29th, so he had to rent a

15  car in Austin at his expense to drive to Dallas and retrieve his baggage the next morning at

16  DFW after 1-2 hours of AA personnel misinforming him that his baggage had been sent back

17  to Fresno.  iii)Mr. Vail was immersed the hellish conditions and distress of other passengers,

18  including a woman who had a diabetic attack next to him who began shaking uncontrollably

19  while begging the flight attendant for food, and whose medications were also in her checked

20  baggage whereupon the flight attendant could only gave her a stale bagel and spoiled milk.

21  iv) Babies ran out of formula and began crying and screaming along with  their mothers

22  begging to be let off the aircraft.  v) Another elderly man who had a colostomy bag went into

23  diabetic shock and was removed from the plane by an EMS team who could not remove the

24  man.  vi)  EMS refused to evacuate other passengers who were yelling "We're being held

25  hostage!"  vii) Mr. Vail began flashing SOS out the window and finally at 9:00 pm the aircraft

26  went to one of the many open gates. viii) Mr. Vail receive no ticket refund or reimbursement

27  for his auto rental expense but did receive a $500 voucher for future air travel.

28

1         d) Flight 1682 from Oklahoma City to DFW left the gate at 2:07 pm, then

2    waited over 8 hours before AA canceled the flight and returned to the terminal upon

3    information and belief based upon a the Wall Street Journal article of January 6, 2007 by

4    Scott McCartney and Flight Stats Inc.

5         e) Flight 37 from Zurich, Switzerland to DFW was diverted to Tulsa,

6    Oklahoma where passengers were confined for 10 hours and did not reach Dallas until 1:33

7    AM on December 30th after passengers had been on board for 22 hours.  I) Pilots refused to

8    take off because they had reached their federal limits of duty time and AA did not supply a

9    replacement crew for many hours.  This allegation is on information and belief based on the

10   Wall Street Journal article cited above.

11        f) William King of Bowling Green, Kentucky, wife his wife and two children

12   ages 5 and 7, on Flight 9133 was returning home to the Nashville airport through Dallas and

13   was diverted to Austin where after many hours of confinement, he was told that either he

14   could not get off or if he did his family tickets would be forfeited and no ticket refund would

15   be granted or assistance to reach his destination.  I) The next day, after receiving no hotel or

16   food or transportation assistance in Austin where he was stranded,  he was forced to rent a

17   car at his expense and drive 13 hours to his home town, because AA stated it could not get

18   him to Nashville.  ii) Total delay was two days.

19        g) JH residing near Fresno, California was on Flight 4384 was diverted to New

20   Orleans after circling Dallas airport until fuel was low, where he was confined for 8 hours,

21   lost 2 days of work and $700 in out of pocket expenses, no food or functioning toilets.  I) He

22   received $500 voucher for future travel.

23

24               **Pattern and Practice of AA Misconduct**

25        60.  Upon information and belief, Defendant AA has a pattern of involuntarily

26   confining passengers on aircraft without survival necessaries for lengthy periods of time on

27   the ground for its own pecuniary gain, and such incidents include the following:

28

1          a) April 24, 2007, 92 flights diverted, on at least 13 flights passengers were

2   confined over 4 hours.

3          b) August 9th, 2007, 12 aircraft at LAX in Los Angeles, passengers confined

4   over 12 hours with some passing out on the aircraft.

5          c) May 8, 2007, passengers held over 8 hours on aircraft at Palm Beach.

6          d) On or about February 8th, 2002, Flight 2011 at DFW, passengers held on

7   aircraft over 7 hours.

8          e) On or about May 19th, 2000, thousands of passengers held in aircraft at

9   DFW up to 7 hours.

10          f) On or about July 2, 1999, at O'Hare Airport 91 passengers held up to 6

11   hours.

12          61.  Defendant AA has not provided reimbursement for passenger expenses,

13   ticket refunds and other forms of compensation to passengers that it diverted and confined

14   on December 29th and 30th, 2006, but only a restricted voucher for $100 to $500 future

15   travel and sometimes a letter of apology.

