1 | PAUL S. HUDSON (admitted pro hoc vice)
LAW OFFICES OF PAUL S. HUDSON P.C.
2 | 4411 Bee Ridge Road #274
 globetrotter1947@hotmail.com
3 | Sarasota, Florida 34233
Telephone: 410-940-8934
4 | Facsimile: 240-391-1923

5 | DAVID G. RAMOS (Bar No. 116456)
LAW OFFICES OF DAVID G. RAMOS
6 |  barram@i-cafe.net
3266 Villa Lane
7 | Napa, California  94558
Telephone:  707-255-1700
8 | Facsimile:  707-255-3660

9 | Attorneys for Plaintiff KATHLEEN HANNI.
Individually and on behalf of all others similarly situated

10

11

12 | UNITED STATES DISTRICT COURT

13 | NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

14

15 | KATHLEEN HANNI, individually and on )    No.         C08-00732 CW
16 | behalf of all others similarly situated,  )
                                           )
17 |             Plaintiff,                  )    **MEMORANDUM OF POINTS AND**
                                           )    **AUTHORITIES IN OPPOSITION TO**
18 | v.                                      )    **DEFENDANT'S MOTION TO DISMISS**
                                           )    **PLAINTIFF'S FIRST AMENDED**
19 | AMERICAN AIRLINES, INC.; and DOES 1 )    **COMPLAINT**
through 20, inclusive,                   )
20 |                                        )    Date: July 10, 2008
             Defendants.                   )    Time: 2:00 p.m.
21 |                                        )    Courtroom: 2, 4th Floor
                                           )
22

23

24

25

26

27

28

TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

I.  Improper Re-argument of Preemption in Violation of Local Rules
and the Law of the Case. ...................................................................................1

II.  The non-preemption arguments for dismissal of the First through Sixth Causes of Action for
failure to state a claim are without merit.......................................................4

         A.   Breach of Contract...........................................................................4

         B.  Fraud/Deceit.....................................................................................6

         C. False Imprisonment..........................................................................8

         D.  Intentional Infliction of Emotional Distress.............................10

         E.  Negligence.......................................................................................11

         F.  Conversion.......................................................................................12

         G.  Civil Conspiracy.............................................................................14

         H.  Civil RICO.......................................................................................14

III.  Conclusion ..............................................................................................14

1

**TABLE OF AUTHORITIES**

2

**CASES**                                                          **PAGE**

3

*Air Transport Association of America, Inc. v Cuomo*, 520 F.3d 218

4
(2nd Cir. 2008) 07-5771cv…………………………………………………………8

*American Airlines v Wolens*, 513 U.S. 219, 230 (1995)……………………….....4

5

6

7
*In re Air Crash at John F. Kennedy Intern. Airport on June 24, 1975,*
635  F.2d 67, 74 (2nd Cir. 1980) ............................................................8

8

9
*Montalvo v Spirit  Airlines*, 508 F.3d 464 (9th Cir. 2007)…………..……………..11

10

11

**CONSTITUTION**

12
U.S. Const. Fourth Amendment……………………………………………… 11

13

14

**STATUTES & RULES**

15
49 U.S.C. Sec. 41713(b)(1)…………………………………………………….4

16
Fed Rule of Civil Procedure 8.....................................................................7

17
Fed Rule of Civil Procedure 9b...................................................................7

18
Fed Rule of Civil Procedure 26...................................................................7

19
14 C.F.R. Sec. 121.533(d)…………………………………………………….8

20
14 C.F.R. Sec. 91.13(a)…………………………………………………….8, 12

21
14 C.F.R. Sec. 254.4……………………………………………………….8

22
Local Rule 7-9...................................…………………………1, 2, 3, 4, 14

23

24
OTHER

25
Restatement Torts 2nd 41-59.....................................................................9

26
Restatement Torts 2nd 300, 314A...............................................................8

27

28

Plaintiff Kathleen Hanni submits this memorandum of points and authorities in opposition to Defendant American Airlines, Inc.'s motion to dismiss.

## I. Improper Re-argument of Preemption in Violation of Local Rules and the Law of the Case.

In this second motion to dismiss the complaint based largely on preemption arguments, Defendant American Airlines Inc. (AA) repeats with more heat the same arguments previously considered and rejected by the Court in its first motion to dismiss. Those arguments were that the complaint is barred by federal preemption under the Airline Deregulation Act of 1978 (ADA) and/or the Federal Aviation Act.

The Court ruled and issued a detailed Order with findings on these arguments after the issues were exhaustively briefed and following oral arguments. AA never sought an interlocutory appeal, and never sought reconsideration under Rule 59 or 60b of the findings and holdings in the Court's order of April 25, 2008, which rejects the same preemption arguments.

Notwithstanding this Court's Order which rejected these arguments, AA "requests that the Court revisit its analysis starting on page 13, line 21, and continuing through page 14, line 21 of the Order..." The only reason given for this blatant attempt to reargue a matter (whether preemption applies to the torts set forth in the complaint) previously decided by this Court in its interlocutory order is counsel's "regret in not briefing the issue more fully." See Defendant Memorandum at p. 6, lines 24-28 –page 7, line 1.

This court has strict local rules that regulate motions for reconsideration and prohibit repetition of arguments previously made.

Under Civil Local Rule 7-9, "no party may notice a motion for reconsideration without first obtaining leave of the Court to file the motion." And in a motion for leave, the "*moving party must specifically show:*

> *1. "a material difference in fact or law exists from that which was presented to the court before entry of the interlocutory order from which reconsideration is sought. The party must also show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or*
>
> *2. The emergence of new material facts or a change of law occurring after the time of such order; or*

*3. A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order."*

Local Rule 7-9(c) **Prohibition Against Repetition of Argument**, proscribes the rehashing of arguments which have been previously ruled upon.

*"No motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party seeks to now have reconsidered. Any party who violates this restriction shall be subject to appropriate sanctions."*

Defendant's argument in support of preemption does not cite or rely on any new authority nor on any authority not previously cited to the court. Nor has the Defendant alleged the emergence of any new facts. Defendant has merely repackaged, and now reargues, the same issue this court has definitively ruled upon.

As noted in the accompanying Declaration of Paul S. Hudson, par. 2, AA counsel were advised by Plaintiff counsel of this violation of local rules but decided to ignore them and refused to withdraw their motion or to even belatedly comply with Local Rule requirements.

Local Rule 7-9 was completely and willfully ignored by Defendant's counsel in the Defendant Memorandum which is largely devoted to re-argument of the preemption issue. Specifically, Defendant's Memorandum argues previously decided preemption issues at III A 1 (pages 3-6)"False Imprisonment Claim is Federally Preempted"; 2 (pages 6-9) "Federal Law Preempts Both State Statutory and Common Law Claims"; B (page 13, lines 3-8) "Second Cause of Action: Intentional Infliction of Emotional Distress"; C (page 14, line 1 and page 15, lines 1-14) "Third Cause of Action Negligence"; E 1 (page 20, lines 9-28, page 21, lines 1-2) "Plaintiff's Claims for Deceit/Fraud Are Preempted"; and in Defendant's Notice of Motion to Dismiss at p. 2, lines 4-10. Accordingly, at a minimum, these portions of the Defendant's Memorandum and Notice of Motion should be stricken as they constitute an impermissible motion for reconsideration filed without leave of the Court in violation of local rules.

Under the law of the case doctrine, where an issue has been decided explicitly or implicitly, as here, that decision should continue to govern the same issue in subsequent proceedings in a case. *Murdoch v Castro*, 489 F.3d 1063, 1068 (9th Cir. 2007). The court is

1    ordinarily precluded from reexamining an issue previously decided by the same court.

2    *Minidoka Irrigation District v Department of Interior* 406 F.3d 567, 573 (9th Cir. 2005). A trial

3    court may not reconsider even its own decision, absent a situation where the first decision was

4    a) clearly erroneous, or b) there has been an intervening change of law, or c) other changed

5    circumstances, or d) a manifest injustice. *United States v Alexander*, 106 F.3d 874, 877-7 (9th

6    Cir. 1997)   None of these tests are met or even alleged by Defendant here. The specificity of

7    the Court's April 25 Order confirms that the preemption issue was actually and fully considered

8    and decided, baring the current argument under the law of the case doctrine. *Hydrick v. Hunter*

9    500 F.3d 978, 986. (9th Cir. 2007).

10        Here the Court has previously explicitly decided that preemption does not bar claims for

11    false imprisonment, intentional infliction of emotional distress, negligence, fraud, and breach

12    of contract. See Order of April 25th, 2008 at page/line(s) 14/11-13 (to extent not controlled by

13    specific regulations, pf. claims not preempted); 14/20-21 (claims re lodging, meals, substitute

14    transportation due to bad weather preempted); 15/9-11 (contract claims preempted to the extent

15    based on implied covenant of good faith and fair dealing); 17/15-18, 23-27 (False Imprisonment:

16    allegations sufficient for withdrawal of consent; must allege facts sufficient to establish Def.

17    lacked legal authority to keep Pf. on plane);18/1-3; 20-27 (IIED: conduct described not

18    sufficiently extreme, insufficient allegation that Def. acted with intent); 19/1-6 (Negligence: must

19    allege facts sufficient to create a duty beyond that created by contract), 11-20, 25-27; 20/1-15

20    (Contract: further detail required re Def. failure to comply with specific terms of contract of

21    carriage); 21 (Fraud: the who, what, when where of misconduct and assertion of detrimental

22    reliance)

23        Accordingly, Defendants preemption arguments which seek to have the false

24    imprisonment, intentional infliction of emotional distress, negligence, and fraud causes of action

25    dismissed based on preemption must be considered as a motion for reconsideration under Rule

26    60b and must meet the tests set forth in Local Rule 7-9 to the court's satisfaction, as a

27    prerequisite to filing a motion.   As none of these tests have been met or in any way addressed

28    in the current motion, Defendant's arguments of preemption must be summarily rejected.

1    However, should the Court somehow see fit to entertain these preemption arguments

2  notwithstanding the gross violation of Local Rule 7-9, seeking to overturn this Court's prior

3  findings, it is respectfully requested that the Court grant Plaintiff  a reasonable time to file a

4  supplementary brief to respond to the preemption re-arguments in this motion.  They are not

5  responded to here, except in passing, as to do so would implicitly excuse their improper use in

6  this motion to overturn the Court's prior findings in its Order of April 25th, 2008.

7    Should it wish to request reconsideration of this Court's April 25th Order on preemption,

8  Defendant should file a motion for leave as required by Local Rule 7-9.

9  **II. The non-preemption arguments for dismissal of the First through Sixth Causes of Action for**

10  **failure to state a claim are without merit.**

11    As to the arguments of deficiencies in the causes of action in the First Amended

12  Complaint ("FAC"), they are borderline frivolous or are in the nature of defensive pleas that

13  cannot be the basis for dismissal at this stage of the litigation.

14  **A.  Breach of Contract.**

15    AA argues that the fourth cause of action for breach of contract should be dismissed

16  because it pleads general damages and the contract excludes special and consequential

17  damages.

18    General contract damages include a) the consideration paid (here the ticket price) and/or

19  b) the out of pocket costs to cover the breach of contract expenses caused by and naturally

20  flowing from the AA breaches,  such as failure to provide overnight lodging as promised in

21  circumstances of excessive delay, and c) potentially lost profits. Damages were also specifically

22  pled which are not excluded by the contract of carriage.  See First Amended Complaint (FAC)

23  Par. 124j-126, 128.  These contract promises were voluntary undertakings of Defendant that

24  Plaintiff paid consideration for.  They were placed in the contract of carriage by the Defendant

25  who solely drafted it, and are not based on any specific regulations.  Under *American Airlines,*

26  *Inc. v Wolens,* 513 U.S. 219 (1995) such contract claims are not preempted.

27    The contract here does not exclude general contract damages.  See *MRO v AT&T*, 205

28  F.3d 1351 (9th Cir. 1999) [General damages are defined as the market value of the thing

1  promised, gains expected or loss produced]; *Valve Corp. v Sierra Entertainment Inc.*, 431 F.

2  Supp. 1091, 1101 (WD Wash. 2004); *American General Corp. v Continental Airlines*, 622 A.2d

3  1, 8 (Del.Ch. 1992) [general contract damages must put the claimant in as good a position as

4  he would have been if the contract had been performed]; *Continental Holdings Ltd. v Leahy*,

5  132 SW3d 441, 475 (Tex. App.-Eastland 2003)[direct or general contract damages may or may

6  not include lost profits even where indirect, special or consequential damages are excluded, it

7  depends on the circumstances, especially the intention of the parties]; See gen. 22 Am Jur.2d

8  Damages Sec. 41 (2004).

9      It is not required in a pleading for a Complaint to negate or disprove every potential

10  affirmative defense that a defendant could possibly allege.  In the breach of contract cause of

11  action, each specific contract clause violated is set forth, the way it was violated is specified,

12  and the allegation that the plaintiff was damaged and an entire section on damages is provided.

13  This specification easily satisfies the requirement in the Court's Order that this cause of action

14  include the specific terms of the contract that Plaintiff alleges were breached by Defendant.

15      Contrary to AA's assertion it is relevant and proper for plaintiff to set forth the fact that

16  approximately 20% of the proposed class were international travelers whose rights for delay are

17  set forth in an international treaty known as the Montreal Convention of 1999 since plaintiff is

18  suing not just individually but "on behalf of all others similarly situated" in a representational

19  capacity. Par. 125-6.  A copy of the Montreal Convention of 1999 is attached hereto as

20  Appendix 2.  A class action requires that the class members have similar or the same claims.

21   A section was added to the complaint setting forth fact allegations regarding the class, which

22  is both relevant and appropriate to more than one of the causes of action.  Damages for delay

23  include "inconvenience" up to $6,200.  See *Harpalani v Air India*, 622 F.Supp. 69 (ND Ill.

24  1985) [delay and involuntary confinement for 2 hours compensable]; *Daniel v Virgin Atl.*

25  *Airways*, 59 F. Supp.2d (ND CA 1998).  FAC Par. 75-86.

26      Similarly, the allegations that the causes for the on ground delays were within the control

27  of AA are relevant in that AA has alleged in its brief that the delays were not within its control

28  or were caused by Acts of God, thereby setting up a defense of  Force Majeur or impossibility

1   to being held accountable for its failure to meet its contract obligations.  The fact that AA did

2   not "guarantee" schedules or that it qualified many of its contract promises to passengers with

3   words like "subject to availability", "will make every reasonable effort" or "endeavor" does not

4   mean that such promises were nullities. Whether or not AA used best efforts as the contract

5   provides for  and which Plaintiff alleges it did not is ultimately an issue of fact, not one to be

6   decided on a motion to dismiss before an answer has even been filed.

