1  PAUL S. HUDSON (pro hoc vice)
   LAW OFFICES OF PAUL S. HUDSON P.C.
2   globetrotter1947@hotmail.com
   4411 Bee Ridge Road #274.
3  Sarasota, Florida 34233
   Telephone: 410-940-8934
4  Facsimile: 240-391-1923

5  DAVID G. RAMOS (Bar No. 116456)
   LAW OFFICES OF DAVID G. RAMOS
6   barram@i-cafe.net
   3266 Villa Lane
7  Napa, California  94558
   Telephone:  707-255-1700
8  Facsimile:  707-255-3660

9  Attorneys for Plaintiff KATHLEEN HANNI.
   Individually and on behalf of all others similarly situated

10

11

12                    UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

14

15  KATHLEEN HANNI, individually and on ) No.           C08-00732 CW
    behalf of all others similarly situated, )
16  TIMOTHY  T.  HANNI,  CHASE  L. )  **SECOND  AMENDED  CLASS  ACTION**
    COSTELLO, and LANDEN T. HANNI, a )  **COMPLAINT**
17  minor, by and through his parent and )
    Natural Guardian, Kathleen Hanni, )
18                                  )
              Plaintiff,             )
19                                  )
    v.                              )
20                                  )
    AMERICAN AIRLINES, INC.; and DOES 1 )
21  through 20, inclusive,          )
                                    )
22            Defendants.           )
                                    )
23  _____ )

24            Plaintiff Kathleen Hanni, Timothy T. Hanni (husband of Kathleen Hanni), Chase

25  L. Costello (son of Kathleen Hanni), and Landen T. Hanni (son of Kathleen Hanni), a minor, by

26  and through his parent and Natural Guardian, Kathleen Hanni, on behalf of herself and all others

27  similarly situated, by and through her attorneys, Paul S. Hudson, Esq. (pro hac vice) and David

28

G. Ramos, Esq., state and allege as and for a Second Amended Class Action Complaint as follows:

### Parties and Jurisdiction

1. Plaintiffs are citizens and residents of Napa, Napa County, California.

2. Defendant American Airlines, Inc. (hereinafter AA) is a corporation organized under the laws of Delaware with its headquarters in Fort Worth, Texas. At all relevant times hereto, AA was doing substantial business in the State of California.

3. The monetary damages at issue in this case are within the jurisdictional requirements of this court.

### Class Action Allegations

4. This cause of action is being maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. In that regard, the Plaintiff alleges the following:

a. The proposed class consists of 3,000 to 12,000 airline passengers confined on aircraft by Defendants for 3 to 11 hours on December 29th, 2006, and who were otherwise affected by related actions of the Defendant as set forth below; accordingly the class is so numerous that joinder of members is impracticable;

b. There are common issues of law and fact common to the class;

c. Many of the claims of Kathleen Hanni are typical of the claims of the class members;

d. Kathleen Hanni has agreed to serve as class representative and has agreed to fairly and adequately protect the interests of the class.

5. In support of the class action allegations, Plaintiff incorporates by reference the statements and allegations that follow.

### Events of December 29th, 2006

6. Plaintiff, her husband Timothy Hanni and her two children purchased tickets for air transportation on AA flight 1348 scheduled to depart from San Francisco, California on December 29th, 2006, at 6:20 AM (Pacific Time) to Dallas (DFW), Texas, connecting to AA flight 3821 scheduled to depart DFW at 1:20 PM (Central Time) to arrive

in Mobile, Alabama at 2:55 PM (Central Time), for a total expected travel time of 7 hours from departure airport to destination airport. However, the trip actually took 57 hours due to Defendant's misconduct detailed below.

7. Plaintiff boarded the AA aircraft with her family members at 6:20 AM (Pacific Time) which departed from San Francisco at about 7:00 AM after a delay due to mechanical problems.

8. En route the AA pilot announced the aircraft was being diverted to Austin, Texas due to weather "but only for a brief time, to allow fingers of weather to move through" and that "we will be landing in Austin to wait for clearance at DFW so we can be on our way."

9. At noon Central Time AA Flight 1348, a filled to capacity MD80, landed in Austin with Plaintiff and approximately 140 other passengers and flight crew, taxied to an area away from the terminal that upon information and belief was an AA maintenance ramp.

10. Plaintiff could see that gates were empty at the terminal, but the AA pilot reassured the passengers that they would only be 10 to 15 minutes and they would be on their way.

11. AA captain Jesse Fodero announced every 15 minutes for 2 ½ hours that it will be just a few more minutes, but at 1:00 pm another AA airliner Flight 1008 pulled up beside, then another and another AA flights 2412 and 534.

12. At 2:30 PM (Central Time), AA captain Fodero announced that he had asked for buses to bring food and potable water to the aircraft and to allow passengers with destinations near Austin, and anyone else who wanted to, to go to the terminal. Captain Fodero stated that he still expected to take off but had not gotten clearance yet, and he will update passengers again in 30 minutes.

13. A bus arrived at about 2:45 PM, but Captain Fodero ordered that only elderly, passengers with children and disabled would be allowed to deplane. At this point many passengers stampeded to the back of the aircraft to exit, but all passengers who did not

1 | have Austin as a final destination were stopped and forced to remain in the aircraft against

2 | their will.

3 |        14.  Captain Fodero also stated that he was very sure that they would take off

4 | shortly and that anyone who exits the aircraft will not be able to get another flight and would

5 | not receive their baggage.

6 |        15.  At 3:00 PM (Central Time) Captain Fodero stated that he has received

7 | clearance to take off and land at DFW, but that although the sky is clear and sunny he states

8 | he is concerned about lightning and will not take off yet, but will soon.