16          62.  Defendant did not advise stranded passengers that they could use their AA

17   tickets on another airline for travel to their destinations on December 29th or subsequent

18   thereto, even though an industry convention and rule provides for such when a flight is

19   cancelled or excessively delayed.

20          63.  Defendant did not provide ticket refunds or other compensation to

21   passengers that it stranded on December 29th and 30th, 2006.

22          64.  Defendant knowingly misrepresented the reasons for the delays and

23   confinements by falsely asserting to passengers and the public that aircraft were not able to

24   take off due to weather.

25          65.  The delays on December 29th, 2006 were actually due to causes within

26   the control of AA and including insufficient personnel, lack of equipment, poor maintenance

27   and lack of planning for ordinary weather disruptions by AA.

28

66.  Confinements by AA, upon information and belief, were to avoid expenses and lawful obligations to passengers associated with strandings, diversions and canceled flights and for AA's and its officers', employees', agents' and stockholders' own pecuniary gain at the expense of Plaintiff and other passengers.

67.  While Plaintiff and other passengers were confined to their aircraft in Austin and other diverted airports, other flights of Defendant and other airlines' aircraft were taking off and landing without significant delays.

68.  Upon information and belief, the Dallas (DFW) airport was only closed to air traffic for approximately 2.5 hours from 2:00 PM to 4:30 PM on December 29th, 2006.

69.  Upon information and belief, AA has a corporate policy, practice and pattern of confining and imprisoning passengers on aircraft of excessively delayed or cancelled flights for excessive periods of time to prevent "passenger migration" and this unlawful practice was used against Plaintiff and other similarly situated passengers by Defendant's employees and agents on December 29th, 2006.  The basis for this belief includes the miscoding of many flights as "continued" or "resumed" rather than cancelled and AA employee informants' assertions.

70.  Upon information and belief, AA has inflicted its practices of confining and imprisoning passengers for over 3 hours to prevent "passenger migration" on over ten thousand of other passengers since December 29th, 2006, including another mass stranding in April 2007.

71.  By unlawfully confining  Plaintiff and other passengers diverted from Dallas on December 29th, 2006 in inhumane conditions, AA recklessly endangered the safety of plaintiff and other passengers.  I) AA also avoided ticket refunds, overnight lodging and meal expenses for passengers, alternate transportation expenses on other airlines that under an industry convention and practice will honor tickets of a defaulting airline and back charge the defaulting airline, ground transportation expenses, terminal employee overtime and staffing expenses, and other expenses normally associated with mass strandings and cancellations.

72.  Defendant could have permitted passengers to exit the aircraft after the diversions on December 29th, 2006, but failed and refused to do so for its own pecuniary gain.

73.  Upon information and belief, some passengers after the confinements ended were forced by Defendant to fly to destinations that they not longer wished to travel to because the reason for their trip such as a missed meeting or family event, but were forced to do so by Defendant not permitting them to exit the aircraft and obtain alternate transportation to another destination or return home.

74.  Other passengers were forced under duress not to abandon their travel with AA on December 29th and 30th, 2006 because AA refused to return their checked baggage, even after promising to do so after finally permitting passengers to exit the aircraft the evening of December 29th, 2006.

**ACTIONS AFFECTING CLASS MEMBERS GENERALLY**

75.  Passengers on the Defendant's diverted flights had their travel delayed up to 3 days after December 29th, 2006 due to non-weather conditions that were within the control of  Defendant AA without compensation for passenger expenses and losses.

76.  Defendant was not prevented or prohibited from permitting passengers to exit or re-supply and service the aircraft in Austin or other diverted airports by the Federal Aviation Administration air or by airport management, or other government authorities, by weather, by safety, or by security considerations.

77.  Upon information and belief, the water served by AA to Plaintiff and other passengers on her flight was untreated non-potable taking from the bathroom sinks and that such water was known by AA to be non-potable in that such water on AA aircraft had recently failed testing and was known by AA to be unfit for drinking and was probably contaminated with bacteria from sanitary waste that could  sicken and endanger passengers' health if drunk..

78.  Defendants' continued detention of Plaintiff and other passengers similarly situated for over 3 hours was done for the commercial convenience of Defendants.