7           As to overbooking compensation, contrary to AA counsel's speculation, the FAC alleges

8   that Plaintiff arrived at the gate 20 minutes before departure (FAC Par. 39), not at the airport, and

9   certainly had a boarding pass as such is required to go through security and therefore timely

10  presented herself for boarding.  Furthermore, contrary to AA counsel's inference, there is no

11  requirement in the contract or otherwise that Plaintiff file a claim with AA for overbooking

12  compensation and be turned down prior to filing a complaint in court for breach of contract.

13          As to special needs which the contract provides for, contrary again to AA counsel's

14  speculation, the FAC Par. 29 alleges that Plaintiff informed Captain Fodero of her post traumatic

15  stress, and that she was having chest pains and a panic attack whereby Captain Fodero said that

16  even if she had a heart attack they (AA) would not allow passengers off the airplane.

17  **B. Fraud/Deceit**.

18          AA argues the fraud cause of action should be dismissed because the complaint does not

19  say how the Plaintiff will prove the alleged fraud and does not plead with enough particularity.

20          There is no such pleading requirement that Plaintiff include a proffer of proof in a fraud

21  complaint.  However, the proof of the fraud will be made in discovery and a preview of such

22  is contained in the accompanying declaration of Paul s. Hudson at par. 3.

23          The Court's Order has been satisfied by the FAC by a) providing in great detail the

24  persons who made the material false statements, what their statements were, when and where

25  the statements were made (See FAC par. 139, 140), and b) by Plaintiff's allegation that she relied

26  to her detriment on these false statements.  See FAC Par. 130-136, 8,11-15, 18, 24, 27, 29, 34,

27  35, 62, 64, 69, 80, 86.

28

1    Had Defendant not lied to plaintiff and the other similarly situated passengers and

2  disclosed the material fact that it was holding them on the ground for its own pecuniary gain,

3  and/or due to lack of personnel, and that they were not going to take off in the foreseeable

4  future, rather than promulgating the false excuse of bad weather, there is no doubt that

5  passengers would have been able to exit the aircraft in less than the approximately 10 hours that

6  plaintiff and many others were forced to endure confinement on the ground in aircraft at remote

7  locations until the flight crews had run out their duty time and flight pay, even if they had to call

8  911 to obtain a rescue by the police.

9    The fact that Plaintiff cannot identify all the names of the captains in other aircraft or the

10  name of the operations management outside of Austin but has described them by description

11  and they are identified as Does in the FAC is sufficient to inform AA of the nature of the

12  complaint and is sufficient for this pleading, particularly since AA is solely in control of this

13  information and since it has so far refused to provide the automatic initial disclosure required

14  by Fed. Rules of Civ. Proc. 26(a)(1) that it disclose the names, addresses and phone numbers of

15  each individual likely to have discoverable information regarding the matters complained of in

16  the complaint, it is estopped from asserting that the complaint should be dismissed based on

17  missing information that it solely possesses and has wrongfully refused to provide to Plaintiff.

18   See accompanying declaration of Paul S. Hudson at par. 4.

19    The requirement of particularity in FRCP 9(b) must be read in conjunction with FRCP 8,

20  which specifies that pleadings are to be "short", "plain", "simple" and "direct" and "must be

21  construed so as to do justice".  Alternate allegations and claims, even if inconsistent are also

22  authorized under FRCP 8(d).  Accordingly Defendant AA's counsel assertion that the fraud claim

23  should be dismissed based on his perceived inconsistency between allegations of detrimental

24  reliance in the fraud cause of action and revoking consent to remain on the aircraft in the false

25  imprisonment cause of action is without merit.

26    Furthermore, the pleading rules for particularity for fraud are relaxed where a special

27  relationship is pleaded as has been done in the FAC  (see FAC par. 131) that the Plaintiff's

28  person was within the sole control of the Defendant AA, and the Defendant also controlled all

1  information during the flight and confinements, unlike a normal arms length relationship.  See

2  Restatement 2nd Torts 300 (Conscious misrepresentation involving risk of physical harm or

3  emotional distress if 1) Defendant knows statement is false, or 2) Defendant has not the

4  knowledge he proclaims); 314A (Special relationship between common carrier and passenger).

5  **C. False Imprisonment.**

6         1. In challenging the first cause of action for false imprisonment, AA makes the argument

7  that the claim is preempted by virtue of the fact that the criminal laws of California and Texas

8  prohibit AA's alleged conduct.

9         This argument is frivolous on its face.  There is no case law so finding that state criminal

10  laws have ever been found preempted by the ADA or Federal Aviation Act, and in a recent

11  Second Circuit case, the court went out of its way to reaffirm the non-preemption of a state

12  statute with criminal penalties for reckless operation of aircraft and the non-preemption of state

13  common law tort actions.  See *Air Transport Assn. v Cuomo*,  520  F.3d 218 at II, par. 2, last

14  sentence  (2nd Cir. 2008) noting that the Federal Aviation Act "does not preempt all state tort

15  actions" citing 49 USC 40120( c) [savings clause] and re-affirming its holding in *In re Air Crash

16  at John F. Kennedy Intern. Airport on June 24, 1975*, 635  F.2d 67, 74 (2nd Cir. 1980)  which

17  upheld a New York State statute (Gen. Business Law Sec. 245(1)) prohibiting operation of

18  aircraft in a careless or reckless manner with criminal penalties against a preemption challenge.

19         2.  In challenging the false imprisonment cause of action AA further argues that Federal

20  regulations authorize confining passengers on the ground in the circumstances alleged in the

21  complaint.

22         The only regulations cited ( 14 CFR Secs. 121.533(d) and 91.3) merely provide the pilot

23  with the power and final authority to control the operation of the aircraft and to be responsible

24  for the safety of passengers.  Granting a power or authority does not immunized AA from

25  unreasonable, tortious or criminal conduct, or unlawful exercise or abuse of that power by its

26  employee(s) or from intentional or negligent torts committed by it against passengers.  Nor does

27  it negate AA's responsibility to exercise due care as a common carrier toward its passengers.

28  A pilot or airline that tortiously imprisons passengers against their will on the ground for an

1  extended period of time without legal justification of safety or security or for any reasonable

2  purpose relating to maintaining flight operations and schedules, without any FAA Air Traffic

3  Control or airport authority direction or other legal authority as alleged here in the Complaint

4  (see FAC par. 91, 92, 93, 95, 96), is unlawful.  Both the employee captain and an airline

5  employer are liable in tort and under the doctrine of respondeat superior.

6       The regulation cited at ft.1 in Defendant's Memorandum, is, as the Court can see by its

7  terms, solely concerned with data gathering on tarmac confinements (which had often gone

8  unreported in DOT flight delay statistics) and the study of the problem and does not in any way

9  regulate confinements, which is now left to the common law and state criminal statutes.

10      Furthermore, to the extent that Defendant AA claims that confining passengers on the

11  ground for this extended period was acting at the behest of government authority, the 4th

12  Amendment to the US Constitution guarantees the right of the people to be secure against

13  "unreasonable seizure" by someone acting under color of federal or state law.

14      Moreover, confinement based on submission to asserted legal authority, mistake, fraud,

15  deceit or under threat of arrest is not legal consent.  Restatement Torts Second Sec. 41-59.

16      Based on the AA reasoning, as recently noted by the US District Court in a decision

17  issued June 2, 2008 in the related case of *Ray v American Airlines, Inc.* at page 26  ft. 2 (copy

18  affixed hereto as Appendix 1), an AA pilot could hold passengers for 11 days instead of 11 hours

19  without AA being in any way liable.

20      3.  Finally AA argues the cause of action for false imprisonment should be dismissed

21  because the reason for the 10 hour confinement was weather and this also excuses the airline

22  from its contractual obligations.

23      This affirmative, fact based defensive plea is directly contradicted by the fact allegations

24  in the complaint that assert weather as a reason was falsely asserted by AA to avoid its

25  obligations under conditions of lengthy delays and diversions.  See FAC Par. 64, 65, 67-69, 136,

26  142.  Factual allegations in the FAC must be taken as true for purposes of a 12b6 motion.

27  Accordingly, this reason for dismissing the complaint is meritless.

28

1        In sum, the false imprisonment cause of action of the FAC satisfies the Court's Order that

2   the Complaint state that there was not legal justification or privilege for the lengthy

3   confinements.  The Defendant has not cited any regulation or other FAA or other government

4   directive that grants the Defendant a privilege or justification.  Furthermore, as noted in the

5   accompanying declaration, highly placed FAA Air Traffic Control officials have recently

6   confirmed that the FAA is normally not involved in decisions by airlines to hold passengers on

7   the ground in aircraft.

8   **D. Intentional Infliction of Emotional Distress.**

9        AA argues the cause of action for infliction fo emotional distress fails to allege sufficiently

10  extreme conduct by AA and fails to sufficiently plead that AA acted with the intent of causing

11  distress.

12       The FAC alleges, as required by the Court's Order, in more than adequate detail the

13  extreme nature of the Defendant's conduct and provides numerous new examples of outrageous

14  and extreme conduct, see FAC par. 19-26, 28-30, 39, 41, 44-51, 59, 60, 77-80.

15       The allegations at par. 106 and 107 of the FAC that AA acted in reckless disregard of

16  causing emotional distress is sufficiently plead and is established by the allegations that Captain

17  Fodero, and other pilots, were witnessing first hand the distress being caused by the lengthy

18  confinements and were reporting them to AA's operations managers, including Al Tinsley at the

19  Austin airport where Plaintiff was confined.  Also the Plaintiff directly reported her distress to

20  Captain Fodero who stated that even if she had a heart attack, AA would not let the passengers

21  exit the aircraft.   This is legally sufficient to show intent by AA to cause emotional distress as

22  the Court's Order required.  See FAC Par. 20, 23,25,26,28,29,30,31.

23       The FAC also details the severe nature of the distress, the symptoms, and damages caused

24  by AA's conduct.  These details show that the Plaintiff suffered mental suffering, fright, anxiety,

25  and a relapse of post traumatic stress disorder.  The FAC meets the standard that the distress be

26  severe and the conduct extreme.  See *Hailey v Cal. Physicians Serv.*, 158 Cal. App. 4th 452 (Cal.

27  Ct. App. 4th Dist. 2007). While the court must rule on whether evidence of Severe Emotional

28

1   Distress can be found, it is for the jury the determine whether the evidence of Severe Emotional

2   Distress in fact exists.  See Restatement Torts Second Sec. 46 et seq.

3        Significantly, in the related case of *Ray v American Airlines, Inc.*, the District Court (WD

4   Arkansas) recently found with much less detail in the Complaint than contained in the FAC here

5   that the AA conduct alleged was sufficient to sustain a cause of action for intentional infliction

6   of emotional distress or outrage against a 12 b 6 motion to dismiss.  See Appendix 1 at p.30-31.

7   **E. Negligence.**

8        AA argues the negligence cause of action fails to allege a duty by AA beyond the terms

9   of the contract of carriage and/or is preempted as safety related.

10        Defendant's reliance on *Montalvo v Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. 2007) in

11   support of its preemption argument is misplaced as the holding is clearly inapposite.  That case

12   found that state or common law duties to warn of deep vein thrombosis were preempted

13   because the federal government had issued detailed regulations in this area.  Here it is admitted

14   that there is no federal regulation of on ground confinements by airlines.  Moreover, the

15   *Montalvo* court did not dismiss a claim for negligent design of seats as preempted because there

16   was no showing that such a claim would interfere with federal regulation.

17        As to duty beyond those things in the Contract of Carriage, the FAC properly alleges, and

18   AA does not dispute, the existence of a common law duty of AA as a common carrier to its

19   passengers of a high level of due care for the protection.  See case citations at Restatement of

20   Torts Second Sec. 314A.  In California, common carriers are held to the "utmost care and

21   diligence of very cautious persons as far as human care and foresight can go and are responsible

22   for injuries occasioned by the slightest neglect against which human care and foresight might

23   have guarded."  Simmons v. F. W. Woolworth Co. 163 Cal.App.2d 709, 710 (1958).  Another

24   legal basis for this duty is the 4th Amendment to the US Constitution which protects against

25   unreasonable seizures and provides for people to be secure in their persons, frompersons acting

26   under color of state or federal law.  This duty was also not disputed by Defendant.

27        Contrary to Defendant's assertion, violation of federal air safety standards has been  held

28   to be either negligence per se or, at a minimum, evidence of negligence in aviation tort cases.

1   See 14 CFR 91.13 (No person shall operate an aircraft in a careless or reckless manner so as to

2   create a risk to the life or property of any person); *Beach Aircraft Corp. v US*, 51 F.3d 834 (9th

3   Cir. 1995); *Management Activities Inc. v US*, 21 F.Supp.2d 1157 (CD CA 1998); *Campbell v*

4   *Keystone Aerial Surveys, Inc.*, 138 F.3d 996 (5th Cir. TX 1998).

5          Plaintiff has clearly satisfied the Court's Order on the issue of alleging a duty not included

6   in the contract of carriage.  See FAC par. 115-118.

7   **F. Conversion.**

8          1.  AA argues that baggage handling is preempted from the conversion cause of action

9   and governed by the terms of the contract of carriage.

10          In fact, the common law of bailment is not modified by federal regulation except that the

11   right of airlines by contract to limit their liability for delayed or lost baggage has been restricted

12   by federal regulation and international treaty.   Neither the contract of carriage nor federal

13   regulation cover the situation as alleged here, where the Defendant willfully refused to return

14   baggage in its immediate possession and to hold it hostage, so that it can coerce passengers not

15   to obtain alternate transportation and to come back the next day and remain a customer of AA.

16          The Federal regulation cited by AA, 49 USC 41713(b)(1) (miscited as 47 USC Sec.

17   41713(b)(1)), is merely the general ADA preemption clause which says "a State may not enact

18   or enforce a law... related to a price, route or service of an air carrier."  There is no specific

19   preemption of the common law of bailment, especially as it relates to the intentional acts

20   alleged here in withholding the return of baggage at the Austin Airport after passengers were

21   finally allowed to exit the aircraft and where the Plaintiff was imprisoned on for over 9 hours

22   on the ground.  AA has made no showing how a conversion action here would impact on its

23   price, routes or service.

24          Indeed the only federal regulation with any applicability is 14 CFR Sec. 254.4 which

25   provides that no air carrier may limit by contract its liability for mishandled baggage to an

26   amount less than $2,800 per passenger on domestic flights.

27

28

1   While AA's contract of carriage seeks to limit its liability for indirect, consequential,

2   incidental, punitive or special damages for delayed baggage, it does not and cannot limit its

3   liability for general or direct damages.