9 |        16.  Plaintiff observed as of 3:00 PM there were 13 other AA aircraft lined up

10 | and parked in the same maintenance area as her flight.

11 |        17.  At 3:30 PM (Central Time) AA Captain Fodero announced that "this bird is

12 | not going to fly" and then reveals that buses he requested are not coming and that an AA

13 | manager, who upon information and belief is named Al Tinsley (aka Doe #1), is refusing to

14 | permit AA aircraft to go to a gate to allow passengers to exit the aircraft.

15 |        18.  Plaintiff and other passengers express their desire to exit the aircraft but

16 | Captain Fodero refused, claiming to be powerless due to AA management.

17 |        19. Passengers start calling for help on their cell phones even though the flight

18 | crew has instructed them not to, and some passengers began talking about popping the

19 | emergency exits and running for the terminal, which terrified Plaintiff and other passengers.

20 |        20.  At about 5:00 PM, Captain Fodoro opened the cockpit door and allowed

21 | some passengers to hear his communications with AA management and other parked

22 | aircraft.  Plaintiff overheard one captain on another parked aircraft state that Hazmat had

23 | been called because a dog with diarrhea  had defecated on some passengers and other

24 | passengers were getting sick from the smell.  Plaintiff also overheard that all parked aircraft

25 | were being told by AA management that they could not come to the terminal.

26 |        21.  At about 6:00 PM toilets were backed up on the plane. Flight attendants

27 | served a half Dixie cup of water, which upon information and belief, was non-potable water

28 |

1    from the lavatory sinks and made some passengers sick, and a small bag of pretzels with

2    about 45 calories.

3              22. One passenger told Plaintiff he had missed a funeral and others were

4    expressing their anger and frustration and anxiety at being imprisoned on the aircraft without

5    any justification.

6              23.  At about 7:00 PM, Captain Fodero announced that he was embarrassed

7    that AA had not emptied the toilets or serviced the aircraft and AA management would not

8    allow the aircraft to have any available gate to return to the terminal and that he did not

9    know what to say anymore.

10             24.  Plaintiff observed that AA gates 24 and 25 were empty and available as

11   well as gates of other airlines, but Captain Fodero continued to insist that they could not go

12   to them as did other flight crew members without explanation.

13             25.  Plaintiff observed that another parked aircraft flight 534 had its cabin

14   lights out and someone was flashing SOS and that a group of male passengers who the

15   Plaintiff later learned were US Marines were being arrested on the tarmac, after, upon

16   information and belief, they had gotten into a fight in order to get off their aircraft.

17             26.  At about 8:00 PM passengers on Plaintiff's flight were speaking out loudly

18   and angrily and the flight attendants ceased circulating through the cabin to ask people to

19   remain calm, but huddled frightened at the front of the aircraft.

20             27.  Captain Fodero continued to repeat that buses and food were coming but

21   nothing came.  He claimed he was talking to the airport managers to get passengers to the

22   terminal, but nothing happened.

23             28.  Plaintiff needed to go to the bathroom and went to the first class lavatory

24   as the coach class bathrooms were inoperable, but was told by Captain Fodero who was just

25   exiting the first class lavatory not to enter or enter at her own risk.  Plaintiff had to use a

26   disgusting lavatory which was not operable, with the toilet bowl filled with excrement and

27   vomit.

28

29.  Plaintiff who had recently been victim of an violent assault and was being treated for post traumatic shock syndrome, then suffered a mild panic attack and a tightening in her chest and informed  Captain Fodero.  Captain Fodero stated that even if she had a heart attack that they would not allow passengers to leave the aircraft, they would just take her off the plane as they were doing with a paraplegic diabetic who was suffering from an attack on another parked aircraft.

30.  Plaintiff observed a pregnant woman with a baby making a diaper out of tee shirt and many other acts of naked survival and physical and emotional distress on the aircraft caused by inhuman conditions being inflicted on her and others similarly situated.

31.  As plaintiff was exiting the first class lavatory she overheard Captain Fodero saying that he could not understand why AA would not send anyone to empty the toilets and then he told Plaintiff that the only way that passengers could return to the terminal without AA management permission was if he declared an on board emergency.

32.  At about 9:04 PM Captain Fodero declared, upon information and belief, after his and other pilots' maximum flight time on duty had expired, an on board emergency and stated that he might lose his job for doing so.

33.  Plaintiff's aircraft then proceeded through a series of hair raising turns on active and inactive runways to the terminal where passengers were deplaned at 9:30 PM, after 9.5 hours confined on the tarmac in Austin, and over 16 hours without food.

34.  In one last announcement, Captain Fodero stated "Please go to baggage claim 3, I promise we will get your bags off this plane quickly and efficiently so you may be on your way.  There will be someone from American to help you when you get off the plane."  However, there was no one to help, all food service places were closed, and after waiting at the baggage claim area for another 2.5 hours until midnight, the Plaintiff's and other passengers baggage and others was not unloaded, .

35.  Rather, AA personnel informed Plaintiff and other passengers that their bags would not be returned, would not be unloaded from the plane and that the flight would be "resumed" at 6:00 AM on December 30th, 2006.

36. Defendant provided no vouchers or money for food, lodging, or anything else to most class members except a $10 hotel discount coupon for passengers who waited in a long line for several hours.

37. Plaintiff returned after 4 hours at a hotel to find 1,000 people from the stranded flights all trying to get through ticketing and security at the Austin airport as Defendant had issued no tickets or boarding passes to its stranded passengers.

38. Plaintiff was finally advised to get on another flight (flight 1008) by Captain Fodero who stated that "this bird (flight 1348) is not going to fly."