1    79.  Defendants' continued detention of Plaintiff and other passengers for over

2   3 hours without potable water, working toilets, breathable air, or adequate food or access to

3   passenger medications recklessly endangered the safety of Plaintiff and others similarly

4   situated.    80.  Gates and/or buses were available to Defendant AA to safely permit

5   passengers to exit the aircraft in Austin and other airports to which AA diverted aircraft, but

6   Defendant AA and/or its agents and employees refused permission to flight crews to return to

7   available terminal gates and/or failed or refused to permit buses to deplane passengers

8   except for a few passengers whose destination was Austin or other airports that AA's aircraft

9   were diverted to on December 29th, 2006.

10    81.  Proper maintenance of aircraft, customer service and operations staffing

11   are matters within the control of Defendant AA.

12    82.  Approximately 20% of the proposed plaintiff class, upon information and

13   belief, based on statements of AA in motion papers, were passengers engaged in

14   international travel, governed by provisions of the Montreal Convention of 1999, which

15   supplants AA's domestic contract conditions and inter alia permits damage recovery of up to

16   approximately $6,600 per passenger for delays on a strict liability basis and also nullifies

17   AA's limitations for consequential or special damages contained AA's domestic contract

18   conditions of carriage.

19    83.  After passengers were finally returned to the terminal in Austin AA Manager Al Tinsley,

20   upon information and belief, ordered with over 300 passengers in need of assistance that the

21   on duty AA Customer Service personnel close the Customer Service Station and go home..

22   84.  AA made an intentional management decision not to delay its non-diverted flights and

23   to confine and hold its diverted flights and confine its passengers on diverted flights to

24   maximize its revenue and minimize its expenses associated with diverted flights by falsely

25   blaming the confinements and delays on the weather (aka Force Majeure or Acts of God).

26   85.  AA management made an intentional decision to close its headquarters at Fort Worth

27   where its most of its Customer Service personnel work for the holiday weekend on

28   December 29th , 2006 through January 1st, 2007.

1    86.  AA management was scheduled to receive (and did receive) large bonuses

2    based on financial results achieved for 2006 and would have received less or even no

3    bonuses if it had compensated passengers as required under its obligations by contract for

4    the diversion delays and called in necessary workers or paid overtime to operate its aircraft

5    and service its diverted passengers, and not sought to falsely excuse its malfeasance and

6    nonfeasance with a fraudulent  Force Majeur claim.

7                          **FIRST CAUSE OF ACTION, FALSE IMPRISONMENT**

8    87.  Plaintiff repeats and realleges paragraphs 1 through 86 as if fully stated

9    herein.

10   88.  Plaintiff and other passengers similarly situated were intentionally

11   confined by Defendant AA or AA's agents and employees in aircraft controlled on the

12   ground for over 3 hours and up to 11 hours on December 29th, 2006 after being diverted

13   from landing at DFW to airports at Austin, Texas and 16 other airports located in Arkansas,

14   Oklahoma, Missouri, Tennessee, Texas, and Louisiana.

15   89.  Any consent by plaintiff and other class members was revoked after 3

16   hours of confinement when Plaintiff and others similarly situated had their requests to exit

17   the aircraft denied by Defendant AA by its agents and employees and/or by Defendant AA

18   and its agents and employees holding Plaintiff and other class members. I) Obtaining

19   continued acquiescence by deception, fraud, deceit, mistake, and/or force or intimidation as

20   Defendant AA did for many class members is ineffective to constitute consent as a matter of

21   law.

22   90.  Plaintiff and other class members were conscious of said confinement and

23   were harmed by it.

24   91.  Said confinement was not a transitory or harmless confinement and was

25   unreasonable in the circumstances.

26   92.  Said confinement was unlawful and not privileged.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT
- C08-00732CW                                          16

93.  Said confinement was not based on safety or security or other lawful considerations, but rather for the financial benefit of AA and its employees and to the detriment of Plaintiff and other class members.

94.  Said confinement was complete and Plaintiff and others similarly situated had not reasonable means of escape.

95.  Said confinement was not based on any Federal aviation law or regulation, the order of any airport authority or federal and state agency or any government regulation, but was solely at the instigation of Defendants.