4   As for passengers on international trips whether the flight segment is in the US or not,

5   the liability limit is approximately $1,640 per passenger for lost or delayed baggage.   This

6   provision voids any other limitation in the contract of carriage and follows the common law of

7   bailment strict liability.   See Montreal Convention, at art. 19, 22, a copy of which is affixed

8   hereto as Appendix 2.

9   The unreasonable refusal to turn over property after demand is actionable as the tort of

10  conversion.  See Restatement of Torts Second,  Sec. 222A et seq.

11  2.  AA also argues the cause of action for conversion should be dismissed because the

12  damages of deprivation of property (baggage) is small (according to AA counsel).

13  Small damages are not a basis for dismissal where the jurisdictional minimum is satisfied

14  as the court has found here, and deprivation of medications in baggage by AA willfully refusing

15  to return luggage for its commercial convenience and to prevent passengers from seeking

16  alternate transportation after 10 hours of confinement is not necessarily trivial or small damages.

17  Defendant AA may be liable for the full value of the baggage or a lesser amount for

18  inconvenience up to $2,800 for domestic passengers and $1,640 for international passengers.

19  Factors used to determine damages include a) the extent and duration of Defendant's dominion

20  and control, b) its intent to assert a right in fact inconsistent with the plaintiff's right of control,

21  c) its good faith, d) the extent and duration of the resulting interference with the plaintiff's rights,

22  e) any harm done to the baggage, f) the inconvenience and expense caused.  Restatement of

23  Torts Second 222A et seq.

24  Conversion is a strict liability tort.  *Burlesci v. Petersen* 68 Cal.App.4th 1062, 1066

25  (1998).  Plaintiff need only show that she was entitled to possession of her property at the time

26  of conversion and the fact that plaintiff later regained possession does not bar a claim for

27  conversion.  *Enterprise Leasing Corp. v. Shugart Corp.* 231 Cal.App.3d 737, 748.

28

**G. Civil Conspiracy**.

In reviewing the case law cited by Defendant, Plaintiff wishes to amend this cause of action to exclude the AA corporation and provide more detail for the conspiracy among several employees of AA as several Doe defendants and Al Tinsley, the operations manager at Austin Airport.

H. **Civil RICO.**

The predicate acts are properly asserted, however in light of recent US Supreme Court decisions, Plaintiff wishes to withdraw this cause of action at this time and with leave to replead should discovery reveal information needed to refile it.

**III. Conclusion**

For the reasons stated herein, the parts of the motion to dismiss constituting re-argument without leave should be struck, the motion to dismiss should be denied and the Defendant ordered to answer the First Amended Complaint, the court should entertain a motion for sanctions against Defendant and its counsel for violation of Local Rule 9-7, with motion costs charged to the Defendant, and the court should grant such other relief as it deems just and proper in the circumstances.

Dated: June 19, 2008          LAW OFFICES OF DAVID G. RAMOS
                              LAW OFFICES OF PAUL S. HUDSON PC


                              By: _____/s/_____
                                      David G. Ramos

                              Attorneys for Plaintiff KATHLEEN HANNI
                              Individually and on behalf of all others
                                      Similarly situated

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CATHERINE RAY, on behalf of herself
and all others similarly situated,                    PLAINTIFF

v.                      Case No. 08-5025

AMERICAN AIRLINES, INC.,

                                        DEFENDANT

## ORDER

    This case concerns the frustrations surrounding an airplane trip described as a nightmare and the Plaintiffs efforts to obtain compensation for it. Plaintiff alleges that she was confined to an aircraft against her will and forced to endure poor conditions while it was on the ground for some eleven (11) hours. In response, Defendant contends that it has no responsibility because the Plaintiff's claims are preempted by the Airline Deregulation Act and the Federal Aviation Act.

    Before the Court are the Plaintiff's Motion for Reconsideration of this Court's Order Granting Defendant Leave to File an Amended Notice of Removal (Doc. 31) and Brief in Support (Doc. 32), and Defendant's Response (Doc. 36), Defendant's Motion to Strike (Doc. 27) and Brief in Support (Doc. 28), and Plaintiff's Response (Doc. 34), Plaintiff's Motion to Remand (Doc. 14), and Brief in Support (Doc. 15), and Defendant's Response (Doc. 26), Defendant's Motion to Transfer Venue (Doc. 12), and Brief in Support (Doc. 13), and

Plaintiff's Response (Doc. 24), and Defendant's Motion to Dismiss (Doc. 7), and Brief in Support (Doc. 8), Plaintiff's Response (Doc. 25) and Defendant's Reply (Doc. 33).

On December 27, 2007, Plaintiff initiated a class action suit against the Defendant in Washington County, Arkansas Circuit Court alleging false imprisonment, outrage or intentional infliction of emotional distress, negligence, breach of contract, and fraud or deceit, all surrounding a prolonged airline trip. As of this date, no effort has been made to certify this matter as a class action. On January 31, 2008, Defendant removed the action pursuant to both the Class Action Fairness Act of 2005, U.S.C. § 1332(d), and this Court's diversity jurisdiction, 28 U.S.C. §§ 1332(a) and 1367(a). On February 7, 2008, Defendant filed a motion to dismiss Plaintiff's First Amended Complaint (Doc. 1) for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) and 9(b). On February 26, 2008, Defendant filed a motion to transfer venue pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Northern District of Texas. On February 28, 2008, Plaintiff filed a motion to remand this action to the Washington County, Arkansas Circuit Court. On March 17, 2008, Defendant filed a motion for leave to file an amended notice of removal, which was granted on March 19, 2008. On March 28,

2

2008, Defendant filed a motion to strike certain portions of the Affidavit of Catherine Ray and Declaration of Paul S. Hudson filed by the Plaintiff in support of her motion to remand.  On April 7, 2008, Plaintiff filed a motion for reconsideration of this Court's order granting Defendant's motion for leave to file an amended notice of removal.  For the reasons reflected herein, Plaintiff's Motion for Reconsideration is **DENIED**; Defendant's Motion to Strike is **DENIED**; Plaintiff's Motion to Remand is **DENIED**; Defendant's Motion to Transfer Venue is **DENIED**; and Defendant's Motion to Dismiss is **GRANTED** in part and **DENIED** in part.

### A.    Background

Plaintiff, Catherine Ray, brings this action based on the experiences on a December 29, 2007 American Airlines flight from Oakland to Dallas-Fort Worth airport ("DFW airport"), which was diverted to Austin, Texas ("Austin") because of weather conditions at DFW airport.  Plaintiff alleges that she was confined to the aircraft against her will and forced to endure deplorable conditions on the ground in Austin for approximately eleven (11) hours by the Defendant.

Plaintiff seeks compensatory and punitive damages for false imprisonment, outrage or intentional infliction of emotional distress, negligence, breach of contract, fraud or deceit.  Plaintiff contends that Defendant's actions or

3

failures to act serve as the basis for her claim, including Defendant's failure to cancel or delay flights due to bad weather; Defendant's refusal to permit passengers to leave the airplane while it was on the runway in Austin; Defendant's failure to "supply the parked aircraft with essentials of water, food, sanitary waste removal, light, and breathable or fresh air at normal temperatures" while stranded on the runway in Austin; Defendant's failure to unload checked baggage when it finally allowed the passengers off the airplane in Austin at 9:30 p.m.; Defendant's refusal to provide overnight lodging, meals, ground transportation, telephone or other passenger expenses and losses caused by its diversion and stranding; and Defendant's refusal to allow some passengers to board their connecting flights in Dallas upon arrival the following morning.

Plaintiff alleges that the delays resulted from Defendant's "intentional or negligent lack of personnel, equipment, and planning for ordinary weather disruptions." (Complaint ¶ 28). Further, Plaintiff alleges that Defendant's decision to keep the passengers on the plane during the delays was to "avoid expenses and lawful obligations to passengers associated with strandings, diversions, and canceled flights and for [Defendant's] and its officers, employees, agents and stockholders own pecuniary gain at the expense of Plaintiff

4

and other passengers." (Complaint ¶ 29).

Defendant moves this Court to dismiss the Plaintiff's claims for failure to state a claim upon which relief can be granted. Defendant contends that the Plaintiff's state law claims are preempted by the Airline Deregulation Act and the Federal Aviation Act, and that her complaint fails to state a claim under the applicable state law. (Doc. 7 ¶ 1).

**B.    Standard of Review**

In determining whether a motion to dismiss should be granted, the court must test the legal sufficiency of a complaint. A motion to dismiss should only be granted if it appears from the face of the complaint that the plaintiff cannot prove any set of facts to support his claims for relief. *Schaller Tel. Co. V. Golden Sky Sys., Inc.,* 298 F.3d 736, 740 (8th Cir. 2002). In considering a motion to dismiss, the Court takes all allegations in the complaint as true and views the facts most favorably to the non-moving party. *Wisdom v. First Midwest Bank of Poplar Bluff,* 167 F.3d 402, 405 (8th Cir. 1999).

When a dispositive issue of law precludes a plaintiff from being entitled to relief regardless of the allegations of fact, the plaintiff might prove, Rule 12(b)(6) authorizes a court to dismiss that plaintiff's claims. *Neitzke v. Williams* 490 U.S. 319, 326-327 (1989); *Hishon v. King & Spalding,* 467

5

U.S. 69, 73 (1984). In order to streamline litigation and dispense with needless discovery and factfinding, courts are required to dismiss legal claims that are destined to fail regardless of whether they are nearly viable. *Neitzke*, 490 U.S. at 326-27 (stating "[n]othing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable . . . . [A] claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one.").

**C.    Discussion**

    **I. Motions to Reconsider, Remand, and Strike**

On January 31, 2008, Defendant removed this matter from Washington County, Arkansas Circuit Court pursuant to both the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) and diversity of citizenship and supplemental jurisdiction, 28 U.S.C. §§ 1332(a), and 1367(a). Thereafter, Defendant filed a motion to transfer venue, and Plaintiff filed a motion to remand. On March 19, 2008, this Court allowed the Defendant to amend its notice of removal. Plaintiff subsequently filed a motion asking the Court to reconsider its order allowing the Defendant to amend its notice of removal.

An action filed in state court may be removed by the defendant to federal district court if the district court could have exercised original jurisdiction over the matter.

6

28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. 28 U.S.C. § 1332(a). Additionally, federal district courts have original jurisdiction of any civil action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action between citizens of different states. 28 U.S.C. § 1332(d). The claims of the individual class members of a class action shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2)(6).

A case must be remanded back to state court if at any time before judgment it appears that the district court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). The district court has subject matter jurisdiction in a diversity case when a fact finder could legally conclude, from the pleadings and proof adduced to the court before trial, that the damages that the plaintiff suffered are greater than $75,000." *Kopp v. Kopp*, 280 F.3d 883, 886 (8th Cir. 2002). A defendant who seeks to remove a case to federal court bears the burden of proving that the requirements for diversity jurisdiction have been met. *Hatridge v. Aetna Casualty &*

7

*Surety Co.*, 415 F.2d 809, 814-15 (8th Cir. 1969). Where, as here, the complaint alleges no specific amount of damages or an amount under the jurisdictional minimum, the removing party must prove by a preponderance of the evidence that the amount in controversy exceeds $75,000. *See Trimble v. Asarco, Inc.*, 232 F.3d 946, 959 (8th Cir. 2000) ("[T]he party invoking federal jurisdiction must prove the requisite amount by a preponderance of the evidence."). When a suit is commenced in state court there is a strong presumption that the plaintiff has not claimed an amount sufficient to establish federal jurisdiction. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 290 (1938).

Plaintiff contends that this case should be remanded to state court because Defendant had not established that the amount in controversy is $75,000, as required to support diversity jurisdiction for her individual claim, and that it is unknown at this time whether the amount in controversy for the entire class will exceed $5,000,000. Plaintiff also contends that the Court should not have allowed the Defendant to amend its notice of removal with a settlement letter. Plaintiff argues that the Court failed to allow her adequate time to respond to the Defendant's motion, pursuant to the Court's local rule 7.2(b). The Court will consider the Plaintiff's motion for reconsideration as her response to the

8

Defendant's motion to amend its notice of removal.

In her motion for reconsideration, the Plaintiff contends that a settlement letter can not be used to establish the amount in controversy because settlement communications are privileged and the federal rules of evidence prohibit such use.  Additionally, Plaintiff argues that she offered to settle for less than the amount required for diversity jurisdiction and that she does not demand more than that amount in her Complaint, and therefore, the Defendant has failed to prove the requisite amount in controversy.  The settlement letter, which was sent to Defendant by Plaintiff's counsel, demands that Defendant pay Plaintiff $50,000 for her individual claim, and $5,000,000 for the class action claim, as well as $74,900 for Katherine Hanni, another passenger who has filed an identical claim in district court in California ("Hanni case"), and $5,000,000 for the class action claim in the Hanni case.

Plaintiff contends that settlement communications are privileged and that Rule 408 and Rule 403 of the Federal Rules of Evidence prohibit the use of settlement letters to establish the amount of a claim.  Rule 408 states that a settlement offer is not admissible "to prove liability for or invalidity of a claim or its amount."  Several courts have concluded that Rule 408 does not prevent them from considering

9

a settlement demand for purposes of assessing the amount in controversy. *See Cohn v. Petsmart, Inc.,* 281 F.3d 837, 840 (9th Cir. 2002); *Rising-Moore v. Red Roof Inns, Inc.,* 435 F.3d 813, 816-17 (7th Cir. 2006); and *Vermande v. Hyundai Motor America, Inc.,* 352 F.Supp. 2d 195, 199 (D.Conn. 2004). We agree that Rule 408 does not prohibit the use of a settlement letter to establish the amount in controversy.

Plaintiff requests the court use its discretion under Rule 403 to prohibit the settlement letter as it is prejudicial evidence. Defendant contends that this argument has no merit because the letter is before the Court for the limited purpose of determining jurisdiction and not evidence. The Court agrees. The Plaintiff next argues that the settlement letter is privileged, and should not have been made public. The Court finds that the settlement letter may be privileged, but it can be used for the limited purpose of determining the amount in controversy. Accordingly, the Court has reconsidered its order of March 19, 2008, and concludes again that the Defendant may file an amended notice of removal.

The Court now considers the Plaintiff's motion for remand. Plaintiff contends that her individual claim is less than the $75,000 necessary to establish diversity jurisdiction, and that it is unknown whether the class action

10

claim will exceed $5,000,000, as required by the Class Action Fairness Act of 2005. Defendant alleges that the Plaintiff seeks damages in excess of the jurisdictional requirements, and asks the Court to consider the settlement offer sent by Plaintiff's counsel on March 3, 2008, as proof of such, as well as an affidavit filed by an experienced Fayetteville lawyer, who states in his professional opinion, that Plaintiff will incur up to $47,500 in prosecuting her alleged breach of contracts claims. The settlement letter proposes a tiered settlement for class members which would pay $10,000 for each passenger confined for 7 hours or more, and $2,000 for each passenger confined between 2 and 4 hours, and attorney fees of $250,000 or 10% of the total amount paid to plaintiffs.