39. Arriving at DFW 20 minutes before the only AA flight to Mobile, Plaintiff was refused boarding even though she had a confirmed reservation by an AA gate agent who also rudely informed her that her baggage was on the flight to Mobile, she and her family would not be allowed to board as the flight was oversold, unless she was "the Queen of England and you are obviously not the Queen of England." Plaintiff then became violently sick to her stomach and nearly vomited.

40. Plaintiff then politely asked that her baggage be removed, but the AA pilot refused and stated that due to the weight of too many bags he was involuntarily removing 14 passengers but would not remove any baggage.

41. Plaintiff then politely asked the gate agent and pilot for a hotel voucher, who responded in unison, "Don't blame us for the weather" and summarily rejected her request and neither paid or offered to pay any compensation for being denied boarding.

42. Plaintiff was then forced to spend another night in a hotel at her expense and finally got on an AA flight on December 31st, 2006 to Mobile to retrieve her baggage over 50 hours after departing from San Francisco, ruining her vacation, and her husband's business trip.

43. Plaintiff was confined to the aircraft against her will on the ground in Austin Texas for approximately 9.5 hours by Defendant, and was not permitted by AA to exit the aircraft until 9:30 PM (Central Time), over 13 hours after boarding the aircraft.

1        44.  While confined on the ground in Austin, the toilets became full and

2  would not flush and the stench of human excrement and body odor filled the plane.

3        45.  Plaintiff and other passengers were deprived of adequate food and potable

4  water.

5        46.  Plaintiff and other passengers were also deprived of access to

6  medications, nutritional supplements and needs, and hydration especially needed by infirm,

7  elderly and children and infants.

8        47.  Plaintiff and other passengers were forced to witness the physical and

9  severe emotional distress and panic of other passengers causing all passengers to suffer

10 emotional distress and endangering the physical safety of Plaintiff and all passengers.

11       48.  The distress of the confined passengers in overcrowded conditions in the

12 aircraft was witnessed by AA flight crew employees and was also reported to AA ground

13 personnel and to Austin airport authorities.

14       49.  As many as 12,000 passengers involving as many as 124 flights on

15 December 29th, 2006 were confined to aircraft diverted from Dallas by Defendant to 17

16 other airports and confined for from 3 to 12 hours on the aircraft in poor to deplorable

17 conditions by Defendants.

18       50.  Plaintiffs and other stranded passengers suffered hunger, thirst, anxiety,

19 physical illness, emotional distress and monetary losses as a result of Defendant's failure to

20 permit passengers to exit the aircraft to the airport terminals or to supply the parked aircraft

21 with essentials of water, food, sanitary waste removal, light, and breathable or fresh air at

22 normal temperatures.

23       51.  Defendants knew or should have known that passengers needed to be

24 supplied with essential rescue and survival conditions on board the aircraft, but failed and

25 refused to do so.

26       52.  Defendants had ample advanced warning of weather conditions at Dallas

27 and knew or should have known that it was not able to land aircraft at Dallas (DFW) airport

28 at the capacity it had scheduled on December 29th, 2006, due to transient thunder storms

1    and could have cancelled or delayed from departing many of the flights that it diverted and

2    stranded, thereby preventing the diversions and confinements.

3            53.  With the exception of a few passengers whose destination was the Austin

4    Texas area, AA refused to permit passengers to exit the aircraft even though buses and

5    available gates at the terminal were available to AA.

6            54.  After AA finally permitted Plaintiff and other passengers to exit the aircraft

7    at about 9:30 PM on December 29th, 2006, it "continued" the flight to the next morning and

8    refused to return checked baggage to the passengers.

9            55.  AA then refused to provide payment for overnight lodging, meals, ground

10    transportation, telephone or other passenger expenses and losses caused by its diversion and

11    stranding.

12            56.  The next morning after more delays Plaintiff and other passengers were

13    flown to Dallas (DWF) airport, where their baggage had been loaded onto the Mobile flight

14    that Plaintiff was involuntarily denied boarding.

15            57.  Other class members who had been diverted, confined and stranded

16    overnight were then denied boarding on connecting flights, and were stranded for another

17    day in Dallas.

18            58.  Intentionally omitted.

19    **Factual Allegations and Experiences  of  Others Similarly Situated in the Proposed Class**

20            59.  The following is a small sample of the experiences of others similarly

21    situated who would be in the proposed class (those identified with initials would have their

22    names not divulged in public filings at this time, but their identities are available to the court

23    *in camera* and to the Defendant upon the filing of an appropriate protective order or

24    stipulation.):

25            a) Paul Ziots residing 8 miles south of San Francisco on Flight 1348 suffered

26    intestinal infection and distress from the water served and/or infection received on the

27    aircraft, that required a two day stay in Austin at his expense cost of over $500 in out-of -

28    pocket expenses, causing cancellation of a vacation in Mexico, and when he tried to use an

1  AA trip voucher for another vacation to Florida, another lengthy delay required cancellation

2  of that trip also.

3          b) TD of Los Altos Hills, California on Flight 1348 on a trip to Belize on AA

4  from San Francisco had out-of-pocket expenses of over $600, had to drive from Austin to

5  Dallas at his expense, will confirm that no water or food was delivered to the aircraft and

6  passengers were forbidden to leave the aircraft after a small group of passengers with Austin

7  as destination were allowed to deplane early on, that the toilets became disgusting and filthy

8  and were not serviced, open gates were obviously available in plain sight while the AA

9  captain continued to say none were available.