96. Said confinement was in violation of state criminal statutes including California Penal Code sections 236 and 237,  Texas Penal Code Secs. 20.02, 20.01, Code of Crim. Proc. Art. 11.22, Louisiana Stat. Criminal Code Sec. 14.46, Ark. Stat. Sec. 5-11-104, 103, Tenn. Stat. Sec. 39-13-302, Missouri Stat. Crimes & Punishment Secs. 565.120, 565.130.

97.  There is and was as of December 29th, 2006, no federal law or regulation governing lengthy confinements on the ground of passengers by air carriers.

98.  Said confinement was in violation of AA's own customer service commitment.

99.  Defendant AA had the power to safely return passengers to the airport terminal but refused to do so.

100.  Said confinement endangered the health and safety of Plaintiff and other class members.

101.  Defendant is guilty of false imprisonment of Plaintiff and other class members under the common law of the States of California, Texas, Arkansas, Oklahoma, Tennessee, Missouri, Louisiana and under Restatement of Torts Second at Section 35 et seq.

102.  As a result of the false and unlawful imprisonment of Plaintiff and other class members by Defendants, and the deprivation of her personal liberty and freedom in inhumane conditions, she and other class members suffered physical injury to the body,

1   mental suffering, inconvenience, out of pocket expenses, loss of earnings and business

2   opportunities, loss of enjoyment of life.

3         103.  The damages of Plaintiff and others similarly situated were proximately

4   caused by the acts and/or omissions of the Defendant AA.

5         WHEREFORE, Plaintiff prays for judgement as hereinafter set forth.

6   **SECOND CAUSE OF ACTION, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

7

8         104.  Plaintiff repeats and realleges paragraphs 1 through 103 as if fully stated

herein.

9

10        105.  Defendant AA's conduct was outrageous and extreme, especially as set

forth in paragraphs 19-26, 28-30, 39, 41, 44-51, 59 a c & e, 60, 77-80.

11

12        106.  Defendant AA acted in reckless disregard of causing emotional distress

to Plaintiff and a subset of other class members.

13

14        107.  Defendant AA knew or should have known that many of its passengers

15  were elderly, infirm, had pre-existing conditions that would be severely aggravated

physically or emotionally or both by the prolonged confinements that it inflicted on them in

16  over crowded conditions without adequate hydration, food, toilets, and breathable air.

17        108.  The acts and/or omissions of the Defendant were the actual and

18  proximate cause of emotional distress to Plaintiff and many other class members.

19        109.  The emotional distress caused by Plaintiff was severe, as especially

20  shown in paragraphs cited in paragraph 105 above.

21        110.  Plaintiff had been scheduled to return to work as a real estate agent

22  shortly after December 29th, 2006, after having been disabled from working due to the post

23  traumatic stress syndrome from a violent crime incident.

24        111.  But the actions of Defendants on December 29th and 30th, 2006 so re-

25  traumatized Plaintiff that she has been unable to return to work as a real estate agent or

26  similar employment where she had earned approximately $300,000 per year.

27

28

1      112.   Defendant AA is guilty of the tort of intentional infliction of emotional

2  distress.

3      113.   The acts and/or omissions of the Defendant as set forth above were the

4  proximate cause of damages to Plaintiff and others similarly situated.

5      WHEREFORE, Plaintiff prays for judgement as hereinafter set forth.

6                      **THIRD CAUSE OF ACTION, NEGLIGENCE**

7      114.   Plaintiff repeats and realleges paragraphs 1 through 113 as if fully stated

8  herein.

9      115.   Defendant is a common carrier offering air transportation to the general

10  public, and as such owed a high duty of care for the safety and protection of its passengers,

11  including Plaintiff and class members.

12      116.   This duty also created a special relationship between AA and Plaintiff and

13  required AA to affirmatively aid and protect Plaintiff and class members against unreasonable risk

14  of physical harm.

15      117.   This duty included a) not depriving Plaintiff and other similarly situated

16  passengers of their personal liberty by unjustified involuntary confinement in crowded conditions

17  on the ground in an aircraft for a lengthy period of time without adequate water, food, restroom

18  facilities, and breathable air at reasonable temperatures, b) not violating criminal laws of the states

19  regarding false imprisonment.