Defendant contends that the settlement letter, included with its amended notice of removal, as well as the Plaintiff's demand for punitive damages and attorneys fees, is proof that the amount in controversy in this matter exceeds $75,000 and $5,000,000 for the respective claims. Plaintiff attempts to avoid diversity jurisdiction in this matter by stating in a post-complaint affidavit that she is "not seeking individual damages in this lawsuit in excess of $74,999 including attorney fees and punitive damages." (Doc. 14-2 ¶ 5). However, it has long been recognized that, for purposes of establishing diversity jurisdiction, tortious injuries may be

11

quantified as tantamount to damages amounts.  The Court finds sufficient allegations in the Plaintiff's complaint to support a potential recovery exceeding $75,000 in this case.

Although Plaintiff initially claimed that the putative class included 12,000 passengers, her counsel now states that he believes that number to be excessive.  Defendant argues that if one applies only the least costly tier of the proposed settlement, *i.e.,* the $2,000 tier, to half of the 12,000 passengers the Complaint alleges were in the putative class, the amount in controversy is $12,000,000.  Defendant contends that the Plaintiff's settlement demand for $5,000,000 for each of the two class action claims filed is proof that the amount in controversy exceeds $5,000,000.  Plaintiff concedes that she does not have sufficient information at this stage in the proceeding to determine whether the amount in controversy exceeds $5,000,000 for the class action claim.

Defendant argues that the $5,000,000 settlement demand is not the amount in controversy, but rather the amount it would take to settle the case.  In support, the Defendant refers to the settlement letter which provides: "settlement...would relieve [Defendant] of the risk of a much larger jury award...".  Defendant claims that statements made in the settlement letter demonstrate that the amount in controversy exceeds $75,000 and $5,000,000.  Although the Eighth Circuit

12

Court of Appeals stopped short of determining whether a post-complaint settlement offer alone was sufficient to establish the requisite amount in controversy, the Court did conclude that a letter was "further support for the valuation of the claims." *In re Minnesota Mut. Life Ins. Co. Sales Practice Litigation,* 346 F.3d 830, 834-35 (8th Cir. 2003). Accordingly, we find that a settlement letter can be considered for the limited purpose of determining the amount in controversy for jurisdictional purposes.

Defendant contends that although Plaintiff does not allege a specific amount in controversy for the putative class she seeks to represent, one can ascertain an amount in controversy from Plaintiff's allegations in the Complaint and Affidavit filed in support of the motion to remand. Specifically, Defendant refers to Plaintiff's allegation that "each of the plaintiffs [meaning the putative class members] suffered individual damages sufficient to satisfy the jurisdictional requirements of the circuit court in Arkansas but insufficient to satisfy the jurisdictional requirements in federal diversity cases." {Complain ¶ 68). Defendant contends that this allegation is proof that Plaintiff intends to place up to $74,999 in controversy for each plaintiff, and considering that the putative class could be as large as 12,000 plaintiffs, the amount in controversy for the putative

13

class could be much higher than the $5,000,000 needed for federal jurisdiction. The Court finds that the Defendant has established that the amount in controversy is sufficient to establish jurisdiction in this Court in either an individual case or a class action.

The Court denies Defendant's motion to strike portions of the declarations of Catherine Ray and Paul Hudson. The Court did not rely on any improper or inadmissable evidence in deciding these motions.

## II.   Motion to Transfer Venue

On February 26, 2008, Defendant filed a motion asking the Court to transfer this case to the United States District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). Section 1404(a) governs the ability of a federal district court to transfer a case to another district. This provision reads: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (1994). The statutory language reveals three general categories of factors that courts must consider when deciding a motion to transfer: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice. *Terra Intern., Inc. v. Mississippi Chemical Corp.*,

14

119 F.3d 688, 691 (8th Cir. 1997).  The Eighth Circuit has recognized that motions for transfer under 1404(a) "require a case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors." *Id.* at 691.  Defendants bear the burden of proving the alternate forum is more convenient than the one chosen by the plaintiffs. *Arkansas Right To Life State Political Action Committee v. Butler*, 972 F.Supp. 1187, 1193 (W.D.Ark. 1997). In doing so, defendants must overcome the general principle that the plaintiffs' choice of forum should be disturbed only if the balance of convenience strongly favors the defendant. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, (1947).

Defendant contends that every section 1404(a) factor supports the transfer to the Northern District of Texas, except plaintiff's choice of forum, which it argues should be given little deference because this matter is a nationwide class action.  Defendant argues that when a plaintiff volunteers to represent a class of plaintiffs who do not reside in the plaintiff's chosen forum, that plaintiff's choice of forum is given lesser weight. *See Lou v. Belzberg,* 834 F.2d 730, 739 (9th Cir. 1987); and *Jenkins v. H & R Block, Inc.,* No. 4:06-CV-00365-GTE, 2006 U.S. Dist. LEXIS 35112 (E.D. Ark. May 17, 2006).  Defendant contends that Plaintiff's choice of venue should be given little weight because very few

15

of the passengers on her flight reside in Arkansas, and there is no connection between this forum and the events of which she complains.

Defendant contends that Texas would be a more convenient forum for this matter because all of Plaintiff's claims arose in Texas, numerous witnesses reside in Texas, most of Defendant's documentary evidence is in Texas, and Texas law will govern Plaintiff's claims. Plaintiff responds that Arkansas is the more convenient forum, and argues that she entered into a contract with the Defendant in Arkansas, Defendant does business in Arkansas, the district court in Arkansas can apply Texas law, and the factors of section 1404 and plaintiff's choice of forum outweigh transfer to Texas. Plaintiff argues that a transfer to Texas is not more convenient for the parties as a whole, and would serve only to shift the inconvenience from the Defendant to the Plaintiff. She contends that this matter will require witnesses, from all over the United States, to travel, and that it will be easier and less expensive for them to travel to Fayetteville, Arkansas. Additionally, she argues that although the claim may have arose in Texas, most of the events did not occur there.

Plaintiff concedes that venue in Texas would be more convenient for the Defendant, since its headquarter is located

16

there, but contends that the Court should not shift the convenience from the Plaintiff to the Defendant. Plaintiff claims that accessability of records is not a factor this Court should give much weight because modern communications, overnight delivery, and computers have made the transfer of records less difficult. Further, Plaintiff contends that Arkansas choice of law rules will apply even if the matter is transferred to Texas, so there is nothing to gain by transferring the matter. Plaintiffs' choice of forum is given "great weight" and should rarely be disturbed. *Houk v. Kimberly-Clark Corp.,* 613 F.Supp. 923, 927 (W.D.Mo. 1985); *Arkansas-Best Freight System, Inc. v. Youngblood,* 359 F.Supp. 1125, 1129 (W.D.Ark. 1973). This is especially true where the plaintiff is a resident of the district in which suit was brought. *Houk,* 613 F.Supp. at 927. In the case at bar, Plaintiff chose to file in this district and she is a resident of this district. In view of the fact that venue is a procedural rule of convenience, the convenience of the aggrieved party should be first accommodated. *Gardner Engineering Corp. v. Page Engineering Co.,* 484 F.2d 27 (8th Cir. 1973).

After considering all the relevant factors, the Court finds that the Defendant has not met its burden of proof to justify a transfer of venue away from the Plaintiff's choice

17

of forum and resident district.  The Defendant has failed to demonstrate that this matter would be any more convenient for the parties and witnesses in the Northern District of Texas than in this district.  Rather, it appears that a transfer of venue to Texas would only serve to shift certain conveniences to the Defendant.  The parties and a majority of the witnesses will be required to travel regardless of whether the venue is in Dallas, Texas or Fayetteville, Arkansas.  Although this matter may later be certified as a class action, the Court does not find that fact justifies a transfer to another district.  The proposed class members reside in states across the country and will be required to travel to either venue.  Additionally, the Court does not find the inaccessibility of records, or application of another state's substantive law require that this matter be transferred to another district.  In considering the interests of justice, this Court finds that the Plaintiff's choice of forum is entitled to great weight, and that factors of judicial economy and mitigation of party expenses require that this matter not be transferred.  Accordingly, the Defendant's motion to transfer venue is denied.

### III. Motion to Dismiss

Defendant contends that Plaintiff's claims should be dismissed because they are preempted by the Airline

18

Deregulation Act ("ADA"), 47 U.S.C. § 41413(b)(1), and the Federal Aviation Act ("FAA"), and for failure to state a claim upon which relief can be granted.

### A.    Preemption

A fundamental principle of the Constitution is that Congress has the power to preempt state law. *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 372 (2000). Pursuant to the Supremacy Clause, state law that conflicts with federal law has no effect. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992). The Supreme Court has held that federal preemption of state law can be either expressed or implied. *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 95 (1983). It is well established that within Constitutional limits Congress may preempt state authority by so stating in express terms. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm.,* 461 U.S. 190, 203 (1983). In the absence of an express congressional command, state law can be preempted impliedly. *Cipollone,* 505 U.S. at 516. There are two types of implied preemption, field preemption and conflict preemption. *Crosby,* 530 U.S. at 372.

There are three situations in which Courts will find a state law field-preempted. First, where "Congress' intent to supercede state law altogether may be found from a scheme of federal regulation so persuasive as to make reasonable the

19

inference that Congress left no room to supplement it." *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm.,* 461 U.S. 190, 204 (1983). Second, where "the Act of Congress [] touch[es] a field in which the federal interest is so dominant that the federal system [can] be assumed to preclude enforcement of state laws on the same subject." *Id.* Lastly, where "the object sought to be obtained by the federal law and the character of the obligations imposed by it may reveal the same purpose." *Id.* Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.*

In determining whether a state action is preempted by federal law, a Court must first look at Congress' intent. *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 209 (1985). The purpose of Congress is the ultimate touchstone. *Id.* To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute. *Gade v. National Solid Wastes Management Association,* 505 U.S. 88, 101 (1992).

20

1.   **Airline Deregulation Act of 1978**

Defendant contends that Plaintiff's causes of action are expressly preempted by the Airline Deregulation Act of 1978, which prohibits states from enacting or enforcing a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier[1]. 49 U.S.C. § 41713(b)(1). The Supreme Court has interpreted the phrase "related to" as preempting all state laws having a connection with or reference to airline rates, routes, or services. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378-79 (1992). However, neither the Supreme Court nor the Eighth Circuit have interpreted the term "services" in the context of the ADA. In *Botz v. Omni Air International,* 286 F.3d 488, 495 (8th Cir. 2002), the Eighth Circuit noted that the circuits were split regarding the definition of "service", but did not settle on a definition. Botz, a flight attendant, was terminated for refusing a flight assignment she believed violated federal safety regulations. *Id.* at 490. The Eighth Circuit held that Botz's claims under the Minnesota Whistle Blower statute were preempted by the ADA because the

---

[1]    Initially, the ADA's preemption provision was codified at 49 U.S.C.App. § 1305(a)(1) and read in pertinent part as follows: "[N]o State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier...."

enforcement of the statute would authorize a flight attendant to refuse assignments and protect her when she does. *Id.* at 495. The Court held that such protections "have a forbidden connection with an air carrier's service under any reasonable interpretation of Congress' use of the word 'service.'" *Id., citing Charas v. Trans World Airlines,* 160 F.3d 1259, 1265-66 (9th Cir. 1998). Although the Court did not define the term "service", it did note that "it is apparent from the preemption provision's plain language that it has a broad preemptive effect on state law claims involving air-carrier prices, routes, or services." *Botz,* 286 F.3d at 494.

The Third and Ninth Circuits have interpreted "service" as "the prices, schedules, origins, and destinations of the point-to-point transportation of passengers, cargo, or mail," but not the "provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." *Charas,* 160 F.3d at 1261; and *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.,* 164 F.3d 186, 194 (3rd Cir. 1998). The Fourth, Fifth, Seventh, and Eleventh Circuits have interpreted "service" more broadly to include boarding procedures. See *Branche v. Airtran Airways, Inc.,* 342 F.3d 1248, 1257-59 (11th Cir. 2003) (stating that "services" includes "the physical transportation of passengers ... and the incidents of that transportation over which air carriers

22

compete"); *Smith v. Comair, Inc.,* 134 F.3d 254, 259 (4th Cir. 1998) ("Undoubtedly, boarding procedures are a service rendered by an airline."); *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir. 1995) (defining service as contractual features of air transportation, including "ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); *Travel All Over The World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1433 (7th Cir. 1996) (adopting definition set forth in *Hodges).*

In *Rowe v. New Hampshire Motor Transport Association,* 128 S.Ct 989, (2008), the Supreme Court interpreted the scope of a preemption provision related to the deregulation of trucking, which was modeled after the ADA's preemption provision. The Court held that federal law preempts a state law that "forbids licensed tobacco retailers to employ a 'delivery service' unless that service follows particular delivery procedures." *Id.* at 995. The state regulation required tobacco retailers to utilize a delivery service which provides a special recipient-verification service to ensure that tobacco is not getting into the hands of minors. *Id.* at 993-94. The Court in *Rowe* held that the state statute was preempted because it would require carriers "to offer tobacco

23

delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate." *Id.* at 996.  The Supreme Court's holding in *Rowe* appears to interpret the term "service" to extend beyond prices, schedules, origins, and destinations.

However, this case and *Charas* are distinguishable from *Rowe* in that they both involve injured passengers seeking compensation for past tortious conduct, while *Rowe* involved a challenge to a state statute which created an affirmative requirement on the part of the carrier.  An affirmative regulation which restricts a carrier's business functions would likely result in a "direct substitution of [the state's] governmental commands for competitive market forces." *Rowe,* 128 S.Ct. at 995.  However, allowing an individual to recover for injuries tortiously caused by a carrier does not create any such regulation.

Defendant contends that Plaintiff's state law causes of action for false imprisonment, intentional infliction of emotional distress, negligence, breach of contract, and fraud are preempted by the ADA.  Plaintiff responds that Congress did not intend to prohibit the use of state tort law to provide remedies to passengers faced with situations similar

24

to those Plaintiff faced as Defendant's passenger. In *Morales,* the Supreme Court described Congress' goal in enacting the ADA as an effort to promote "maximum reliance on competitive market forces" that would further "efficiency, innovation, and low prices" as well as "variety [and] quality...of air transportation services." 504 U.S., at 378. In support of its limited definition of "service", the Ninth Circuit concluded in *Charas,*

> "when Congress enacted federal economic deregulation of the airlines, it intended to insulate the industry from possible state economic regulation as well. It intended to encourage the forces of competition. It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct."