10          c) Mark Vail of Mardera, California on Flight 534 from Fresno to Dallas was

11 suffering from claustrophobia and is required to take medication daily for epilepsy.  i) His

12 flight was diverted to Austin and he and his fellow passenger were confined against their will

13 for over 7 hours on the ground, plus 3 hours in the air.  ii) He was deprived of medication

14 which was in his baggage that AA refused to return on December 29th, so he had to rent a

15 car in Austin at his expense to drive to Dallas and retrieve his baggage the next morning at

16 DFW after 1-2 hours of AA personnel misinforming him that his baggage had been sent back

17 to Fresno.  iii) Mr. Vail was immersed the hellish conditions and distress of other passengers,

18 including a woman who had a diabetic attack next to him, who began shaking

19 uncontrollably while begging the flight attendant for food, and whose medications were also

20 in her checked baggage. The flight attendant only gave her a stale bagel and spoiled milk.

21 iv) Babies ran out of formula and began crying and screaming along with  their mothers

22 begging to be let off the aircraft.  v) Another elderly man who had a colostomy bag went into

23 diabetic shock and was removed from the plane by an EMS team.  vi)  EMS refused to

24 evacuate other passengers who were yelling "We're being held hostage!"  vii) Mr. Vail began

25 flashing SOS out the window and finally at 9:00 pm the aircraft went to one of the many

26 open gates. viii) Mr. Vail received no ticket refund or reimbursement for his auto rental

27 expense, but did receive a $500 voucher for future air travel.

28

1           d) Flight 1682 from Oklahoma City to DFW left the gate at 2:07 pm, then

2   waited over 8 hours before AA canceled the flight and returned to the terminal, upon

3   information and belief based upon a the Wall Street Journal article of January 6, 2007 by

4   Scott McCartney and Flight Stats Inc.

5           e) Flight 37 from Zurich, Switzerland to DFW was diverted to Tulsa,

6   Oklahoma where passengers were confined for 10 hours and did not reach Dallas until 1:33

7   AM on December 30th after passengers had been on board for 22 hours.  The pilots refused

8   to take off because they had reached their federal limits of duty time and AA did not supply a

9   replacement crew for many hours.  This allegation is on information and belief based on the

10  Wall Street Journal article cited above.

11          f) William King of Bowling Green, Kentucky, his wife and two children ages 5

12  and 7, on Flight 9133 were returning home to the Nashville airport through Dallas and was

13  diverted to Austin where after many hours of confinement, he was told that he could not get

14  off and, if he did, his family tickets would be forfeited and no ticket refund would be granted

15  or assistance provided to reach his destination.  i) The next day, after receiving no hotel or

16  food or transportation assistance in Austin where he was stranded, Mr. King was forced to

17  rent a car at his expense and drive 13 hours to his home town, because AA stated it could

18  not get him to Nashville.  The total delay was two days.

19          g) JH residing near Fresno, California was on Flight 4384, which was diverted

20  to New Orleans after circling Dallas airport until fuel was low, where he was confined for 8

21  hours where he had no food or functioning toilets, lost 2 days of work and $700 in out of

22  pocket expenses, no food or functioning toilets.  i) He received $500 voucher for future

23  travel.

24          **Pattern and Practice of AA Misconduct**

25          60.  Upon information and belief, Defendant AA has a pattern of involuntarily

26  confining passengers on aircraft without survival necessaries for lengthy periods of time on

27  the ground for its own pecuniary gain, and such incidents include the following:

28

1    a) April 24, 2007, 92 flights were diverted, on at least 13 of the flights,

2 passengers were confined over 4 hours.

3    b) August 9th, 2007, 12 aircraft at LAX in Los Angeles, passengers confined

4 over 12 hours with some passing out on the aircraft.

5    c) May 8, 2007, passengers held over 8 hours on aircraft at Palm Beach.

6    d) On or about Febuary 8th, 2002, Flight 2011 at DFW, passengers held on

7 aircraft over 7 hours.

8    e) On or about May 19th, 2000, thousands of passengers held in aircraft at

9 DFW up to 7 hours.

10    f) On or about July 2, 1999, at O'Hare Airport, 91 passengers were held up to

11 6 hours.

12    61.  Defendant AA has not provided reimbursement for passenger expenses,

13 ticket refunds and other forms of compensation to passengers that it diverted and confined

14 on December 29th and 30th, 2006, but only a restricted voucher for $100 to $500 future

15 travel and sometimes a letter of apology.

16    62.  Defendant did not advise stranded passengers that they could use their AA

17 tickets on another airline for travel to their destinations on December 29th or subsequent

18 thereto, even though an industry convention and rule provides for such when a flight is

19 cancelled or excessively delayed.

20    63.  Defendant did not provide ticket refunds or other compensation to

21 passengers that it stranded on December 29th and 30th, 2006.

22    64.  Defendant knowingly misrepresented the reasons for the delays and

23 confinements by falsely asserting to passengers and the public that aircraft were not able to

24 take off due to weather.

25    65.  The delays on December 29th, 2006 were actually due to causes within

26 the control of AA, including insufficient personnel, lack of equipment, poor maintenance

27 and lack of planning for ordinary weather disruptions by AA.

28

1    66.  Confinements by AA, upon information and belief, were to avoid

2  expenses and lawful obligations to passengers associated with strandings, diversions and

3  canceled flights and for AA's and its officers', employees', agents' and stockholders' own

4  pecuniary gain at the expense of Plaintiff and other passengers.

5    67.  While Plaintiff and other passengers were confined to their aircraft in

6  Austin and other diverted airports, other flights of Defendant and other airlines' aircraft were

7  taking off and landing without significant delays.