20      118.   This duty arises out of state common law, as summarized at Restatement of

21  Torts Second Section 314A, out of the general federal standard of due care to provide "safe and

22  adequate service" (49 U.S.C. 41702), and out of Fourth Amendment to the United States

23  Constitution providing for the right of people to be secure in their persons shall not be violated by

24  unreasonable seizures.

25      119.   Defendant breached its duties to Plaintiff and others similarly situated on

26  December 29th and 30th, 2006, and its conduct was in reckless disregard its duty owed to Plaintiff

27  and similarly situated passengers.

28

1    120.  Defendant's conduct was the proximate cause of damage and losses to the

2  Plaintiff and other class members.

3    121.  Defendant is guilty of negligence and/or gross negligence.

4    WHEREFORE, Plaintiff prays for judgement as hereinafter set forth.

5    **FOURTH CAUSE OF ACTION,  BREACH OF CONTRACT**

6    122.  Plaintiff repeats and realleges paragraphs 1 through 121 as if fully stated

7  herein.

8    123.  Defendant has filed with the US Department of Transportation, published on

9  its web site, and referenced on its tickets "conditions of carriage" and a "Customer Service Plan".

10    124.  The contract between the Plaintiff and other class members and Defendant AA

11  includes the following relevant terms and each were violated by Defendant AA as indicated below:

12    a) *"Your ticket and the following Conditions of Carriage constitute the Contract*

13  *between You, the Passenger, and American Airlines, Inc./American Eagle/American and apply to*

14  *all transportation provided by American (including transportation on codeshare Partners)*

15  *between points in the United States."*

16    b) *"American will endeavor to carry you and your baggage with reasonable*

17  *dispatch, but times and timetables or elsewhere are not guaranteed and form no part of this*

18  *Contract."*

19    AA failed to "endeavor" to carry Plaintiff and her baggage and other class members

20  with reasonable dispatch, and instead willfully chose to not carry its passengers or even permit

21  them to obtain timely alternate transportation by its lengthy on ground confinements of over 3

22  hours on December 29th, 2006.

23    c) *"If you decide not to use your ticket, and unless the ticket specifies otherwise,*

24  *American will issue a refund for the" unused portion*.  Plaintiff did not receive a refund as she used

25  all portions of her ticket, however, other class members who will be added as plaintiffs shortly, did

26  not receive refunds for unused tickets as alleged in paragraph 59 above.

27    d) *"American Airlines and American Eagle will provide customers at the airport*

28  *and onboard affected aircraft with timely and frequent updates regarding known delays,*

1  *cancellations and diversions and will strive to provide the best available information concerning*

2  *the duration of delays and to the extent available, the flight's anticipated departure time."*

3  Defendant AA in breach of this contract term by failing to strive to provide Plaintiff and other class

4  members with "best available information" concerning the duration of delays on December 29th,

5  2006 and as noted above by repeatedly supplying misleading and false information.

6         e) "*When cancellations and major delays are experienced, you will be rerouted on*

7  *our next flight with available seats*." Plaintiff and many other class members could have been

8  rerouted on other AA flights that were taking off from Austin and other airports with diverted

9  flights for DFW and other destinations or allowed to exit the aircraft when the diverted airport was

10  at or near their destination, but Defendant AA in breach of this contract term failed and refused to

11  do so on December 29th and 30th, 2006.

12         f) "*If the delay was caused by events within our control and we do not get you to*

13  *your final destination on the expected arrival day, we will provide reasonable overnight*

14  *accommodations, subject to availability*." Plaintiff and most other class members were not

15  provided with overnight accommodations in breach of this contract provision. On Plaintiff's flight

16  and several other flights the initial delay was caused by poor maintenance, by lack of available

17  aircraft or crew members, matters within the control of AA that resulted in such flights being

18  diverted instead of being able to land at DFW. The on ground confinements of over 3 hours were

19  within the control of Defendant AA and prevented most class members from reaching their final

20  destinations on the same day, however, Defendant AA also breached this contract term by failing

21  and refusing to provide overnight accommodations despite availability.