160 F.3d at 1266. The Ninth Circuit reasoned that "[t]o interpret 'service' more broadly is to ignore the context of its use; and, it effectively would result in the preemption of virtually everything an airline does. It seems clear to us that this is not what Congress intended." *Id.* We agree with the reasoning of the Ninth Circuit and we do not believe that Congress intended to preempt all state claims for tortious

25

acts of air carriers.[2]

Accordingly, we find that Plaintiff's claims, which are not controlled by specific regulations, are not preempted by the ADA.   Plaintiff's claims involving compensation for lodging, meals, ground transportation and other expenses are preempted.  The Department of Transportation has implemented regulations which require air carriers to compensate passengers when flights are overbooked, but it has not extended such protection for weather related cancellations. Finally, Plaintiff's breach of contract claims which allege a breach of the implied covenant of good faith and fair dealing based on Defendant's Customer Service Plan and Conditions of Carriage are preempted.  The Supreme Court has held that the ADA "confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *American Airlines, Inc., v. Wolens,* 513 U.S. 219, 233 (1995).

**2.    Federal Aviation Act of 1958**

Defendant next contends that Plaintiff's claims are

---

[2]    Defendant's position would appear to be the same if the Plaintiff was kept on the plane for eleven (11) days instead of eleven (11) hours.

26

field-preempted by the Federal Aviation Act of 1958, codified at 49 U.S.C. §§ 40101, and its implementation of Federal Aviation Regulations ("FARs"), which preempt the field of passenger health and safety on commercial aircraft. The FAA was enacted in response to "a series of fatal air crashes between civil and military aircraft operating under separate flight rules." *United States v. Christensen*, 419 F.2d 1401, 1404 (9th Cir. 1969). Congress's purpose in enacting the FAA was "to promote safety in aviation and thereby protect the lives of persons who travel on board aircraft." *In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400, 406 (9th Cir. 1983). Defendant contends that Plaintiff is trying "to utilize state law to impose standards on air carriers that would establish new legal requirements for health and safety services for passengers during lengthy diversions and delays of flights." (Doc. 8 at 24). Plaintiff's claims which are based on Defendant's decision to re-route her flight due to safety concerns and the Federal Aviation Administration's decision to shut down the DFW airport for bad weather are preempted by the FAA. The Court finds that these decisions are directly related to safety issues currently regulated by the FAA. However, the Court concludes Plaintiff's claims

27

which are based on Defendant's actions after the flight was diverted and on the ground in Austin are not preempted. The Defendant alleges that the Department of Transportation is currently considering whether additional regulation is necessary in this field. While the Court applauds the Department of Transportation's concern, we find that there are currently no regulations in place which address the health and safety of air carrier passengers during lengthy delays on the ground, and the Plaintiff's claims based on such are not preempted.

### B.    Failure to State a Claim

Alternatively, Defendant contends that Plaintiff's claims should be dismissed for failure to state a claim. A complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). Dismissal under Rule 12(b)(6) is only appropriate when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007). Plaintiff plead her claims under Arkansas law. However, Defendant argues that Texas law should apply to Plaintiff's claims. For purposes of this motion, the Court will consider both State's

28

laws.

   1.   **False Imprisonment**

   Pursuant to either Arkansas or Texas law, false imprisonment consists of the "intentional confinement of a person, without consent or lawful privilege." *See Dick v. State,* 364 Ark. 133, 141 (Ark. 2005); and *Wal-Mart Stores, Inc. v. Rodriquez*, 92 S.W.2d 502, 506 (Tex. 2002). Defendant contends that Plaintiff has failed to allege facts from which it could be determined that (1) she validly withdrew her consent to remain on the aircraft, (2) a duty arose on Defendant's part to release her, or (3) that Defendant lacked federal legal authority over its aircraft and those on board until the flight crew opened the passenger door of the aircraft, released the fasten safety belt warnings, and notified passengers that it was safe to deplane. Plaintiff alleges that "with the exception of a few passengers whose destination was Austin", Defendant "refused to permit passengers to exit the aircraft even though buses and available gates at the terminal were available" to them. (Complaint ¶ 19). Further, Plaintiff alleges that Defendant misrepresented the reasons for confining the passengers on the plane. (Complaint ¶ 27).  Considering all allegations in the

29

complaint as true and viewing the facts most favorably to the Plaintiff, the Court finds that the Plaintiff has offered sufficient proof at this stage in the proceeding to support a claim for false imprisonment.  Accordingly, the Defendant's motion to dismiss the false imprisonment claim is denied.

**2.   Intentional Infliction of Emotional Distress/Outrage**

Pursuant to either Texas or Arkansas law, to prove a claim for intentional infliction of emotional distress or outrage, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.  *See Key v. Coryell,* 86 Ark.App. 334, 336 (Ark.App. 2004); and *Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004).  The conduct must be so extreme as to be "beyond all possible bounds of decency, and utterly intolerable in a civilized community," *Id.,* and the distress so severe "that no reasonable person could be expected to endure it."  *Id.*  The Court finds that Plaintiff has alleged facts sufficient to support a claim for intentional infliction of emotional distress or outrage at this stage in the proceeding.  Although Plaintiff alleges that

30

AO72A
(Rev. 8/82)

Defendant initially re-routed her flight in response to inclement weather, and that many other flights were similarly disrupted, she argues that the long delay on the ground could have been avoided. Under these circumstances, a jury could find that the Defendant's actions are so extreme and outrageous as to be "beyond all possible bounds of decency, and utterly intolerable in a civilized community." Accordingly, Defendant's motion to dismiss the Plaintiff's intentional infliction of emotional distress or outrage claim is denied.

### 3.  Negligence

Under Texas law, if a defendant's conduct violates a contractual duty, rather than a duty independently imposed by law, there is no negligence claim. *See DeWitt County Elec. Cooperative, Inc. v. Parks,* 1 S.W.3d 96, 105 (Tex. 1999) (a contract which "spells out the parties' respective rights," governs any dispute, not common-law negligence). Under Arkansas law, "if the facts warrant, a party to a contract may sue on an independent tort claim, but may not transform a breach of contract action into a tort claim by alleging the breach was motivated by malice. The breach itself is simply not a tort." *Quinn Companies, Inc. v. Herring-Marathon Group,*

31

*Inc.,* 299 Ark. 431, 432 (Ark. 1989). "Legitimate tort claims can arise out of contractual relationships in some situations; however, unless the conduct involves a foreseeable, unreasonable risk of harm to the plaintiff's interests, a breach of contract is generally not treated as a tort if it consists merely of a failure to act (nonfeasance)." *Lehman Properties, Ltd. Partnership v. BB & B Const. Co., Inc.,* 81 Ark.App. 104, 110 (Ark.App. 2003). In Arkansas, the essential elements of a cause of action for negligence are that the plaintiff show a duty owed and a duty breached, and that the defendant's negligence was a proximate cause of the plaintiff's damages. *See Wagner v. Gen. Motors Corp.,* 370 Ark. 268, 271 (Ark. 2007).

Defendant argues that Plaintiff's negligence claims are identical to her breach of contract claims, and that she fails to identify any duty owed to her by Defendant, independent of the duties set forth in Defendant's Conditions of Carriage. However, Arkansas courts have permitted tort claims based on contractual duties "when the misconduct involves a foreseeable, unreasonable risk of harm to the plaintiff's interests." *Westark Specialities, Inc. v. Stouffer Family Ltd., Partnership,* 310 Ark. 225, 233 (Ark. 1992). Plaintiff

32

alleges that Defendant owed her and other passengers a duty of due care to use best efforts to bring passengers safely to their destinations, to plan for weather related disturbances in its flight operations, and to refrain from mistreatment of them with unjustified involuntary confinement, deprivation of passengers' baggage and stranding in remote locations. Plaintiff further alleges that Defendant breached those duties and that its negligence was the proximate cause of damage and losses to her.  The Court finds that Plaintiff has plead allegations sufficient to support a negligence claim under Arkansas law, and that it was foreseeable that Defendant's conduct could have resulted in an unreasonable risk of harm to the plaintiff's interests.   Accordingly, the Defendant's motion to dismiss the Plaintiff's claim for negligence is denied.

**4.   Breach of Contract**

Defendant contends that Plaintiff's breach of contract claim, based on Defendant's Customer Service Plan and Conditions of Carriage, should be dismissed because it fails as a matter of law.  Defendant argues that Plaintiff's reliance on it's Customer Service Plan is misplaced because the plan expressly states that it "does not create contractual

33

or legal rights." (Doc. 8-2 at 67). The Court agrees. Additionally, Defendant contends that the claim based on Defendant's Conditions of Carriage fails because all of the damages she alleges are expressly excluded by the document's terms. Defendant argues that it does not guarantee its schedule and expressly disclaims any liability for delays as a result of bad weather. Plaintiff responds that her complaint "provides sufficient notice of the alleged breaches," but agrees to "provide Defendant with a more definite statement setting forth further details [of] the breaches of contract [claim]." (Doc. 25 at 28). The Court finds that the Plaintiff's complaint fails to allege sufficient facts regarding Defendant's failure to comply with specific terms of the Conditions of Carriage, and therefore does not state a claim for breach of contract. Accordingly, the Defendant's motion to dismiss the Plaintiff's breach of contract claim is granted with prejudice.

    5.    **Fraud**

    Defendant contends that Plaintiff's fraud claim is not plead with sufficient particularity and should be dismissed. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

34

particularity." Fed. R. Civ. P. 9(b). This particularity requirement demands a higher degree of notice than that required for other claims. *U.S. ex rel. Costner v. U.S.,* 317 F.3d 883, 888 (8th Cir. 2003). 'Circumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir. 1982). Allegations of fraud must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Costner*, 317 F.3d at 889.

Plaintiff contends that she has sufficiently plead allegations of fraud to support her claim. The complaint alleges that Defendant knowingly deceived Plaintiff with false statements and misrepresentations and concealment of material information in relation to the reasons for the confinement, diversions, and schedule changes, and that Defendant had a special relationship with the Plaintiff as it possessed all relevant information and power over the person and baggage of its passengers, that Defendant had a duty to disclose material

35

information related to its delays and diversion, which it
failed to do, and that Plaintiff relied to her detriment on
the false and deceptive statement of Defendant, and suffered
damages thereby.  (Complaint ¶¶ 60-65).

Under either Texas or Arkansas law, to establish fraud,
five elements must be proven: (1) a false representation of a
material fact; (2) knowledge that the representation is false
or that there is insufficient evidence upon which to make the
representation; (3) intent to induce action or inaction in
reliance upon the representation; (4) justifiable reliance on
the representation; and (5) damage suffered as a result of the
reliance*.  See Riley v. Hoisington*, 80 Ark.App. 346, 351
(Ark.App. 2003); and *Clardy Mfg. Co. v. Marine Midland
Business Loans, Inc.,* 88 F.3d 347, 359 (5th Cir. 1996).
Additionally, Texas law requires that Plaintiff demonstrate
that she relied on the representations to her detriment.  *See
Sanchez v. Liggett & Myers, Inc.,* 187 F.3d 486, 493 (5th Cir.
1999).

As the basis for her claim, Plaintiff alleges that
Defendant "falsely assert[ed] to passengers and the public
that aircraft were not able to take off due to weather or
congestion" (Complaint ¶¶ 27 & 63).  However, Plaintiff fails

36

to identify who made this statement, how she intends to prove that the statement was false when it was made, or how she relied on the representation. The Court finds that Plaintiff has failed to sufficiently state a claim for fraud. Accordingly, the Defendant's motion to dismiss the Plaintiff's fraud claim is granted with prejudice.

### C. Conclusion

For the foregoing reasons, Plaintiff's Motion for Reconsideration is **DENIED**; Defendant's Motion to Strike is **DENIED**; Plaintiff's Motion to Remand is **DENIED**; Defendant's Motion to Transfer Venue is **DENIED**; and Defendant's Motion to Dismiss is **GRANTED** in part and **DENIED** in part. In her response to the motion to dismiss, Plaintiff states that she wishes to add additional claims to her Complaint. Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), a plaintiff may amend his complaint once *as of right* at any time before he has been served with a "responsive pleading." Defendant has not filed an Answer to the Complaint, and its Motion to Dismiss is not a "responsive pleading" under Rule 15. *See Winfrey v. Brewer,* 570 F.2d 761, 764 (8th Cir. 1978) ("A motion to dismiss is not a 'responsive pleading' for purposes of [Rule 15].") However, Plaintiff has already amended her Complaint

37

once, and therefore, must seek leave of the Court to amend it
again.  The Court finds that justice requires that Plaintiff
be given leave to file a Second Amended Complaint to remedy
any defects in her pleading and include any additional claims.

IT IS SO ORDERED this 2nd day of June 2008.


                              /s/ Robert T. Dawson
                              Robert T. Dawson
                              United States District Judge

38

# Convention for the Unification of Certain Rules for International Carriage by Air

**Montreal, 28 May 1999**

copy @ lexmercatoria.org  [*]

[*] Generated by SiSU  www.jus.uio.no/sisu
www.sisudoc.org

Generated by SiSU [ SiSU 0.67.1 of 2008w21/2 ] www.jus.uio.no/sisu

Copyright © 1997, current 2008 Ralph Amissah, All Rights Reserved.

SiSU is software for document structuring, publishing and search (with object citation numbering), www.sisudoc.org

SiSU is released under GPL 3  or later, <http://www.fsf.org/licenses/gpl.html>.