8    68.  Upon information and belief, the Dallas (DFW) airport was only closed to

9  air traffic for approximately 2.5 hours from 2:00 PM to 4:30 PM on December 29th, 2006,

10  and brief closure did not cause the delay of approximately 50 hours of plaintiff to her

11  destination or that of others similarly situated but was instead caused by matters within the

12  control of AA.

13    69.  Upon information and belief, AA has a corporate policy, practice and

14  pattern of confining and imprisoning passengers on aircraft of excessively delayed or

15  cancelled flights for excessive periods of time to prevent "passenger migration" and this

16  unlawful practice was used against Plaintiff and other similarly situated passengers by

17  Defendant's employees and agents on December 29th, 2006.  The basis for this belief

18  includes the miscoding of many flights as "continued" or "resumed" rather than cancelled

19  and AA employee informants' assertions.

20    70.  Upon information and belief, AA has inflicted its practices of confining

21  and imprisoning passengers for over 3 hours to prevent "passenger migration" on over ten

22  thousand other passengers since December 29th, 2006, including another mass stranding on

23  April 2007.

24    71.  By unlawfully confining  Plaintiff and other passengers diverted from

25  Dallas on December 29th, 2006 in inhumane conditions, AA recklessly endangered the

26  safety of plaintiff and other passengers.  AA also avoided ticket refunds, overnight lodging

27  and meal expenses for passengers, alternate transportation expenses on other airlines that

28  under an industry convention and practice will honor tickets of a defaulting airline and back

1  charge the defaulting airline, ground transportation expenses, terminal employee overtime

2  and staffing expenses, and other expenses normally associated with mass strandings and

3  cancellations.

4       72.  Defendant could have permitted passengers to exit the aircraft after the

5  diversions on December 29th, 2006, but failed and refused to do so for its own pecuniary

6  gain.

7       73.  Upon information and belief, some passengers after the confinements

8  ended were forced by Defendant to fly to destinations that they not longer wished to travel

9  to because the reason for their trip such as a missed meeting or family event, no longer

10  existed, but were forced to do so by Defendant who did not permit them to exit the aircraft

11  and obtain alternate transportation to another destination or return home.

12       74.  Other passengers were forced under duress not to abandon their travel

13  with AA on December 29th and 30th, 2006 because AA refused to return their checked

14  baggage, even after promising to do so, after finally permitting passengers to exit the aircraft

15  the evening of December 29th, 2006.

16  **ACTIONS AFFECTING CLASS MEMBERS GENERALLY**

17       75.  Passengers on the Defendant's diverted flights had their travel delayed up

18  to 3 days after December 29th, 2006 due to non-weather conditions that were within the

19  control of  Defendant AA without compensation for passenger expenses and losses.

20       76.  Defendant was not prevented or prohibited from permitting passengers to

21  exit or re-supply and service the aircraft in Austin or other diverted airports by the Federal

22  Aviation Administration air or by airport management, or other government authorities, by

23  weather, by safety, or by security considerations.

24       77.  Upon information and belief, the water served by AA to Plaintiff and other

25  passengers on her flight was untreated, non-potable water taken from the bathroom sinks and

26  that such water was known by AA to be non-potable in that such water on AA aircraft had

27  recently failed testing and was known by AA to be unfit for drinking, and likely

28

1  contaminated with bacteria from sanitary waste that could  sicken and endanger passengers'

2  health if drunk.

3          78.  Defendants' continued detention of Plaintiff and other passengers similarly

4  situated for over 3 hours was done for the commercial convenience of Defendants.

5          79.  Defendants' continued detention of Plaintiff and other passengers for over

6  3 hours without potable water, working toilets, breathable air, or adequate food or access to

7  passenger medications recklessly endangered the safety of Plaintiff and others similarly

8  situated.

9          80.  Gates and/or buses were available to Defendant AA to safely permit

10  passengers to exit the aircraft in Austin and other airports to which AA diverted aircraft, but

11  Defendant AA and/or its agents and employees refused permission to flight crews to return to

12  available terminal gates and/or failed or refused to permit buses to deplane passengers

13  except for a few passengers whose destination was Austin or other airports that AA's aircraft

14  were diverted to on December 29th, 2006.

15          81.  Proper maintenance of aircraft, customer service and operations staffing

16  are matters within the control of Defendant AA.

17          82.  Intentionally omitted.

18          83.  After passengers were finally returned to the terminal in Austin with over

19  300 passengers in need of assistance.  AA Manager Al Tinsley, upon information and belief,

20  ordered that the only duty AA Customer Service personnel close the Customer Service

21  Station and go home.

22          84.  AA made an intentional management decision not to delay its non-

23  diverted flights and to confine and hold its diverted flights and confine its passengers on

24  diverted flights to maximize its revenue and minimize its expenses associated with diverted

25  flights by falsely blaming the confinements and delays on the weather (aka Force Majeure or

26  Acts of God).

27

28

1    85.  AA management made an intentional decision to close its headquarters at

2  Fort Worth where most of its Customer Service personnel work for the holiday weekend on

3  December 29th , 2006 through January 1st, 2007.

4    86.  AA management was scheduled to receive (and did receive) large bonuses

5  based on financial results achieved for 2006 and would have received less or even no

6  bonuses if it had compensated passengers as required under its obligations by contract for

7  the diversion delays and called in necessary workers or paid overtime to operate its aircraft

8  and service its diverted passengers, and not sought to falsely excuse its malfeasance and

9  nonfeasance with a fraudulent  Force Majeur claim.

10    **FIRST CAUSE OF ACTION,  NEGLIGENCE**

11    87.  Plaintiff repeats and realleges paragraphs 1 through 86 as if fully stated

12  herein.