22         g) "*In extreme circumstances, it is possible that a flight will cancel while on the*

23  *ground in the city to which it was diverted. When this happens you will be rerouted on the next*

24  *American Airlines or American Eagle flight with available seats, or in circumstances on alterative*

25  *means of transportation, If we are unable to reroute you, reasonable overnight accommodations*

26  *will be provided by American Airlines or American Eagle, subject to availability."* Defendant AA

27  failed and refused to provide for or reimburse Plaintiff and most other class members for overnight

28  accommodations at diverted locations on December 29th, 2006 and in Dallas on December 30th,

1   2006 in breach of this contract term, or provide alternate transportation or reroute.  The great

2   majority of diverted flights from DFW on December 29th, 2006 were defacto canceled when they

3   did not fly to DFW and the flight crews left the aircraft.  The mislabeling of such flights as

4   "continued" the next day was an deceptive and unauthorized practice by Defendant AA to avoid its

5   obligations under this and other contract provisions.

6          h)    *"American Airlines and American Eagle will provide amenities for delayed*

7   *passengers, necessary to maintain the safety and/or welfare of certain passengers such as*

8   *customers with disabilities, unaccompanied children, the elderly and others to whom such*

9   *amenities will be furnished consistent with special needs and/or circumstances."*  Many class

10  members had special needs and circumstances including the Plaintiff and her family members, but

11  Defendant breached this provision of its contract by failing to provide such "amenities" as potable

12  water, adequate food, access to medications, baby formula, diapers, breathable air during the on

13  ground confinements of over 3 hours.

14         I)    *"In the case of extraordinary events that result in very lengthy onboard delays,*

15  *American and American Eagle will make every reasonable effort to ensure that essential needs of*

16  *food (snack bar such as Nutri-Grain), water, restroom facilities and basic medical assistance are*

17  *met."*  Defendant AA flagrantly breached this contract provision for Plaintiff and nearly all other

18  class members.

19         j) *"If a flight is oversold (more passengers hold confirmed reservations than there*

20  *are seats available), and you are denied boarding involuntarily at the airport, you will be entitled*

21  *to Denied Boarding Compensation from American Airlines…"  (and if American cannot arrange*

22  *alternate transportation for you to arrive within 2 hours of your scheduled arrival time, you will*

23  *be offered a payment of double the value of your flight coupon up to $400.)*  Defendant AA

24  breached this term of its contract with Plaintiff and many other class members when it denied her

25  boarding involuntarily on December 30th at the airport in DFW because the her flight to Mobile

26  Alabama was oversold and failed to pay her Denied Boarding Compensation.

27

28

1    125.  The Montreal Convention of 1999 supersedes the domestic contract of

2  carriage for Defendant AA and applies to all passengers whose trip includes a stop in a foreign

3  nation.

4    126.  Said Montreal Convention provides for a damage liability limit on a strict

5  liability basis for delays of passengers or baggage up to approximately $6,600, on a no fault basis.

6  Approximately 20% of the class members are expected to fall into this subclass and would be

7  entitled to special and consequential damages in addition to ordinary contracts damages for

8  Defendant's breaches up to $6,600 per passenger.

9    127.  Upon information and belief, the aforementioned documents form a contract

10  between the Defendant and Plaintiff and others similarly situated.

11    128.  Defendant's conduct on December 29th, 2006 and subsequent thereto breached

12  its Contract with Plaintiff and other class members and entitles them for domestic passengers to a

13  full ticket refund and the out of pocket expenses incurred to cover Defendant AA's contract

14  breaches, and for international passengers all reasonable and consequential damages up to $6,600

15  for the delay this sub-class suffered.

16    129.  As a result of Defendant's breach of contract, Plaintiff and others similarly

17  situated have sustained damages as more fully set forth below.

18    WHEREFORE, Plaintiff prays for judgement as hereinafter set forth.

19    **FIFTH CAUSE OF ACTION,  DECEIT/FRAUD**

20    130.  Plaintiff repeats and realleges paragraphs 1 through 129 as if fully stated

21  herein.