Document information:

sourcefile air.carriage.unification.convention.montreal.1999.sst

Generated by SiSU www.jus.uio.no/sisu

version information:    SiSU 0.67.1 of 2008w21/2

For alternative output formats of this document check:

<http://www.jus.uio.no/lm//air.carriage.unification.convention.montreal.1999/sisu__manifest.html>

# Contents

**Convention for the Unification of Certain Rules for International Carriage by Air (Montreal, 28 May 1999)**      **1**

**Chapter 1 - General Provisions**      **1**

Article 1 - Scope of application . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Article 2 - Carriage performed by State and carriage of postal items . . . . . . . 2

**Chapter II - Documentation and Duties of the Parties Relating to the Carriage of Passengers, Baggage and Cargo**      **2**

Article 3 - Passengers and baggage . . . . . . . . . . . . . . . . . . . . . . . . 2

Article 4 - Cargo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Article 5 - Contents of air waybill or cargo receipt . . . . . . . . . . . . . . . . 3

Article 6 - Document relating to the nature of the cargo . . . . . . . . . . . . 3

Article 7 - Description of air waybill . . . . . . . . . . . . . . . . . . . . . . . 3

Article 8 - Documentation for multiple packages . . . . . . . . . . . . . . . . . 3

Article 9 - Non-compliance with documentary requirements . . . . . . . . . . . 4

Article 10 - Responsibility for particulars of documentation . . . . . . . . . . . 4

Article 11 - Evidentiary value of documentation . . . . . . . . . . . . . . . . . 4

Article 12 - Right of disposition of cargo . . . . . . . . . . . . . . . . . . . . . 4

Article 13 - Delivery of the cargo . . . . . . . . . . . . . . . . . . . . . . . . . 5

Article 14 - Enforcement of the rights of consignor and consignee . . . . . . . . 5

Article 15 - Relations of consignor and consignee or mutual relations of third parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Article 16 - Formalities of customs, police or other public authorities . . . . . . 6

**Chapter III - Liability of the Carrier and Extent of Compensation for Damage**      **6**

Article 17 - Death and injury of passengers - damage to baggage . . . . . . . . 6

Article 18 - Damage to cargo . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Article 19 - Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Article 20 - Exoneration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Article 21 - Compensation in case of death or injury of passengers . . . . . . . 8

Article 22 - Limits of liability in relation to delay, baggage and cargo . . . . . . 8

Article 23 - Conversion of monetary units . . . . . . . . . . . . . . . . . . . . 9

Article 24 - Review of limits . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Article 25 - Stipulation on limits . . . . . . . . . . . . . . . . . . . . . . . . . 10

Article 26 - Invalidity of contractual provisions . . . . . . . . . . . . . . . . . 11

Article 27 - Freedom to contract . . . . . . . . . . . . . . . . . . . . . . . . . 11

Article 28 - Advance payments . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Article 29 - Basis of claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Article 30 - Servants, agents - aggregation of claims . . . . . . . . . . . . . . . 11

Article 31 - Timely notice of complaints . . . . . . . . . . . . . . . . . . . . . 12

Article 32 - Death of person liable . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 33 - Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Article 34 - Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Article 35 - Limitation of actions . . . . . . . . . . . . . . . . . . . . . . 13
Article 36 - Successive carriage . . . . . . . . . . . . . . . . . . . . . . . 13
Article 37 - Right of recourse against third parties . . . . . . . . . . . . . . 14

**Chapter IV - Combined Carriage**                                          **14**
Article 38 - Combined carriage . . . . . . . . . . . . . . . . . . . . . . . 14

**Chapter V - Carriage by Air Performed by a Person other than the Contracting
Carrier**                                                                   **14**
Article 39 - Contracting carrier - actual carrier . . . . . . . . . . . . . . . 14
Article 40 - Respective liability of contracting and actual carriers . . . . . . 14
Article 41 - Mutual liability . . . . . . . . . . . . . . . . . . . . . . . . . 14
Article 42 - Addressee of complaints and instructions . . . . . . . . . . . 15
Article 43 - Servants and agents . . . . . . . . . . . . . . . . . . . . . . . 15
Article 44 - Aggregation of damages . . . . . . . . . . . . . . . . . . . . . 15
Article 45 - Addressee of claims . . . . . . . . . . . . . . . . . . . . . . . 15
Article 46 - Additional jurisdiction . . . . . . . . . . . . . . . . . . . . . . 16
Article 47 - Invalidity of contractual provisions . . . . . . . . . . . . . . . . 16
Article 48 - Mutual relations of contracting and actual carriers . . . . . . . . 16

**Chapter VI - Other Provisions**                                           **16**
Article 49 - Mandatory application . . . . . . . . . . . . . . . . . . . . . . 16
Article 50 - Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Article 51 - Carriage performed in extraordinary circumstances . . . . . . . . 16
Article 52 - Definition of days . . . . . . . . . . . . . . . . . . . . . . . . 17

**Chapter VII - Final Clauses**                                             **17**
Article 53 - Signature, ratification and entry into force . . . . . . . . . . . . 17
Article 54 - Denunciation . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Article 55 - Relationship with other Warsaw Convention instruments . . . . . . 18
Article 56 - States with more than one system of law . . . . . . . . . . . . . 19
Article 57 - Reservations . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Document Information (metadata)**                                         **21**
Metadata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Information on this document copy and an unofficial List of Some web related
information and sources**                                                   **22**
Information on this document copy . . . . . . . . . . . . . . . . . . . . . . 22
Links that may be of interest . . . . . . . . . . . . . . . . . . . . . . . . . 22

# Convention for the Unification of Certain Rules for International Carriage by Air (Montreal, 28 May 1999)

THE STATES PARTIES TO THIS CONVENTION

RECOGNIZING the significant contribution of the Convention for the Unification of Certain Rules relating to International Carriage by Air signed in Warsaw on 12 October 1929, hereinafter referred to as the "Warsaw Convention", and other related instruments to the harmonization of private international air law;

RECOGNIZING the need to modernize and consolidate the Warsaw Convention and related instruments;

RECOGNIZING the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution;

REAFFIRMING the desirability of an orderly development of international air transport operations and the smooth flow of passengers, baggage and cargo in accordance with the principles and objectives of the Convention on International Civil Aviation, done at Chicago on 7 December 1944;

CONVINCED that collective State action for further harmonization and codification of certain rules governing international carriage by air through a new Convention is the most adequate means of achieving an equitable balance of interests;

HAVE AGREED AS FOLLOWS:

## Chapter 1 - General Provisions

Article 1 - Scope of application

1. This Convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward. It applies equally to gratuitous carriage by aircraft performed by an air transport undertaking.

2. For the purposes of this Convention, the expression "international carriage" means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party. Carriage between two points within the territory of a single State Party without an agreed stopping place within the territory of another State is not international carriage for the purposes of this Convention.

3. Carriage to be performed by several successive carriers is deemed, for the purposes of this Convention, to be one undivided carriage if it has been regarded by the parties as a single operation, whether it had been agreed upon under the form of a single contract or of a series of contracts, and it does not lose its international character merely because

one contract or a series of contracts is to be performed entirely within the territory of the same State.

4. This Convention applies also to carriage as set out in Chapter V, subject to the terms contained therein.

Article 2 - Carriage performed by State and carriage of postal items

1. This Convention applies to carriage performed by the State or by legally constituted public bodies provided it falls within the conditions laid down in Article 1.

2. In the carriage of postal items, the carrier shall be liable only to the relevant postal administration in accordance with the rules applicable to the relationship between the carriers and the postal administrations.

3. Except as provided in paragraph 2 of this Article, the provisions of this Convention shall not apply to the carriage of postal items.

# Chapter II - Documentation and Duties of the Parties Relating to the Carriage of Passengers, Baggage and Cargo

Article 3 - Passengers and baggage

1. In respect of carriage of passengers, an individual or collective document of carriage shall be delivered containing:

(a) an indication of the places of departure and destination;

(b) if the places of departure and destination are within the territory of a single State Party, one or more agreed stopping places being within the territory of another State, an indication of at least one such stopping place.

2. Any other means which preserves the information indicated in paragraph 1 may be substituted for the delivery of the document referred to in that paragraph. If any such other means is used, the carrier shall offer to deliver to the passenger a written statement of the information so preserved.

3. The carrier shall deliver to the passenger a baggage identification tag for each piece of checked baggage.

4. The passenger shall be given written notice to the effect that where this Convention is applicable it governs and may limit the liability of carriers in respect of death or injury and for destruction or loss of, or damage to, baggage, and for delay.

5. Non-compliance with the provisions of the foregoing paragraphs shall not affect the existence or the validity of the contract of carriage, which shall, nonetheless, be subject to the rules of this Convention including those relating to limitation of liability.

Article 4 - Cargo  28

1. In respect of the carriage of cargo, an air waybill shall be delivered. 29

2. Any other means which preserves a record of the carriage to be performed may be 30 substituted for the delivery of an air waybill. If such other means are used, the carrier shall, if so requested by the consignor, deliver to the consignor a cargo receipt permitting identification of the consignment and access to the information contained in the record preserved by such other means.

Article 5 - Contents of air waybill or cargo receipt 31

The air waybill or the cargo receipt shall include: 32

(a) an indication of the places of departure and destination; 33

(b) if the places of departure and destination are within the territory of a single State 34 Party, one or more agreed stopping places being within the territory of another State, an indication of at least one such stopping place; and

(c) an indication of the weight of the consignment. 35

Article 6 - Document relating to the nature of the cargo 36

The consignor may be required, if necessary, to meet the formalities of customs, police and 37 similar public authorities to deliver a document indicating the nature of the cargo. This provision creates for the carrier no duty, obligation or liability resulting therefrom.

Article 7 - Description of air waybill 38

1. The air waybill shall be made out by the consignor in three original parts. 39

2. The first part shall be marked "for the carrier"; it shall be signed by the consignor. 40 The second part shall be marked "for the consignee"; it shall be signed by the consignor and by the carrier. The third part shall be signed by the carrier who shall hand it to the consignor after the cargo has been accepted.

3. The signature of the carrier and that of the consignor may be printed or stamped. 41

4. If, at the request of the consignor, the carrier makes out the air waybill, the carrier 42 shall be deemed, subject to proof to the contrary, to have done so on behalf of the consignor.

Article 8 - Documentation for multiple packages 43

When there is more than one package: 44

(a) the carrier of cargo has the right to require the consignor to make out separate air 45 waybills;

(b) the consignor has the right to require the carrier to deliver separate cargo receipts    46
when the other means referred to in paragraph 2 of Article 4 are used.

Article 9 - Non-compliance with documentary requirements    47

Non-compliance with the provisions of Articles 4 to 8 shall not affect the existence or    48
the validity of the contract of carriage, which shall, nonetheless, be subject to the rules
of this Convention including those relating to limitation of liability.

Article 10 - Responsibility for particulars of documentation    49

1. The consignor is responsible for the correctness of the particulars and statements    50
relating to the cargo inserted by it or on its behalf in the air waybill or furnished by it or
on its behalf to the carrier for insertion in the cargo receipt or for insertion in the record
preserved by the other means referred to in paragraph 2 of Article 4. The foregoing shall
also apply where the person acting on behalf of the consignor is also the agent of the
carrier.

2. The consignor shall indemnify the carrier against all damage suffered by it, or by    51
any other person to whom the carrier is liable, by reason of the irregularity, incorrectness
or incompleteness of the particulars and statements furnished by the consignor or on its
behalf.

3. Subject to the provisions of paragraphs 1 and 2 of this Article, the carrier shall    52
indemnify the consignor against all damage suffered by it, or by any other person to whom
the consignor is liable, by reason of the irregularity, incorrectness or incompleteness of the
particulars and statements inserted by the carrier or on its behalf in the cargo receipt or
in the record preserved by the other means referred to in paragraph 2 of Article 4.

Article 11 - Evidentiary value of documentation    53

1. The air waybill or the cargo receipt is prima facie evidence of the conclusion of    54
the contract, of the acceptance of the cargo and of the conditions of carriage mentioned
therein.

2. Any statements in the air waybill or the cargo receipt relating to the weight, dimensions    55
and packing of the cargo, as well as those relating to the number of packages, are prima
facie evidence of the facts stated; those relating to the quantity, volume and condition of
the cargo do not constitute evidence against the carrier except so far as they both have
been, and are stated in the air waybill or the cargo receipt to have been, checked by it in
the presence of the consignor, or relate to the apparent condition of the cargo.

Article 12 - Right of disposition of cargo    56

1. Subject to its liability to carry out all its obligations under the contract of carriage,    57
the consignor has the right to dispose of the cargo by withdrawing it at the airport of

departure or destination, or by stopping it in the course of the journey on any landing, or by calling for it to be delivered at the place of destination or in the course of the journey to a person other than the consignee originally designated, or by requiring it to be returned to the airport of departure. The consignor must not exercise this right of disposition in such a way as to prejudice the carrier or other consignors and must reimburse any expenses occasioned by the exercise of this right.

2. If it is impossible to carry out the instructions of the consignor, the carrier must so inform the consignor forthwith.                58

3. If the carrier carries out the instructions of the consignor for the disposition of the cargo without requiring the production of the part of the air waybill or the cargo receipt delivered to the latter, the carrier will be liable, without prejudice to its right of recovery from the consignor, for any damage which may be caused thereby to any person who is lawfully in possession of that part of the air waybill or the cargo receipt.                59

4. The right conferred on the consignor ceases at the moment when that of the consignee begins in accordance with Article 13. Nevertheless, if the consignee declines to accept the cargo, or cannot be communicated with, the consignor resumes its right of disposition.                60

Article 13 - Delivery of the cargo                61

1. Except when the consignor has exercised its right under Article 12, the consignee is entitled, on arrival of the cargo at the place of destination, to require the carrier to deliver the cargo to it, on payment of the charges due and on complying with the conditions of carriage.                62

2. Unless it is otherwise agreed, it is the duty of the carrier to give notice to the consignee as soon as the cargo arrives.                63

3. If the carrier admits the loss of the cargo, or if the cargo has not arrived at the expiration of seven days after the date on which it ought to have arrived, the consignee is entitled to enforce against the carrier the rights which flow from the contract of carriage.                64

Article 14 - Enforcement of the rights of consignor and consignee                65

The consignor and the consignee can respectively enforce all the rights given to them by Articles 12 and 13, each in its own name, whether it is acting in its own interest or in the interest of another, provided that it carries out the obligations imposed by the contract of carriage.                66

Article 15 - Relations of consignor and consignee or mutual relations of third parties                67

1. Articles 12, 13 and 14 do not affect either the relations of the consignor and the consignee with each other or the mutual relations of third parties whose rights are derived either from the consignor or from the consignee.                68

2. The provisions of Articles 12, 13 and 14 can only be varied by express provision in the air waybill or the cargo receipt. [69]

Article 16 - Formalities of customs, police or other public authorities [70]

1. The consignor must furnish such information and such documents as are necessary to meet the formalities of customs, police and any other public authorities before the cargo can be delivered to the consignee. The consignor is liable to the carrier for any damage occasioned by the absence, insufficiency or irregularity of any such information or documents, unless the damage is due to the fault of the carrier, its servants or agents. [71]

2. The carrier is under no obligation to enquire into the correctness or sufficiency of such information or documents. [72]

Chapter III - Liability of the Carrier and Extent of Compensation for Damage [73]

Article 17 - Death and injury of passengers - damage to baggage [74]

1. The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking. [75]

2. The carrier liable for damage sustained in case of destruction or loss of, or of damage to, checked baggage upon condition only that the event which caused the destruction, loss or damage took place on board the aircraft or during any period within which the checked baggage was in the charge of the carrier. However, the carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage. In the case of unchecked baggage, including personal items, the carrier is liable if the damage resulted from its fault or that of its servants or agents. [76]

3. If the carrier admits the loss of the checked baggage, or if the checked baggage has not arrived at the expiration of twenty-one days after the date on which it ought to have arrived, the passenger is entitled to enforce against the carrier the rights which flow from the contract of carriage. [77]

4. Unless otherwise specified, in this Convention the term "baggage" means both checked baggage and unchecked baggage. [78]

Article 18 - Damage to cargo [79]

1. The carrier is liable for damage sustained in the event of the destruction or loss of or damage to, cargo upon condition only that the event which caused the damage so sustained took place during the carriage by air. [80]

2. However, the carrier is not liable if and to the extent it proves that the destruction, [81]

or loss of, or damage to, the cargo resulted from one or more of the following:

(a) inherent defect, quality or vice of that cargo;                                    82

(b) defective packing of that cargo performed by a person other than the carrier or its    83
servants or agents;

(c) an act of war or an armed conflict;                                              84

(d) an act of public authority carried out in connection with the entry, exit or transit of    85
the cargo.