13    88.  Defendant is a common carrier offering air transportation to the general

14  public, and as such owed a high duty of care for the safety and protection of its passengers,

15  including Plaintiffs and class members.

16    89.  This duty also created a special relationship between AA and Plaintiff and

17  required AA to affirmatively aid and protect Plaintiff and class members against unreasonable

18  risk of physical harm.

19    90.  This duty included a high standard of care so as to

20    a) not deprive Plaintiffs and other similarly situated passengers of their

21  personal liberty by unjustified involuntary confinement  in crowded conditions on the

22  ground in an aircraft for a lengthy period of time without adequate water, food, restroom

23  facilities, and breathable air at reasonable temperatures,

24    b) not violate criminal laws of the states regarding false imprisonment,

25    c) not cause plaintiffs and other passengers physical injury and emotional

26  distress, and

27    d) not place passengers in danger or risk of physical harm.

28

91.  This duty arises out of state common law, as summarized at Restatement of Torts Second Section 314A, out of the general federal standard of due care to provide "safe and adequate service" (49 U.S.C. 41702), under criminal statutes in Texas, California and other states where AA confined passengers defining the crime of false imprisonment and/or reckless endangerment, and to the extent that AA alleges it was acting under color of federal law and government authority, it arises out of the Fourth Amendment to the United States Constitution providing that the right of people to be secure in their persons shall not be violated by unreasonable seizures.

92.  Defendant breached its duties to Plaintiffs and others similarly situated on December 29th and 30th, 2006, and its conduct was in reckless disregard of its duty owed to Plaintiffs and similarly situated passengers.

93.  Defendant's conduct was the proximate cause of damage and losses to the Plaintiffs and other class members; plaintiffs individual damages include lost earnings proximately caused by Defendant AA's negligence and reckless conduct, pain and suffering from physical and emotional injury caused by Defendant AA's negligence.

94.  Defendant is guilty of negligence and/or gross negligence.

**SECOND CAUSE OF ACTION, BREACH OF CONTRACT**

95.  Plaintiff repeats and realleges paragraphs 1 through 94 as if fully stated herein.

96.  Defendant has filed with the US Department of Transportation, published on its web site, and referenced on its tickets "conditions of carriage" and a "Customer Service Plan".

97.  The contract between the Plaintiffs and other class members and Defendant AA includes the following relevant terms and each were violated by Defendant AA as indicated below:

a) *"Your ticket and the following Conditions of Carriage constitute the Contract between You, the Passenger, and American Airlines, Inc./American Eagle/American*

1  *and apply to all transportation provided by American (including transportation on codeshare*

2  *Partners) between points in the United States."*

3  b) *"American Airlines and American Eagle will provide customers at the*

4  *airport and onboard affected aircraft with timely and frequent updates regarding known*

5  *delays, cancellations and diversions and will strive to provide the best available information*

6  *concerning the duration of delays and to the extent available, the flight's anticipated*

7  *departure time."*  Defendant AA in breach of this contract term by failing to strive to provide

8  Plaintiffs and other class members with "best available information" concerning the duration

9  of delays on December 29th, 2006 and as noted above by repeatedly supplying misleading

10  and false information as set forth in paragraphs 8 through 35 above.  Had AA provided

11  Plaintiff with timely delay information instead of providing false and misleading information

12  she and others similarly situated could have made alternative travel arrangements or

13  canceled their trips and claimed a ticket refund from AA.

14  c) *"When cancellations and major delays are experienced, you will be*

15  *rerouted on our next flight with available seats."*  Plaintiffs and many other class members

16  could have been rerouted on other AA flights that were taking off from Austin and other

17  airports with diverted flights for DFW and other destinations or allowed to exit the aircraft

18  when the diverted airport was at or near their destination, but Defendant AA in breach of this

19  contract term failed and refused to do so on December 29th and 30th, 2006.  AA had other

20  flights with available seats at Austin and the other 16 airports that it diverted over 100 planes

21  to on December 29th, 2006 with available seats that it could have rerouted Plaintiff and other

22  passengers to DFW and other destinations but instead confined Plaintiff and others on the

23  ground in aircraft for 3 to 10 hours.

24  d)  *"If the delay was caused by events within our control and we do not get*

25  *you to your final destination on the expected arrival day, we will provide reasonable*

26  *overnight accommodations, subject to availability."*  Plaintiffs and most other class members

27  were not provided with overnight accommodations in breach of this contract provision.  On

28  Plaintiffs flight and several other flights the initial delay was caused by poor maintenance, by

1   lack of available aircraft or crew members, all matters within the control of AA that resulted

2   in such flights being diverted instead of being able to land at DFW.  The on ground

3   confinements of 3 to 10 + hours were within the control of Defendant AA and prevented

4   unnecessarily most class members from reaching their final destinations on the same day, as

5   DFW was only closed for approximately 2.5 hours on December 29th, 2006. Defendant AA

6   also breached this contract term by failing and refusing to provide overnight

7   accommodations despite availability.  AA employees have admitted in media accounts and

8   others will testify at trial that on December 29th, 2006 it had inadequate software to track

9   excessive ground delays although such software was readily available, that it lost track of

10  many aircraft and was using scraps of paper and yellow pads to try to keep up but was

11  unable to do so, and that in Austin and at other diverted airports AA supervisors ordered

12  pilots not to come into available gates and sent customer service personnel  home, and

13  closed its central customer service facility on December 29th, 2006 so that it had inadequate

14  staff to handle passenger needs.