22    131.  Defendant AA controlled all information regarding flight delays and

23  conditions, had control over the person and baggage of the Plaintiff and other class members, and

24  as such had a special relationship and duty to convey accurately material information to Plaintiff

25  and other class members, and not conceal such information.

26    132.  Defendant AA under its Customer Service Commitments promised Plaintiff

27  and other class members that it would provide accurate and timely information on flight delays.

28

133.  These promises were on its web site and widely publicized by AA and filed with the United States Department of Transportation.

134.  AA has asserted publicly that these Customer Service Commitments which date to 1999 show that no federal regulation or state regulation was needed.

135.  Defendant AA through its flight crews and operations employees (Defendants Does 1-20) on December 29th, 2006 at the airports where it had diverted 124 flights including the flight involving plaintiff at Austin, plus Abilene, Lubbock, Houston, San Antonio, Wichita Falls, Midland, Longview, Texas; Little Rock, Arkansas; Memphis, Nashville, Tennessee; Oklahoma City, Tulsa, Oklahoma; St. Louis, Springfield, Missouri; and New Orleans, Shreveport, Louisiana repeatedly represented to Plaintiff and other class members that the aircraft they were confined to would take off, return to the airport terminal, and/or they would be allowed to exit the aircraft shortly.

136.  These representations were both material and false, and including the statements set forth in paragraphs 8, 11, 12, 13, 14, 15, 18, 24, 27, 29, 34, 35, 62, 64, 69, 80, 86 above.

137.  Defendants knew that these representations were false or that they were being made with reckless disregard for their truth or falsity.

138.  Defendants intended to deceive and induce Plaintiff and other class members to rely on these representations.

139.  Plaintiff and other class members reasonably relied on these false representations to their detriment.

140.  Had Defendant AA told the truth and acted reasonably the Plaintiff and other passengers most would have been able to arrange for alternate transportation to their destinations the same day or the next day.

141.  Plaintiff and other class members sustained injury and loss as a direct result of their reliance on these representations and have been damaged thereby.

142.  Defendant sought to deceive and defraud Plaintiff and others similarly situated for Defendant's pecuniary gain, and specifically with intent to fraudulently invoke a Force Majeure

1  clause in its contract with Plaintiff by falsely asserting a weather emergency as justification for the

2  extreme delays, confinements, and other mistreatment of passengers and to avoid other liabilities to

3  Plaintiff for its misconduct.

4          143.  Defendant is guilty of deceit and fraud.

5          144.  As a result of the above acts and/or omissions of the Defendant, Plaintiff and

6  others similarly situated have sustained damages as more fully set forth below.

7          WHEREFORE, Plaintiff prays for judgement as hereinafter set forth.

8          **SIXTH CAUSE OF ACTION, CONVERSION**

9          145.  Plaintiff repeats and re-alleges paragraphs 1 through 144 as if fully set forth

10  herein.

11          146.  Defendant AA wrongfully exercised dominion over the baggage of Plaintiff

12  and other class members when it refused to return their baggage to them that was readily available

13  to be returned to Plaintiff and other class members on December 29th and 30th, 2006.

14          147.  Plaintiff and other class members were damaged thereby and some were

15  endangered by being denied access to necessary medications.

16          148.  Defendant AA is guilty of the tort of conversion.

17          WHEREFORE, Plaintiff prays for judgement as hereinafter set forth.

18          **SEVENTH CAUSE OF ACTION, CIVIL CONSPIRACY**

19          149.  Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 148 as

20   if fully set forth herein.

21          150.  Defendants AA and Doe #1 one Al Tinsley, and Doe #2 and others, consisting

22  of the operations managers of AA on duty on December 29th and 30th, 2006 and Does consisting of

23  the executive officers of AA, upon information and belief, agreed to participate in an unlawful acts

24  of  false imprisonment coupled with fraud and deceit, and intentional infliction of emotional

25  distress.

26          151.  As a result of this conspiracy, Plaintiff and other class members were injured

27  and suffered damages and losses.

28

1    152.  Unlawful overt acts done in furtherance of this agreement included

2    coordination with the operations managers at 17 or more airport locations where aircraft were

3    diverted from DFW on December 29th, 2006 to involuntarily confine passengers for 3 to 11 hours

4    in AA aircraft on the ground.