3. The carriage by air within the meaning of paragraph 1 of this Article comprises the    86
period during which the cargo is in the charge of the carrier.

4. The period of the carriage by air does not extend to any carriage by land, by sea or    87
by inland waterway performed outside an airport. If, however, such carriage takes place
in the performance of a contract for carriage by air, for the purpose of loading, delivery
or transhipment, any damage is presumed, subject to proof to the contrary, to have been
the result of an event which took place during the carriage by air. If a carrier, without
the consent of the consignor, substitutes carriage by another mode of transport for the
whole or part of a carriage intended by the agreement between the parties to be carriage
by air, such carriage by another mode of transport is deemed to be within the period of
carriage by air.

Article 19 - Delay                                                                88

The carrier is liable for damage occasioned by delay in the carriage by air of passengers,    89
baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned
by delay if it proves that it and its servants and agents took all measures that could
reasonably be required to avoid the damage or that it was impossible for it or them to
take such measures.

Article 20 - Exoneration                                                          90

If the carrier proves that the damage was caused or contributed to by the negligence or    91
other wrongful act or omission of the person claiming compensation, or the person from
whom he or she derives his or her rights, the carrier shall be wholly or partly exonerated
from its liability to the claimant to the extent that such negligence or wrongful act or
omission caused or contributed to the damage. When by reason of death or injury of
a passenger compensation is claimed by a person other than the passenger, the carrier
shall likewise be wholly or partly exonerated from its liability to the extent that it proves
that the damage was caused or contributed to by the negligence or other wrongful act
or omission of that passenger. This Article applies to all the liability provisions in this
Convention, including paragraph 1 of Article 21.

Article 21 - Compensation in case of death or injury of passengers                    92

1.  For damages arising under paragraph 1 of Article 17 not exceeding 100,000 Special    93
Drawing Rights for each passenger, the carrier shall not be able to exclude or limit its
liability.

2.  The carrier shall not be liable for damages arising under paragraph 1 of Article 17    94
to the extent that they exceed for each passenger 100,000 Special Drawing Rights if the
carrier proves that:

(a) such damage was not due to the negligence or other wrongful act or omission of the    95
carrier or its servants or agents; or

(b) such damage was solely due to the negligence or other wrongful act or omission of a    96
third party.

Article 22 - Limits of liability in relation to delay, baggage and cargo                    97

1.  In the case of damage caused by delay as specified in Article 19 in the carriage of    98
persons, the liability of the carrier for each passenger is limited to 4,150 Special Drawing
Rights.

2.  In the carriage of baggage, the liability of the carrier in the case of destruction, loss,    99
damage or delay is limited to 1,000 Special Drawing Rights for each passenger unless the
passenger has made, at the time when the checked baggage was handed over to the carrier,
a special declaration of interest in delivery at destination and has paid a supplementary
sum if the case so requires.  In that case the carrier will be liable to pay a sum not
exceeding the declared sum, unless it proves that the sum is greater than the passenger's
actual interest in delivery at destination.

3.  In the carriage of cargo, the liability of the carrier in the case of destruction, loss,    100
damage or delay is limited to a sum of 17 Special Drawing Rights per kilogram, unless
the consignor has made, at the time when the package was handed over to the carrier, a
special declaration of interest in delivery at destination and has paid a supplementary sum
if the case so requires.  In that case the carrier will be liable to pay a sum not exceeding
the declared sum, unless it proves that the sum is greater than the consignor's actual
interest in delivery at destination.

4.  In the case of destruction, loss, damage or delay of part of the cargo, or of any object    101
contained therein, the weight to be taken into consideration in determining the amount
to which the carrier's liability is limited shall be only the total weight of the package or
packages concerned.  Nevertheless, when the destruction, loss, damage or delay of a part
of the cargo, or of an object contained therein, affects the value of other packages covered
by the same air waybill, or the same receipt or, if they were not issued, by the same record
preserved by the other means referred to in paragraph 2 of Article 4, the total weight of
such package or packages shall also be taken into consideration in determining the limit
of liability.

5.  The foregoing provisions of paragraphs 1 and 2 of this Article shall not apply if it is    102

proved that the damage resulted from an act or omission of the carrier, its servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of a servant or agent, it is also proved that such servant or agent was acting within the scope of its employment.

6. The limits prescribed in Article 21 and in this Article shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff, including interest. The foregoing provision shall not apply if the amount of the damages awarded, excluding court costs and other expenses of the litigation, does not exceed the sum which the carrier has offered in writing to the plaintiff within a period of six months from the date of the occurrence causing the damage, or before the commencement of the action, if that is later. 103

Article 23 - Conversion of monetary units 104

1. The sums mentioned in terms of Special Drawing Right in this Convention shall be deemed to refer to the Special Drawing Right as defined by the International Monetary Fund. Conversion of the sums into national currencies shall, in case of judicial proceedings, be made according to the value of such currencies in terms of the Special Drawing Right at the date of the judgement. The value of a national currency, in terms of the Special Drawing Right, of a State Party which is a Member of the International Monetary Fund, shall be calculated in accordance with the method of valuation applied by the International Monetary Fund, in effect at the date of the judgement, for its operations and transactions. The value of a national currency, in terms of the Special Drawing Right, of a State Party which is not a Member of the International Monetary Fund, shall be calculated in a manner determined by that State. 105

2. Nevertheless, those States which are not Members of the International Monetary Fund and whose law does not permit the application of the provisions of paragraph 1 of this Article may, at the time of ratification or accession or at any time thereafter, declare that the limit of liability of the carrier prescribed in Article 21 is fixed at a sum of 1,500,000 monetary units per passenger in judicial proceedings in their territories; 62,500 monetary units per passenger with respect to paragraph 1 of Article 22; 15,000 monetary units per passenger with respect to paragraph 2 of Article 22; and 250 monetary units per kilogram with respect to paragraph 3 of Article 22. This monetary unit corresponds to sixty-five and a half milligrams of gold of millesimal fineness nine hundred. These sums may be converted into the national currency concerned in round figures. The conversion of these sums into national currency shall be made according to the law of the State concerned. 106

3. The calculation mentioned in the last sentence of paragraph I of this Article and the conversion method mentioned in paragraph 2 of this Article shall be made in such manner as to express in the national currency of the State Party as far as possible the same real value for the amounts in Articles 21 and 22 as would result from the application of the 107

first three sentences of paragraph 1 of this Article. States Parties shall communicate to the depositary the manner of calculation pursuant to paragraph 1 of this Article, or the result of the conversion in paragraph 2 of this Article as the case may be, when depositing an instrument of ratification, acceptance, approval of or accession to this Convention and whenever there is a change in either.

Article 24 - Review of limits                                                                    108

1. Without prejudice to the provisions of Article 25 of this Convention and subject to    109
paragraph 2 below, the limits of liability prescribed in Articles 21, 22 and 23 shall be
reviewed by the Depositary at five-year intervals, the first such review to take place at
the end of the fifth year following the date of entry into force of this Convention, or if
the Convention does not enter into force within five years of the date it is first open for
signature, within the first year of its entry into force, by reference to an inflation factor
which corresponds to the accumulated rate of inflation since the previous revision or in
the first instance since the date of entry into force of the Convention. The measure of
the rate of inflation to be used in determining the inflation factor shall be the weighted
average of the annual rates of increase or decrease in the Consumer Price Indices of the
States whose currencies comprise the Special Drawing Right mentioned in paragraph 1 of
Article 23.

2. If the review referred to in the preceding paragraph concludes that the inflation factor    110
has exceeded 10 percent, the Depositary shall notify States Parties of a revision of the
limits of liability. Any such revision shall become effective six months after its notification
to the States Parties. If within three months after its notification to the States Parties
a majority of the States Parties register their disapproval, the revision shall not become
effective and the Depositary shall refer the matter to a meeting of the States Parties.
The Depositary shall immediately notify all States Parties of the coming into force of any
revision.

3. Notwithstanding paragraph 1 of this Article, the procedure referred to in paragraph 2    111
of this Article shall be applied at any time provided that one-third of the States Parties
express a desire to that effect and upon condition that the inflation factor referred to in
paragraph 1 has exceeded 30 percent since the previous revision or since the date of entry
into force of this Convention if there has been no previous revision. Subsequent reviews
using the procedure described in paragraph 1 of this Article will take place at five-year
intervals starting at the end of the fifth year following the date of the reviews under the
present paragraph.

Article 25 - Stipulation on limits                                                              112

A carrier may stipulate that the contract of carriage shall be subject to higher limits of    113
liability than those provided for in this Convention or to no limits of liability whatso-
ever.

## Article 26 - Invalidity of contractual provisions [114]

Any provision tending to relieve the carrier of liability or to fix a lower limit than that [115] which is laid down in this Convention shall be null and void, but the nullity of any such provision does not involve the nullity of the whole contract, which shall remain subject to the provisions of this Convention.

## Article 27 - Freedom to contract [116]

Nothing contained in this Convention shall prevent the carrier from refusing to enter [117] into any contract of carriage, from waiving any defences available under the Convention, or from laying down conditions which do not conflict with the provisions of this Convention.

## Article 28 - Advance payments [118]

In the case of aircraft accidents resulting in death or injury of passengers, the carrier [119] shall, if required by its national law, make advance payments without delay to a natural person or persons who are entitled to claim compensation in order to meet the immediate economic needs of such persons. Such advance payments shall not constitute a recognition of liability and may be offset against any amounts subsequently paid as damages by the carrier.

## Article 29 - Basis of claims [120]

In the carriage of passengers, baggage and cargo, any action for damages, however [121] founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

## Article 30 - Servants, agents - aggregation of claims [122]

1. If an action is brought against a servant or agent of the carrier arising out of damage to [123] which the Convention relates, such servant or agent, if they prove that they acted within the scope of their employment, shall be entitled to avail themselves of the conditions and limits of liability which the carrier itself is entitled to invoke under this Convention.

2. The aggregate of the amounts recoverable from the carrier, its servants and agents, in [124] that case, shall not exceed the said limits.

3. Save in respect of the carriage of cargo, the provisions of paragraphs 1 and 2 of this [125] Article shall not apply if it is proved that the damage resulted from an act or omission of the servant or agent done with intent to cause damage or recklessly and with knowledge that damage would probably result.

Article 31 - Timely notice of complaints 126

1. Receipt by the person entitled to delivery of checked baggage or cargo without com- 127
plaint is prima facie evidence that the same has been delivered in good condition and
in accordance with the document of carriage or with the record preserved by the other
means referred to in paragraph 2 of Article 3 and paragraph 2 of Article 4.

2. In the case of damage, the person entitled to delivery must complain to the carrier 128
forthwith after the discovery of the damage, and, at the latest, within seven days from the
date of receipt in the case of checked baggage and fourteen days from the date of receipt
in the case of cargo. In the case of delay, the complaint must be made at the latest within
twenty-one days from the date on which the baggage or cargo have been placed at his or
her disposal.

3. Every complaint must be made in writing and given or dispatched within the times 129
aforesaid.

4. If no complaint is made within the times aforesaid, no action shall lie against the 130
carrier, save in the case of fraud on its part.

Article 32 - Death of person liable 131

In the case of the death of the person liable, an action for damages lies in accordance with 132
the terms of this Convention against those legally representing his or her estate.

Article 33 - Jurisdiction 133

1. An action for damages must be brought, at the option of the plaintiff, in the territory 134
of one of the States Parties, either before the court of the domicile of the carrier or of its
principal place of business, or where it has a place of business through which the contract
has been made or before the court at the place of destination.

2. In respect of damage resulting from the death or injury of a passenger, an action may 135
be brought before one of the courts mentioned in paragraph 1 of this Article, or in the
territory of a State Party in which at the time of the accident the passenger has his or her
principal and permanent residence and to or from which the carrier operates services for
the carriage of passengers by air, either on its own aircraft or on another carrier's aircraft
pursuant to a commercial agreement, and in which that carrier conducts its business of
carriage of passengers by air from premises leased or owned by the carrier itself or by
another carrier with which it has a commercial agreement.

3. For the purposes of paragraph 2, 136

(a) "commercial agreement" means an agreement, other than an agency agreement, made 137
between carriers and relating to the provision of their joint services for carriage of pas-
sengers by air;

(b) "principal and permanent residence" means the one fixed and permanent abode of 138

the passenger at the time of the accident. The nationality of the passenger shall not be the determining factor in this regard.

4. Questions of procedure shall be governed by the law of the court seized of the case. 139

## Article 34 - Arbitration 140

1. Subject to the provisions of this Article, the parties to the contract of carriage for cargo may stipulate that any dispute relating to the liability of the carrier under this Convention shall be settled by arbitration. Such agreement shall be in writing. 141

2. The arbitration proceedings shall, at the option of the claimant, take place within one of the jurisdictions referred to in Article 33. 142

3. The arbitrator or arbitration tribunal shall apply the provisions of this Convention. 143

4. The provisions of paragraphs 2 and 3 of this Article shall be deemed to be part of every arbitration clause or agreement, and any term of such clause or agreement which is inconsistent therewith shall be null and void. 144

## Article 35 - Limitation of actions 145

1. The right to damages shall be extinguished if an action is not brought within a period of two years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped. 146

2. The method of calculating that period shall be determined by the law of the court seized of the case. 147

## Article 36 - Successive carriage 148

1. In the case of carriage to be performed by various successive carriers and falling within the definition set out in paragraph 3 of Article 1, each carrier which accepts passengers, baggage or cargo is subject to the rules set out in this Convention and is deemed to be one of the parties to the contract of carriage in so far as the contract deals with that part of the carriage which is performed under its supervision. 149

2. In the case of carriage of this nature, the passenger or any person entitled to compensation in respect of him or her can take action only against the carrier which performed the carriage during which the accident or the delay occurred, save in the case where, by express agreement, the first carrier has assumed liability for the whole journey. 150

3. As regards baggage or cargo, the passenger or consignor will have a right of action against the first carrier, and the passenger or consignee who is entitled to delivery will have a right of action against the last carrier, and further, each may take action against the carrier which performed the carriage during which the destruction, loss, damage or delay took place. These carriers will be jointly and severally liable to the passenger or to the consignor or consignee. 151

Article 37 - Right of recourse against third parties                              152

Nothing in this Convention shall prejudice the question whether a person liable for damage    153
in accordance with its provisions has a right of recourse against any other person.