15          e)  "*In extreme circumstances, it is possible that a flight will cancel while on

16  *the ground in the city to which it was diverted.  When this happens you will be rerouted on*

17  *the next American Airlines or American Eagle flight with available seats, or in circumstances*

18  *on alterative means of transportation,  If we are unable to reroute you, reasonable overnight*

19  *accommodations will be provided by American Airlines or American Eagle, subject to*

20  *availability.*"  Defendant AA failed and refused to provide for or reimburse Plaintiff and most

21  other class members for overnight accommodations at diverted locations on December 29th,

22  2006 and in Dallas on December 30th, 2006 in breach of this contract term, or provide

23  alternate transportation or reroute.  The great majority of diverted flights from DFW on

24  December 29th, 2006 were defacto canceled when they did not fly to DFW and the flight

25  crews left the aircraft.  The mislabeling of such flights as "continued" the next day was an

26  deceptive and unauthorized practice by Defendant AA to avoid its obligations under this and

27  other contract provisions.

28

1    f) *"American Airlines and American Eagle will provide amenities for delayed*

2  *passengers, necessary to maintain the safety and/or welfare of certain passengers such as*

3  *customers with disabilities, unaccompanied children, the elderly and others to whom such*

4  *amenities will be furnished consistent with special needs and/or circumstances."* Many class

5  members had special needs and circumstances including the Plaintiff and her family

6  members, but Defendant breached this provision of its contract by failing to provide such

7  "amenities" as potable water, adequate food, access to medications (Plaintiff had anti-seizure

8  medications in her baggage that she was deprived of for about 57 hours), baby formula,

9  diapers, breathable air during the on ground confinements of over 3 hours.

10    g) *"In the case of extraordinary events that result in very lengthy onboard*

11  *delays, American and American Eagle will make every reasonable effort to ensure that*

12  *essential needs of food (snack bar such as Nutri-Grain), water, restroom facilities and basic*

13  *medical assistance are met."* Par. 19 of COC. Defendant AA flagrantly breached this

14  contract provision for Plaintiff and nearly all other class members.

15    h) *"If a flight is oversold (more passengers hold confirmed reservations than*

16  *there are seats available), and you are denied boarding involuntarily at the airport, you will*

17  *be entitled to Denied Boarding Compensation from American Airlines..."* (and if American

18  *cannot arrange alternate transportation for you to arrive within 2 hours of your scheduled*

19  *arrival time, you will be offered a payment of double the value of your flight coupon up to*

20  *$400.) Par. 5 of Contract of Carriage (COC).* Defendant AA breached this term of its contract

21  with Plaintiffs and many other class members when it denied her boarding involuntarily on

22  December 30th at the airport in DFW because the her flight to Mobile Alabama was oversold

23  and failed to pay her Denied Boarding Compensation (for Plaintiff $400 per ticket times 4

24  tickets for herself and three family members traveling with her, or if the aircraft was an

25  American Eagle flight with under 60 seats a full refund of the ticket price up to $100 per

26  ticket).

27  Plaintiff had complied with the check in requirements as set forth in Par. 7 of the COC, none

28  of the five exceptions in Par. 5 of the COC is applicable and she was present at least 15

1 | minutes prior to the scheduled boarding time for her flight from DFW to Mobile Alabama on

2 | December 30th, 2006.

3 |     98.  Defendant's conduct on December 29th, 2006 and subsequent thereto

4 | breached its Contract with Plaintiff and other class members and caused them damages and

5 | entitles them to general damages as provided by law.

6 |     99.  The COC is a consumer contract of adhesion that must be strictly

7 | construed against AA and to the extent that the COC seeks to exclude all damages for its

8 | breaches of contract (e.g. by inserting the clause that it is "not responsible for any special,

9 | incidental or consequential damages" COC Par. 19) such clauses are void as a matter of law

10 | as unconscionable and illusory.

11 | **THIRD CAUSE OF ACTION, CONVERSION**

12 |     100.  Plaintiffs repeat and re-allege paragraphs 1 through 99 as if fully set forth

13 | herein.

14 |     101.  Defendant AA wrongfully exercised dominion over the baggage of

15 | Plaintiffs and other class members when it refused to return their baggage to them that was

16 | readily available to be returned to Plaintiffs and other class members on December 29th and

17 | 30th, 2006.

18 |     102.  Plaintiffs and other class members were damaged thereby and some

19 | were endangered by being denied access to necessary medications, including anti-seizure

20 | medicine in Plaintiff's baggage that she was deprived of by AA for over 57 hours causing her

21 | pain, emotional distress, and anxiety and related damages.

22 |     103.  Defendant AA is guilty of the tort of conversion.

23 | **FOURTH CAUSE OF ACTION, CIVIL CONSPIRACY**

24 |     104.  Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 103

25 | as if fully set forth herein.

26 |     105.  Defendants Doe #1, Al Tinsley, AA manager at the Austin airport on

27 | December 29th, 2006,  Doe #2, Don Dillman, managing director of AA's operations center,

28 | Doe #3, Bonnie Sutton, AA's general manager at the Little Rock, Arkansas airport on

December 29th, 2006 and Does #4 through #18, consisting of the operations or general managers of AA on duty on December 29th and 30th, 2006, upon information and belief, knowingly agreed to participate in committing torts against Plaintiffs and others similarly situated, and knowingly or recklessly breached the standard of care owed to Plaintiffs and others similarly situated, and knowingly undertook a course of conduct that threatened the physical safety and emotional well being of Plaintiffs and others similarly situated by knowingly confining Plaintiffs and others similarly situated for 3-10 hours in aircraft against their will and without adequate necessities of potable water, toilet facilities, food, access to medications, exercise to avoid blood clots from confinements over 4 hours, and/or breathable air, for Defendant Does #1-#18 commercial convenience and pecuniary gain.