5            WHEREFORE, Plaintiff prays for judgement as hereinafter set forth.

6    **EIGHTH CAUSE OF ACTION, CIVIL RICO COMPLAINT  UNDER 18 U.S.C. SECTION**

7    **1961 ET SEQ**

8            153.  Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 152 as

9    if fully set forth herein.

10           154.  Defendants engaged in a pattern of racketeering activity affecting interstate

11   commerce in the conduct of its enterprise by violating criminal laws against wrongful

12   imprisonment and reckless endangerment through lengthy involuntary confinements of passengers

13   on numerous occasions over the past ten years.

14           155.  A list of predicate acts illegal acts is set forth in paragraph 60 above.

15           156.   Plaintiff and some other class members were injured in their business or

16   property proximately caused by such racketeering activity, as but for Defendants illegal acts on

17   December 29th, 2006, she would have been able to re-establish her real estate business.

18           157. Plaintiff and some other class members were damaged by Defendant's

19   racketeering activity and are entitled to threefold damages sustained, the costs of this suit including

20   a reasonable attorney's fee pursuant to 18 USC Sec. 1964 ( c) and other federal statutes.

21                              **DAMAGES/RELIEF SOUGHT**

22           WHEREFORE, Plaintiff prays for damages as follows:

23           158.  Plaintiff repeats and realleges paragraphs 1 through 100 as if fully stated

24   herein.

25           159.  Plaintiff is a consumer and class representative of all others similarly situated

26   who suffered losses and were damaged by Defendant's misconduct on December 29th and 30th,

27   2006 in the aforementioned diversions from Dallas (DFW) airport and the subsequent, delays,

28   injuries, confinements, and indignities suffered as a result of Defendant's conduct.

1      160.  The Plaintiff seeks individual damages in excess of $75,000 plus an amount

2  in excess of  $5,000,000 for the proposed class for false imprisonment, intentional infliction of

3  emotional distress,  negligence, breach of contract, fraud and deceit, conversion, conspiracy and

4  Civil RICO for compensatory, special, actual, and consequential damages, plus exemplary and

5  punitive damages.

6      161.  Punitive damages are warranted in this case as the acts and/or omissions of the

7  Defendant were intentional and the Defendant knew, or in light of the surrounding circumstances

8  ought to have known, that its conduct would naturally and probably result in injury and yet the

9  Defendant continued this course of conduct with malice or in reckless disregard of the

10  consequences from which malice may be inferred.

11      162.  The Defendant, motivated by greed and a desire for profit, continued the

12  actions as set for above in reckless disregard of the consequences from which malice may be

13  inferred.

14      163.  The Defendant continues the practices detailed above and therefore punitive

15  damages are necessary in order to deter like conduct in the future.

16      164.  Plaintiff also seeks the opportunity to be heard as to being named

17  representative of a class of all passengers similarly situated and will seek an incentive amount for

18  such representational duties as the court may determine.

19      165.  Wherefore, Plaintiff requests that this honorable Court appoint the Plaintiff as

20  class representative, certify this case a class action pursuant to the Federal  Rules of Civil

21  Procedure, order the Defendant to preserve all records relating the incidents complained of, and

22  otherwise issue orders and relief as the court deems just and proper in the circumstances.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

166.  Plaintiff also requests attorney fees, expenses, costs, disbursements, and interest as provided by law.

Dated: April 15, 2008                    LAW OFFICES OF PAUL S. HUDSON PC
                                         LAW OFFICES OF DAVID G. RAMOS


                                         By: _____/s/_____
                                                David G. Ramos
                                         Attorneys for Plaintiff KATHLEEN HANNI
                                         Individually and on behalf of all others
                                                similarly situated


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.


Dated: April 15, 2008                    LAW OFFICES OF PAUL S. HUDSON PC
                                         LAW OFFICES OF DAVID G. RAMOS


                                         By: _____/s/_____
                                                David G. Ramos
                                         Attorneys for Plaintiff KATHLEEN HANNI
                                         Individually and on behalf of all others
                                                similarly situated