# Chapter IV - Combined Carriage                                            154

Article 38 - Combined carriage                                              155

1. In the case of combined carriage performed partly by air and partly by any other mode    156
of carriage, the provisions of this Convention shall, subject to paragraph 4 of Article 18,
apply only to the carriage by air, provided that the carriage by air falls within the terms
of Article 1.

2. Nothing in this Convention shall prevent the parties in the case of combined carriage    157
from inserting in the document of air carriage conditions relating to other modes of
carriage, provided that the provisions of this Convention are observed as regards the
carriage by air.

# Chapter V - Carriage by Air Performed by a Person other than the Con-    158
tracting Carrier

Article 39 - Contracting carrier - actual carrier                           159

The provisions of this Chapter apply when a person (hereinafter referred to as "the con-    160
tracting carrier") as a principal makes a contract of carriage governed by this Convention
with a passenger or consignor or with a person acting on behalf of the passenger or con-
signor, and another person (hereinafter referred to as "the actual carrier") performs, by
virtue of authority from the contracting carrier, the whole or part of the carriage, but is
not with respect to such part a successive carrier within the meaning of this Convention.
Such authority shall be presumed in the absence of proof to the contrary.

Article 40 - Respective liability of contracting and actual carriers         161

If an actual carrier performs the whole or part of carriage which, according to the contract    162
referred to in Article 39, is governed by this Convention, both the contracting carrier and
the actual carrier shall, except as otherwise provided in this Chapter, be subject to the
rules of this Convention, the former for the whole of the carriage contemplated in the
contract, the latter solely for the carriage which it performs.

Article 41 - Mutual liability                                               163

1. The acts and omissions of the actual carrier and of its servants and agents acting       164

within the scope of their employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the contracting carrier.

2. The acts and omissions of the contracting carrier and of its servants and agents acting within the scope of their employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the actual carrier. Nevertheless, no such act or omission shall subject the actual carrier to liability exceeding the amounts referred to in Articles 21, 22, 23 and 24. Any special agreement under which the contracting carrier assumes obligations not imposed by this Convention or any waiver of rights or defences conferred by this Convention or any special declaration of interest in delivery at destination contemplated in Article 22 shall not affect the actual carrier unless agreed to by it.

Article 42 - Addressee of complaints and instructions

Any complaint to be made or instruction to be given under this Convention to the carrier shall have the same effect whether addressed to the contracting carrier or to the actual carrier. Nevertheless, instructions referred to in Article 12 shall only be effective if addressed to the contracting carrier.

Article 43 - Servants and agents

In relation to the carriage performed by the actual carrier, any servant or agent of that carrier or of the contracting carrier shall, if they prove that they acted within the scope of their employment, be entitled to avail themselves of the conditions and limits of liability which are applicable under this Convention to the carrier whose servant or agent they are, unless it is proved that they acted in a manner that prevents the limits of liability from being invoked in accordance with this Convention.

Article 44 - Aggregation of damages

In relation to the carriage performed by the actual carrier, the aggregate of the amounts recoverable from that carrier and the contracting carrier, and from their servants and agents acting within the scope of their employment, shall not exceed the highest amount which could be awarded against either the contracting carrier or the actual carrier under this Convention, but none of the persons mentioned shall be liable for a sum in excess of the limit applicable to that person.

Article 45 - Addressee of claims

In relation to the carriage performed by the actual carrier, an action for damages may be brought, at the option of the plaintiff, against that carrier or the contracting carrier, or against both together or separately. If the action is brought against only one of those carriers, that carrier shall have the right to require the other carrier to be joined in the

proceedings, the procedure and effects being governed by the law of the court seized of the case.

Article 46 - Additional jurisdiction                                                    174

Any action for damages contemplated in Article 45 must be brought, at the option of    175
the plaintiff, in the territory of one of the States Parties, either before a court in which
an action may be brought against the contracting carrier, as provided in Article 33, or
before the court having jurisdiction at the place where the actual carrier has its domicile
or its principal place of business.

Article 47 - Invalidity of contractual provisions                                       176

Any contractual provision tending to relieve the contracting carrier or the actual carrier of  177
liability under this Chapter or to fix a lower limit than that which is applicable according
to this Chapter shall be null and void, but the nullity of any such provision does not
involve the nullity of the whole contract, which shall remain subject to the provisions of
this Chapter.

Article 48 - Mutual relations of contracting and actual carriers                        178

Except as provided in Article 45, nothing in this Chapter shall affect the rights and    179
obligations of the carriers between themselves, including any right of recourse or indem-
nification.

# Chapter VI - Other Provisions                                                          180

Article 49 - Mandatory application                                                       181

Any clause contained in the contract of carriage and all special agreements entered into  182
before the damage occurred by which the parties purport to infringe the rules laid down
by this Convention, whether by deciding the law to be applied, or by altering the rules as
to jurisdiction, shall be null and void.

Article 50 - Insurance                                                                   183

States Parties shall require their carriers to maintain adequate insurance covering their  184
liability under this Convention. A carrier may be required by the State Party into which
it operates to furnish evidence that it maintains adequate insurance covering its liability
under this Convention.

Article 51 - Carriage performed in extraordinary circumstances                          185

The provisions of Articles 3 to 5, 7 and 8 relating to the documentation of carriage shall  186

not apply in the case of carriage performed in extraordinary circumstances outside the normal scope of a carrier's business.

## Article 52 - Definition of days                                        187

The expression "days" when used in this Convention means calendar days, not working   188
days.

## Chapter VII - Final Clauses                                            189

Article 53 - Signature, ratification and entry into force                  190

1. This Convention shall be open for signature in Montreal on 28 May 1999 by States   191
participating in the International Conference on Air Law held at Montreal from 10 to 28
May 1999.  After 28 May 1999, the Convention shall be open to all States for signature
at the headquarters of the International Civil Aviation Organization in Montreal until it
enters into force in accordance with paragraph 6 of this Article.

2. This Convention shall similarly be open for signature by Regional Economic Integra-   192
tion Organisations.  For the purpose of this Convention, a "Regional Economic Integration
Organisation" means any organisation which is constituted by sovereign States of a given
region which has competence in respect of certain matters governed by this Convention
and has been duly authorized to sign and to ratify, accept, approve or accede to this Con-
vention.  A reference to a "State Party" or "States Parties" in this Convention, otherwise
than in paragraph 2 of Article 1, paragraph 1(b) of Article 3, paragraph (b) of Article 5,
Articles 23, 33, 46 and paragraph (b) of Article 57, applies equally to a Regional Economic
Integration Organisation.  For the purpose of Article 24, the references to "a majority of
the States Parties" and "one-third of the States Parties" shall not apply to a Regional
Economic Integration Organisation.

3. This Convention shall be subject to ratification by States and by Regional Economic   193
Integration Organisations which have signed it.

4. Any State or Regional Economic Integration Organisation which does not sign this   194
Convention may accept, approve or accede to it at any time.

5. Instruments of ratification, acceptance, approval or accession shall be deposited with   195
the International Civil Aviation Organization, which is hereby designated the Deposi-
tary.

6. This Convention shall enter into force on the sixtieth day following the date of deposit   196
of the thirtieth instrument of ratification, acceptance, approval or accession with the
Depositary between the States which have deposited such instrument.  An instrument
deposited by a Regional Economic Integration Organisation shall not be counted for the
purpose of this paragraph.

7. For other States and for other Regional Economic Integration Organisations, this   197

Convention shall take effect sixty days following the date of deposit of the instrument of ratification, acceptance, approval or accession.

8. The Depositary shall promptly notify all signatories and States Parties of:          198

(a) each signature of this Convention and date thereof;          199

(b) each deposit of an instrument of ratification, acceptance, approval or accession and          200
date thereof;

(c) the date of entry into force of this Convention;          201

(d) the date of the coming into force of any revision of the limits of liability established          202
under this Convention;

(e) any denunciation under Article 54.          203

Article 54 - Denunciation          204

1. Any State Party may denounce this Convention by written notification to the Deposi-          205
tary.

2. Denunciation shall take effect one hundred and eighty days following the date on which          206
notification is received by the Depositary.

Article 55 - Relationship with other Warsaw Convention instruments          207

This Convention shall prevail over any rules which apply to international carriage by          208
air:

1. between States Parties to this Convention by virtue of those States commonly being          209
Party to

(a) the Convention for the Unification of Certain Rules relating to International Carriage          210
by Air signed at Warsaw on 12 October 1929 (hereinafter called the Warsaw Conven-
tion);

(b) the Protocol to amend the Convention for the Unification of Certain Rules relating to          211
International Carriage by Air signed at Warsaw on 12 October 1929, done at The Hague
on 28 September 1955 (hereinafter called The Hague Protocol);

(c) the Convention, Supplementary to the Warsaw Convention, for the Unification of          212
Certain Rules relating to International Carriage by Air Performed by a Person other than
the Contracting Carrier, signed at Guadalajara on 18 September 1961 (hereinafter called
the Guadalajara Convention);

(d) the Protocol to amend the Convention for the Unification of Certain Rules relating          213
to International Carriage by Air signed at Warsaw on 12 October 1929 as amended by
the Protocol done at The Hague on 28 September 1955, signed at Guatemala City on 8
March 1971 (hereinafter called the Guatemala City Protocol);

(e) Additional Protocol Nos. 1 to 3 and Montreal Protocol No. 4 to amend the Warsaw          214
Convention as amended by The Hague Protocol or the Warsaw Convention as amended

by both The Hague Protocol and the Guatemala City Protocol, signed at Montreal on 25 September 1975 (hereinafter called the Montreal Protocols); or

2. within the territory of any single State Party to this Convention by virtue of that State being Party to one or more of the instruments referred to in sub-paragraphs (a) to (e) above.                                                                                                215

## Article 56 - States with more than one system of law                                    216

1. If a State has two or more territorial units in which different systems of law are applicable in relation to matters dealt with in this Convention, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.                                  217

2. Any such declaration shall be notified to the Depositary and shall state expressly the territorial units to which the Convention applies.                                               218

3. In relation to a State Party which has made such a declaration:                          219

(a) references in Article 23 to "national currency" shall be construed as referring to the currency of the relevant territorial unit of that State; and                                    220

(b) the reference in Article 28 to "national law" shall be construed as referring to the law of the relevant territorial unit of that State.                                               221

## Article 57 - Reservations                                                               222

No reservation may be made to this Convention except that a State Party may at any time declare by a notification addressed to the Depositary that this Convention shall not apply to:                                                                                      223

(a) international carriage by air performed and operated directly by that State Party for non-commercial purposes in respect to its functions and duties as a sovereign State; and/or                                                                                        224

(b) the carriage of persons, cargo and baggage for its military authorities on aircraft registered in or leased by that State Party, the whole capacity of which has been reserved by or on behalf of such authorities.                                                        225

IN WITNESS WHEREOF the undersigned Plenipotentiaries, having been duly authorized, have signed this Convention.                                                           226

DONE at Montreal on the 28th day of May of the year one thousand nine hundred and ninety-nine in the English, Arabic, Chinese, French, Russian and Spanish languages, all texts being equally authentic. This Convention shall remain deposited in the archives of the International Civil Aviation Organization, and certified copies thereof shall be transmitted by the Depositary to all States Parties to this Convention, as well as to all States Parties to the Warsaw Convention, The Hague Protocol, the Guadalajara Convention, the Guatemala City Protocol and the Montreal Protocols.                                     227

Convention for the Unification of Certain Rules for International Carriage by Air

[Signatures]

228

Convention for the Unification of Certain Rules for International Carriage by Air

## meta Document Information (metadata)

Metadata

Document Manifest @

<http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/sisu_manifest.html>

Dublin Core  (DC)

DC tags included with this document are provided here.

DC Title: Convention for the Unification of Certain Rules for International Carriage by Air - Montreal, 28 May 1999

DC Date: 1999-05-28

DC Type: international convention multilateral

description: Convention for the Unification of Certain Rules for International Carriage by Air, Montreal, 1999

Version Information

Sourcefile: air.carriage.unification.convention.montreal.1999.lm3

Filetype: SiSU text 0.38

Sourcefile Digest, MD5(air.carriage.unification.convention.montreal.1999.sst)= e034bddb9ba42648f6af2

Skin_Digest: MD5(skin_lm.rb)= 6b9c73a9fc8c2120b23888c4886c53f1

Generated

Document (metaverse) last generated: Wed Jun 11 12:10:47 -0400 2008

Generated by: SiSU 0.67.1 of 2008w21/2 (2008-05-27)

Ruby version:  ruby 1.8.7 (2008-05-31 patchlevel 0) [i486-linux]

Convention for the Unification of Certain Rules for International Carriage by Air

# Information on this document copy and an unofficial List of Some web related information and sources

"Support Open Standards and Software Libre for the Information Technology Infrastructure" RA

## Information on this document copy lexmercatoria.org

Generated by SiSU found at www.jus.uio.no/sisu [ SiSU 0.67.1 2008w21/2 ] www.sisudoc.org. SiSU is software for document structuring, publishing and search (using SiSU: object citation numbering, markup, meta-markup, and system) Copyright [©] 1997, current 2008 Ralph Amissah, All Rights Reserved.

SiSU is released under GPL 3 or later (www.fsf.org/licenses/gpl.html).

W3 since October 3 1993 **SiSU** SiSU 1997, current 2008.

Lex Mercatoria presentations at lexmercatoria.org

Convention for the Unification of Certain Rules for International Carriage by Air pdf versions can be found at:

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/portrait.pdf

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/landscape.pdf

Convention for the Unification of Certain Rules for International Carriage by Air html versions may be found at:

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/toc.html or

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/doc.html

SiSU Manifest of document output and metadata may be found at:

http://www.jus.uio.no/lm/air.carriage.unification.convention.montreal.1999/sisu_manifest.html

Lex Mercatoria found at: lexmercatoria.org

Links that may be of interest at Lex Mercatoria and elsewhere:

Air Carriage
(lexmercatoria.org)
http://www.jus.uio.no/lm/transport.and.carriage.of.goods/air.html

Transport
(lexmercatoria.org)
http://www.jus.uio.no/lm/transport.and.carriage.of.goods/toc.html

Lex Mercatoria home:
lexmercatoria.org