106. Unlawful overt acts done in furtherance of this conspiracy included:

a) by Defendant Doe #2 instructing and coordinating with Defendant Does #1, and #3 through #18, operations managers at 17 or more airport locations where over 100 aircraft were diverted from DFW on December 29th, 2006, to involuntarily confine passengers for 3 to 11 hours in AA aircraft on the ground;

b) by Defendant Does #1-#18 intentionally and repeatedly making misrepresentations to the AA pilots of diverted aircraft over many hours including Plaintiff and others similarly situated, knowing and intending that AA pilots would then pass on these misrepresentations and false information to the Plaintiff and others similarly situated that i) no gates or buses were available to permit passengers to safely exit the aircraft; ii) that Plaintiff's and other diverted aircraft were cleared for takeoff or would be taking off shortly for DFW; iii) that DFW airport was closed;

c) by Defendant Does #1 - #18 intentionally withholding and refusing to deliver to Plaintiff's and others similarly situated available or reasonably available essential survival supplies or services of potable water, working toilet facilities, food, and access to medications or exercise after over 3 hours of confinement on the diverted airport tarmacs;

d) by Defendant Doe #1 Al Tinsley telling AA customer service agents under his supervision to go home and close the customer service center in Austin, so that there

1  would be inadequate or no personnel to provide services to Plaintiff and others similarly

2  situated after they were finally allowed to deplane at the Austin airport after many hours of

3  confinement;

4          e) by Defendant Does #1-#18 intentionally and fraudulently miscoding diverted

5  flight delays of Plaintiff and others similarly situated as due to weather or other reasons not

6  within the control of AA, so as to wrongfully and in bad faith deny overnight lodging, meal

7  and other compensation due to Plaintiff and others similarly situated who were stranded

8  overnight on December 29th, 2006 under a Force Majeur clause in the Contract of Carriage

9  rather than give the true reason which was for the commercial convenience and pecuniary

10  gain to AA and its employees;

11          f) by Defendant Does #1- #18 wrongfully and intentionally refusing and

12  denying requests  AA pilots of Plaintiff's aircraft and others similarly situated to come to open

13  gates to discharge passengers even after many hours of confinement and when they knew

14  passengers were suffering from severe physical and emotional distress.

15          107.  Defendant Doe #2 Don Dillman has publicly admitted that he knowingly

16  sacrificed the diverted flights of Plaintiff and others similarly situated and was quoted in a

17  November 15th, 2007 New York Times article on the December 29th , 2006 incident that is

18  the subject of the Plaintiff's complaint saying, "We had an attitude that was pretty much a

19  brick wall.  You don't want the diverted flights to pull your normal flights down."

20          108.  The aforementioned conspirators, upon information and belief, all had

21  personal financial reasons for engaging in such aforementioned wrongful and unlawful

22  conduct in that their bonuses from AA are determined in part based on how little was paid

23  out for diversions and delays, and pilots and other flight crew members who continuously

24  provided the false information and misrepresentations to Plaintiff and others similarly receive

25  much higher flight pay when the aircraft doors are locked and closed and little to no pay

26  when aircraft doors are opened to allow passengers to exit the aircraft.

27          109.  Plaintiff and others similarly situated suffered damages and losses as a

28  result of Defendant Does #1-#18 wrongful and unlawful conduct.

**DAMAGES/RELIEF SOUGHT**

110.  Plaintiffs repeat and reallege paragraphs 1 through 109 as if fully stated herein.

111.  Plaintiff is a consumer and class representative of all others similarly situated who suffered losses and were damaged by Defendant's misconduct on December 29th and 30th, 2006 in the aforementioned diversions from Dallas (DFW) airport and the subsequent, delays, injuries, confinements, and indignities suffered as a result of Defendant's conduct.

112.  The Plaintiff  seeks individual damages of $1,000,000 plus an amount in excess of  $5,000,000 for the proposed class for negligence, breach of contract, conversion and civil conspiracy, for compensatory, special, actual, and consequential damages, plus exemplary and punitive damages.

113.  Punitive damages are warranted in this case as the acts and/or omissions of the Defendants were intentional and the Defendants knew, or in light of the surrounding circumstances ought to have known, that their conduct would naturally and probably result in injury and yet the Defendants continued this course of conduct with malice or in reckless disregard of the consequences from which malice may be inferred.

114.  The Defendants, motivated by greed and a desire for profit, continued the actions as set for above in reckless disregard of the consequences from which malice may be inferred.

115.  The Defendant continues the practices detailed above and therefore punitive damages are necessary in order to deter like conduct in the future.

116.  Plaintiff also seeks the opportunity to be heard as to being named representative of a class of all passengers similarly situated and will seek an incentive amount for such representational duties as the court may determine.

117.  Wherefore, Plaintiff requests that this honorable Court appoint the Plaintiff as class representative, certify this case a class action pursuant to the Federal  Rules of Civil Procedure, order the Defendant to preserve all records relating the incidents

1  complained of, and otherwise issue orders and relief as the court deems just and proper in the

2  circumstances.

3        118.  Plaintiffs also request attorney fees, expenses, costs, disbursements, and

4  interest as provided by law.

5

6                          **DEMAND FOR JURY TRIAL**

7

8        Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal

9  Rules of Civil Procedure.

10

11

12  Dated: July 31, 2008                    LAW OFFICES OF PAUL S. HUDSON PC
                                           LAW OFFICES OF DAVID G. RAMOS
13

14                                          By: _____/s/_____
                                               Paul S. Hudson
15                                          Attorneys for Plaintiff KATHLEEN HANNI
                                            Individually and on behalf of all others
16                                               similarly situated

17

18

19

20

21

22

23

24

25

26

27

28