1 | PAUL S. HUDSON (pro hoc vice)
  | LAW OFFICES OF PAUL S. HUDSON P.C.
2 | globetrotter1947@hotmail.com
  | 4411 Bee Ridge Road #274.
3 | Sarasota, Florida 34233
  | Telephone: 410-940-8934
4 | Facsimile: 240-391-1923

5 | DAVID G. RAMOS (Bar No. 116456)
  | LAW OFFICES OF DAVID G. RAMOS
6 | barram@i-cafe.net
  | 3266 Villa Lane
7 | Napa, California  94558
  | Telephone:  707-255-1700
8 | Facsimile:  707-255-3660

9 | Attorneys for Plaintiff KATHLEEN HANNI.
  | Individually and on behalf of all others similarly situated

10

11

12 | UNITED STATES DISTRICT COURT

13 | NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

14

15 | KATHLEEN HANNI, individually and on ) No.          C08-00732 CW
   | behalf of all others similarly situated, )
16 | TIMOTHY  T.  HANNI,  CHASE  L. ) **THIRD   AMENDED   CLASS   ACTION**
   | COSTELLO, and LANDEN T. HANNI, a ) **COMPLAINT**
17 | minor, by and through his parent and )
   | Natural Guardian, Kathleen Hanni, )
18 |                                )
   |            Plaintiff,          )
19 |                                )
   | v.                             )
20 |                                )
   | AMERICAN AIRLINES, INC.; and DOES 1 )
21 | through 20, inclusive,         )
   |                                )
22 |            Defendants.         )
   |                                )
23 | _____    )

24 | Plaintiff Kathleen Hanni, Timothy T. Hanni (husband of Kathleen Hanni), Chase

25 | L. Costello (son of Kathleen Hanni), and Landen T. Hanni (son of Kathleen Hanni), a minor, by

26 | and through his parent and Natural Guardian, Kathleen Hanni, on behalf of herself and all others

27 | similarly situated, by and through her attorneys, Paul S. Hudson, Esq. (pro hac vice) and David

28 | G. Ramos, Esq., state and allege as and for a Third Amended Class Action Complaint as follows:

**Parties and Jurisdiction**

1.  Plaintiffs are citizens and residents of Napa, Napa County, California.

2.  Defendant American Airlines, Inc. (hereinafter AA) is a corporation organized under the laws of Delaware with its headquarters in Fort Worth, Texas. At all relevant times hereto, AA was doing substantial business in the State of California.

3.  The monetary damages at issue in this case are within the jurisdictional requirements of this court.

**Class Action Allegations**

4.  This cause of action is being maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. In that regard, the Plaintiff alleges the following:

a.  The proposed class consists of 3,000 to 12,000 airline passengers confined on aircraft by Defendants for 3 to 11 hours on December 29th, 2006, and who were otherwise affected by related actions of the Defendant as set forth below; accordingly the class is so numerous that joinder of members is impracticable;

b.  There are common issues of law and fact common to the class;

c.  Many of the claims of Kathleen Hanni are typical of the claims of the class members;

d.  Kathleen Hanni has agreed to serve as class representative and has agreed to fairly and adequately protect the interests of the class.

5.  In support of the class action allegations, Plaintiff incorporates by reference the statements and allegations that follow.

**Events of December 29th, 2006**

6.  Plaintiff, her husband Timothy Hanni and her two children purchased tickets for air transportation on AA flight 1348 scheduled to depart from San Francisco, California on December 29th, 2006, at 6:20 AM  (Pacific Time) to Dallas (DFW), Texas, connecting to AA flight 3821 scheduled to depart  DFW at 1:20 PM (Central Time) to arrive in Mobile, Alabama at 2:55 PM (Central Time), for a total expected travel time of 7 hours

1  from departure airport to destination airport. However, the trip actually took 57 hours due to
2  Defendant's misconduct detailed below.

3       7.  Plaintiff boarded the AA aircraft with her family members at 6:20 AM
4  (Pacific Time) which departed from San Francisco at about 7:00 AM after a delay due to
5  mechanical problems.

6       8.  En route the AA pilot announced the aircraft was being diverted to Austin,
7  Texas due to weather "but only for a brief time, to allow fingers of weather to move through"
8  and that "we will be landing in Austin to wait for clearance at DFW so we can be on our
9  way."

10       9.  At noon Central Time AA Flight 1348, a filled to capacity MD80, landed in
11  Austin with Plaintiff and approximately 140 other passengers and flight crew, taxied to an
12  area away from the terminal that upon information and belief was an AA maintenance ramp.

13       10.  Plaintiff could see that gates were empty at the terminal, but the AA pilot
14  reassured the passengers that they would only be 10 to 15 minutes and they would be on
15  their way.

16       11.  AA captain Jesse Fodero announced every 15 minutes for 2 ½ hours that it
17  will be just a few more minutes, but at 1:00 pm another AA airliner Flight 1008 pulled up
18  beside, then another and another AA flights 2412 and 534.

19       12.  At 2:30 PM (Central Time), AA captain Fodero announced that he had
20  asked for buses to bring food and potable water to the aircraft and to allow passengers with
21  destinations near Austin, and anyone else who wanted to, to go to the terminal.  Captain
22  Fodero stated that he still expected to take off but had not gotten clearance yet, and he will
23  update passengers again in 30 minutes.

24       13.  A bus arrived at about 2:45 PM, but Captain Fodero ordered that only
25  elderly, passengers with children and disabled would be allowed to deplane.  At this point
26  many passengers stampeded to the back of the aircraft to exit, but all passengers who did not
27  have Austin as a final destination were stopped and forced to remain in the aircraft against
28  their will.

14. Captain Fodero also stated that he was very sure that they would take off shortly and that anyone who exits the aircraft will not be able to get another flight and would not receive their baggage.

15. At 3:00 PM (Central Time) Captain Fodero stated that he has received clearance to take off and land at DFW, but that although the sky is clear and sunny he states he is concerned about lightning and will not take off yet, but will soon.

16. Plaintiff observed as of 3:00 PM there were 13 other AA aircraft lined up and parked in the same maintenance area as her flight.

17. At 3:30 PM (Central Time) AA Captain Fodero announced that "this bird is not going to fly" and then reveals that buses he requested are not coming and that an AA manager, who upon information and belief is named Al Tinsley (aka Doe #1), is refusing to permit AA aircraft to go to a gate to allow passengers to exit the aircraft.

18. Plaintiff and other passengers express their desire to exit the aircraft but Captain Fodero refused, claiming to be powerless due to AA management.

19. Passengers start calling for help on their cell phones even though the flight crew has instructed them not to, and some passengers began talking about popping the emergency exits and running for the terminal, which terrified Plaintiff and other passengers.

20. At about 5:00 PM, Captain Fodoro opened the cockpit door and allowed some passengers to hear his communications with AA management and other parked aircraft. Plaintiff overheard one captain on another parked aircraft state that Hazmat had been called because a dog with diarrhea had defecated on some passengers and other passengers were getting sick from the smell. Plaintiff also overheard that all parked aircraft were being told by AA management that they could not come to the terminal.

21. At about 6:00 PM toilets were backed up on the plane. Flight attendants served a half Dixie cup of water, which upon information and belief, was non-potable water from the lavatory sinks and made some passengers sick, and a small bag of pretzels with about 45 calories.

22. One passenger told Plaintiff he had missed a funeral and others were expressing their anger and frustration and anxiety at being imprisoned on the aircraft without any justification.

23. At about 7:00 PM, Captain Fodero announced that he was embarrassed that AA had not emptied the toilets or serviced the aircraft and AA management would not allow the aircraft to have any available gate to return to the terminal and that he did not know what to say anymore.

24. Plaintiff observed that AA gates 24 and 25 were empty and available as well as gates of other airlines, but Captain Fodero continued to insist that they could not go to them as did other flight crew members without explanation.

25. Plaintiff observed that another parked aircraft flight 534 had its cabin lights out and someone was flashing SOS and that a group of male passengers who the Plaintiff later learned were US Marines were being arrested on the tarmac, after, upon information and belief, they had gotten into a fight in order to get off their aircraft.

26. At about 8:00 PM passengers on Plaintiff's flight were speaking out loudly and angrily and the flight attendants ceased circulating through the cabin to ask people to remain calm, but huddled frightened at the front of the aircraft.

27. Captain Fodero continued to repeat that buses and food were coming but nothing came.  He claimed he was talking to the airport managers to get passengers to the terminal, but nothing happened.

28. Plaintiff needed to go to the bathroom and went to the first class lavatory as the coach class bathrooms were inoperable, but was told by Captain Fodero who was just exiting the first class lavatory not to enter or enter at her own risk.  Plaintiff had to use a disgusting lavatory which was not operable, with the toilet bowl filled with excrement and vomit.

29. Plaintiff who had recently been victim of an violent assault and was being treated for post traumatic shock syndrome, then suffered a mild panic attack and a tightening in her chest and informed  Captain Fodero.  Captain Fodero stated that even if she had a

heart attack that they would not allow passengers to leave the aircraft, they would just take her off the plane as they were doing with a paraplegic diabetic who was suffering from an attack on another parked aircraft.

30.  Plaintiff observed a pregnant woman with a baby making a diaper out of tee shirt and many other acts of naked survival and physical and emotional distress on the aircraft caused by inhuman conditions being inflicted on her and others similarly situated.

31.  As plaintiff was exiting the first class lavatory she overheard Captain Fodero saying that he could not understand why AA would not send anyone to empty the toilets and then he told Plaintiff that the only way that passengers could return to the terminal without AA management permission was if he declared an on board emergency.

32.  At about 9:04 PM Captain Fodero declared, upon information and belief, after his and other pilots' maximum flight time on duty had expired, an on board emergency and stated that he might lose his job for doing so.

33.  Plaintiff's aircraft then proceeded through a series of hair raising turns on active and inactive runways to the terminal where passengers were deplaned at 9:30 PM, after 9.5 hours confined on the tarmac in Austin, and over 16 hours without food.

34.  In one last announcement, Captain Fodero stated "Please go to baggage claim 3, I promise we will get your bags off this plane quickly and efficiently so you may be on your way.  There will be someone from American to help you when you get off the plane."  However, there was no one to help, all food service places were closed, and after waiting at the baggage claim area for another 2.5 hours until midnight, the Plaintiff's and other passengers baggage and others was not unloaded, .

35.  Rather, AA personnel informed Plaintiff and other passengers that their bags would not be returned, would not be unloaded from the plane and that the flight would be "resumed" at 6:00 AM on December 30th, 2006.

36.  Defendant provided no vouchers or money for food, lodging, or anything else to most class members except a $10 hotel discount coupon for passengers who waited in a long line for several hours.

37.  Plaintiff returned after 4 hours at a hotel to find 1,000 people from the stranded flights all trying to get through ticketing and security at the Austin airport as Defendant had issued no tickets or boarding passes to its stranded passengers.

38.  Plaintiff was finally advised to get on another flight (flight 1008) by Captain Fodero who stated that "this bird (flight 1348) is not going to fly."

39.  Arriving at DFW 20 minutes before the only AA flight to Mobile, Plaintiff was refused boarding even though she had a confirmed reservation by an AA gate agent who also rudely informed her that her baggage was on the flight to Mobile, she and her family would not be allowed to board as the flight was oversold, unless she was "the Queen of England and you are obviously not the Queen of England."  Plaintiff then became violently sick to her stomach and nearly vomited.

40.  Plaintiff then politely asked that her baggage be removed, but the AA pilot refused and stated that due to the weight of too many bags he was involuntarily removing 14 passengers but would not remove any baggage.

41.  Plaintiff then politely asked the gate agent and pilot for a hotel voucher, who responded in unison, "Don't blame us for the weather" and summarily rejected her request and neither paid or offered to pay any compensation for being denied boarding.

42.  Plaintiff was then forced to spend another night in a hotel at her expense and finally got on an AA flight on December 31st, 2006 to Mobile to retrieve her baggage over 50 hours after departing from San Francisco, ruining her vacation, and her husband's business trip.

43.  Plaintiff was confined to the aircraft against her will on the ground in Austin Texas for approximately 9.5  hours by Defendant, and was not permitted by AA to exit the aircraft until 9:30 PM (Central Time), over 13 hours after boarding the aircraft.

44.  While confined on the ground in Austin, the toilets became full and would not flush and the stench of human excrement and body odor filled the plane.

45.  Plaintiff and other passengers were deprived of adequate food and potable water.

46. Plaintiff and other passengers were also deprived of access to medications, nutritional supplements and needs, and hydration especially needed by infirm, elderly and children and infants.

47. Plaintiff and other passengers were forced to witness the physical and severe emotional distress and panic of other passengers causing all passengers to suffer emotional distress and endangering the physical safety of Plaintiff and all passengers.

48. The distress of the confined passengers in overcrowded conditions in the aircraft was witnessed by AA flight crew employees and was also reported to AA ground personnel and to Austin airport authorities.

49. As many as 12,000 passengers involving as many as 124 flights on December 29th , 2006 were confined to aircraft diverted from Dallas by Defendant  to 17 other airports and confined for from 3 to 12 hours on the aircraft in poor to deplorable conditions by Defendants.

50. Plaintiffs and other stranded passengers suffered hunger, thirst, anxiety, physical illness, emotional distress and monetary losses as a result of Defendant's failure to permit passengers to exit the aircraft to the airport terminals or to supply the parked aircraft with essentials of water, food, sanitary waste removal, light, and breathable or fresh air at normal temperatures.

51. Defendants knew or should have known that passengers needed to be supplied with essential rescue and survival conditions on board the aircraft, but failed and refused to do so.

52. Defendants had ample advanced warning of weather conditions at Dallas and knew or should have known that it was not able to land aircraft at Dallas (DFW) airport at the capacity it had scheduled on December 29th, 2006, due to transient thunder storms and could have cancelled or delayed from departing many of the flights that it diverted and stranded, thereby preventing the diversions and confinements.

1   53.  With the exception of a few passengers whose destination was the Austin

2   Texas area, AA refused to permit passengers to exit the aircraft even though buses and

3   available gates at the terminal were available to AA.

4   54.  After AA finally permitted Plaintiff and other passengers to exit the aircraft

5   at about 9:30 PM on December 29th, 2006, it "continued" the flight to the next morning and

6   refused to return checked baggage to the passengers.

7   55.  AA then refused to provide payment for overnight lodging, meals, ground

8   transportation, telephone or other passenger expenses and losses caused by its diversion and

9   stranding.

10  56.  The next morning after more delays Plaintiff and other passengers were

11  flown to Dallas (DWF) airport, where their baggage had been loaded onto the Mobile flight

12  that Plaintiff was involuntarily denied boarding.

13  57.  Other class members who had been diverted, confined and stranded

14  overnight were then denied boarding on connecting flights, and were stranded for another

15  day in Dallas.

16  58.  Intentionally omitted.

17  **Factual Allegations and Experiences  of  Others Similarly Situated in the Proposed Class**

18  59.  The following is a small sample of the experiences of others similarly

19  situated who would be in the proposed class (those identified with initials would have their

20  names not divulged in public filings at this time, but their identities are available to the court

21  *in camera* and to the Defendant upon the filing of an appropriate protective order or

22  stipulation.):

23  a) Paul Ziots residing 8 miles south of San Francisco on Flight 1348 suffered

24  intestinal infection and distress from the water served and/or infection received on the

25  aircraft, that required a two day stay in Austin at his expense cost of over $500 in out-of -

26  pocket expenses, causing cancellation of a vacation in Mexico, and when he tried to use an

27  AA trip voucher for another vacation to Florida, another lengthy delay required cancellation

28  of that trip also.

b) TD of Los Altos Hills, California on Flight 1348 on a trip to Belize on AA from San Francisco had out-of-pocket expenses of over $600, had to drive from Austin to Dallas at his expense, will confirm that no water or food was delivered to the aircraft and passengers were forbidden to leave the aircraft after a small group of passengers with Austin as destination were allowed to deplane early on, that the toilets became disgusting and filthy and were not serviced, open gates were obviously available in plain sight while the AA captain continued to say none were available.

c) Mark Vail of Mardera, California on Flight 534 from Fresno to Dallas was suffering from claustrophobia and is required to take medication daily for epilepsy.  i) His flight was diverted to Austin and he and his fellow passenger were confined against their will for over 7 hours on the ground, plus 3 hours in the air.  ii) He was deprived of medication which was in his baggage that AA refused to return on December 29th, so he had to rent a car in Austin at his expense to drive to Dallas and retrieve his baggage the next morning at DFW after 1-2 hours of AA personnel misinforming him that his baggage had been sent back to Fresno.  iii) Mr. Vail was immersed the hellish conditions and distress of other passengers, including a woman who had a diabetic attack next to him, who began shaking uncontrollably while begging the flight attendant for food, and whose medications were also in her checked baggage. The flight attendant only gave her a stale bagel and spoiled milk. iv) Babies ran out of formula and began crying and screaming along with  their mothers begging to be let off the aircraft.  v) Another elderly man who had a colostomy bag went into diabetic shock and was removed from the plane by an EMS team.  vi)  EMS refused to evacuate other passengers who were yelling "We're being held hostage!"  vii) Mr. Vail began flashing SOS out the window and finally at 9:00 pm the aircraft went to one of the many open gates. viii) Mr. Vail received no ticket refund or reimbursement for his auto rental expense, but did receive a $500 voucher for future air travel.

d) Flight 1682 from Oklahoma City to DFW left the gate at 2:07 pm, then waited over 8 hours before AA canceled the flight and returned to the terminal, upon

information and belief based upon a the Wall Street Journal article of January 6, 2007 by Scott McCartney and Flight Stats Inc.

e) Flight 37 from Zurich, Switzerland to DFW was diverted to Tulsa, Oklahoma where passengers were confined for 10 hours and did not reach Dallas until 1:33 AM on December 30th after passengers had been on board for 22 hours.  The pilots refused to take off because they had reached their federal limits of duty time and AA did not supply a replacement crew for many hours.  This allegation is on information and belief based on the Wall Street Journal article cited above.

f) William King of Bowling Green, Kentucky, his wife and two children ages 5 and 7, on Flight 9133 were returning home to the Nashville airport through Dallas and was diverted to Austin where after many hours of confinement, he was told that he could not get off and, if he did, his family tickets would be forfeited and no ticket refund would be granted or assistance provided to reach his destination.  i) The next day, after receiving no hotel or food or transportation assistance in Austin where he was stranded, Mr. King was forced to rent a car at his expense and drive 13 hours to his home town, because AA stated it could not get him to Nashville.  The total delay was two days.

g) JH residing near Fresno, California was on Flight 4384, which was diverted to New Orleans after circling Dallas airport until fuel was low, where he was confined for 8 hours where he had no food or functioning toilets, lost 2 days of work and $700 in out of pocket expenses, no food or functioning toilets.  i) He received $500 voucher for future travel.

## Pattern and Practice of AA Misconduct

60.  Upon information and belief, Defendant AA has a pattern of involuntarily confining passengers on aircraft without survival necessaries for lengthy periods of time on the ground for its own pecuniary gain, and such incidents include the following:

a) April 24, 2007, 92 flights were diverted, on at least 13 of the flights, passengers were confined over 4 hours.

1       b) August 9th, 2007, 12 aircraft at LAX in Los Angeles, passengers confined
2  over 12 hours with some passing out on the aircraft.

3       c) May 8, 2007, passengers held over 8 hours on aircraft at Palm Beach.

4       d) On or about Febuary 8th, 2002, Flight 2011 at DFW, passengers held on
5  aircraft over 7 hours.

6       e) On or about May 19th, 2000, thousands of passengers held in aircraft at
7  DFW up to 7 hours.

8       f) On or about July 2, 1999, at O'Hare Airport, 91 passengers were held up to
9  6 hours.

10      61.  Defendant AA has not provided reimbursement for passenger expenses,
11  ticket refunds and other forms of compensation to passengers that it diverted and confined
12  on December 29th and 30th, 2006, but only a restricted voucher for $100 to $500 future
13  travel and sometimes a letter of apology.

14      62.  Defendant did not advise stranded passengers that they could use their AA
15  tickets on another airline for travel to their destinations on December 29th or subsequent
16  thereto, even though an industry convention and rule provides for such when a flight is
17  cancelled or excessively delayed.

18      63.  Defendant did not provide ticket refunds or other compensation to
19  passengers that it stranded on December 29th and 30th, 2006.

20      64.  Defendant knowingly misrepresented the reasons for the delays and
21  confinements by falsely asserting to passengers and the public that aircraft were not able to
22  take off due to weather.

23      65.  The delays on December 29th, 2006 were actually due to causes within
24  the control of AA, including insufficient personnel, lack of equipment, poor maintenance
25  and lack of planning for ordinary weather disruptions by AA.

26      66.  Confinements by AA, upon information and belief, were to avoid
27  expenses and lawful obligations to passengers associated with strandings, diversions and

28

1  canceled flights and for AA's and its officers', employees', agents' and stockholders' own

2  pecuniary gain at the expense of Plaintiff and other passengers.

3       67.  While Plaintiff and other passengers were confined to their aircraft in

4  Austin and other diverted airports, other flights of Defendant and other airlines' aircraft were

5  taking off and landing without significant delays.

6       68.  Upon information and belief, the Dallas (DFW) airport was only closed to

7  air traffic for approximately 2.5 hours from 2:00 PM to 4:30 PM on December 29th, 2006,

8  and brief closure did not cause the delay of approximately 50 hours of plaintiff to her

9  destination or that of others similarly situated but was instead caused by matters within the

10  control of AA.

11       69.  Upon information and belief, AA has a corporate policy, practice and

12  pattern of confining and imprisoning passengers on aircraft of excessively delayed or

13  cancelled flights for excessive periods of time to prevent "passenger migration" and this

14  unlawful practice was used against Plaintiff and other similarly situated passengers by

15  Defendant's employees and agents on December 29th, 2006.  The basis for this belief

16  includes the miscoding of many flights as "continued" or "resumed" rather than cancelled

17  and AA employee informants' assertions.

18       70.  Upon information and belief, AA has inflicted its practices of confining

19  and imprisoning passengers for over 3 hours to prevent "passenger migration" on over ten

20  thousand other passengers since December 29th, 2006, including another mass stranding on

21  April 2007.

22       71.  By unlawfully confining  Plaintiff and other passengers diverted from

23  Dallas on December 29th, 2006 in inhumane conditions, AA recklessly endangered the

24  safety of plaintiff and other passengers.  AA also avoided ticket refunds, overnight lodging

25  and meal expenses for passengers, alternate transportation expenses on other airlines that

26  under an industry convention and practice will honor tickets of a defaulting airline and back

27  charge the defaulting airline, ground transportation expenses, terminal employee overtime

28

1    and staffing expenses, and other expenses normally associated with mass strandings and

2    cancellations.

3           72.   Defendant could have permitted passengers to exit the aircraft after the

4    diversions on December 29th, 2006, but failed and refused to do so for its own pecuniary

5    gain.

6           73.   Upon information and belief, some passengers after the confinements

7    ended were forced by Defendant to fly to destinations that they not longer wished to travel

8    to because the reason for their trip such as a missed meeting or family event, no longer

9    existed, but were forced to do so by Defendant who did not permit them to exit the aircraft

10   and obtain alternate transportation to another destination or return home.

11          74.   Other passengers were forced under duress not to abandon their travel

12   with AA on December 29th and 30th, 2006 because AA refused to return their checked

13   baggage, even after promising to do so, after finally permitting passengers to exit the aircraft

14   the evening of December 29th, 2006.

15                    **ACTIONS AFFECTING CLASS MEMBERS GENERALLY**

16          75.   Passengers on the Defendant's diverted flights had their travel delayed up

17   to 3 days after December 29th, 2006 due to non-weather conditions that were within the

18   control of  Defendant AA without compensation for passenger expenses and losses.

19          76.   Defendant was not prevented or prohibited from permitting passengers to

20   exit or re-supply and service the aircraft in Austin or other diverted airports by the Federal

21   Aviation Administration air or by airport management, or other government authorities, by

22   weather, by safety, or by security considerations.

23          77.   Upon information and belief, the water served by AA to Plaintiff and other

24   passengers on her flight was untreated, non-potable water taken from the bathroom sinks and

25   that such water was known by AA to be non-potable in that such water on AA aircraft had

26   recently failed testing and was known by AA to be unfit for drinking, and likely

27   contaminated with bacteria from sanitary waste that could  sicken and endanger passengers'

28   health if drunk.

78.  Defendants' continued detention of Plaintiff and other passengers similarly situated for over 3 hours was done for the commercial convenience of Defendants.

79.  Defendants' continued detention of Plaintiff and other passengers for over 3 hours without potable water, working toilets, breathable air, or adequate food or access to passenger medications recklessly endangered the safety of Plaintiff and others similarly situated.

80.  Gates and/or buses were available to Defendant AA to safely permit passengers to exit the aircraft in Austin and other airports to which AA diverted aircraft, but Defendant AA and/or its agents and employees refused permission to flight crews to return to available terminal gates and/or failed or refused to permit buses to deplane passengers except for a few passengers whose destination was Austin or other airports that AA's aircraft were diverted to on December 29th, 2006.

81.  Proper maintenance of aircraft, customer service and operations staffing are matters within the control of Defendant AA.

82.  Intentionally omitted.

83.  After passengers were finally returned to the terminal in Austin with over 300 passengers in need of assistance.  AA Manager Al Tinsley, upon information and belief, ordered that the only duty AA Customer Service personnel close the Customer Service Station and go home.

84.  AA made an intentional management decision not to delay its non-diverted flights and to confine and hold its diverted flights and confine its passengers on diverted flights to maximize its revenue and minimize its expenses associated with diverted flights by falsely blaming the confinements and delays on the weather (aka Force Majeure or Acts of God).

85.  AA management made an intentional decision to close its headquarters at Fort Worth where most of its Customer Service personnel work for the holiday weekend on December 29th , 2006 through January 1st, 2007.

1         86.  AA management was scheduled to receive (and did receive) large bonuses

2    based on financial results achieved for 2006 and would have received less or even no

3    bonuses if it had compensated passengers as required under its obligations by contract for

4    the diversion delays and called in necessary workers or paid overtime to operate its aircraft

5    and service its diverted passengers, and not sought to falsely excuse its malfeasance and

6    nonfeasance with a fraudulent  Force Majeur claim.

7                     **FIRST CAUSE OF ACTION,  NEGLIGENCE**

8         87.  Plaintiffs repeat and re-allege paragraphs 1 through 86 as if fully stated

9    herein.

10        88.  Defendant is a common carrier offering air transportation to the general

11   public, and as such owed a high duty of care for the safety and protection of its passengers,

12   including Plaintiffs and class members.

13        89.  This duty also created a special relationship between AA and Plaintiff and

14   required AA to affirmatively aid and protect Plaintiff and class members against unreasonable

15   risk of physical harm.

16        90.  This duty included a high standard of care so as to

17        a) not deprive Plaintiffs and other similarly situated passengers of their

18   personal liberty by unjustified confinement in crowded conditions on the ground in an

19   aircraft for a lengthy period of time without adequate water, food, restroom facilities, and

20   breathable air at reasonable temperatures,

21        b) not violate criminal laws of the states regarding false imprisonment,

22        c) not cause plaintiffs and other passengers physical injury and emotional

23   distress, and

24        d) not place passengers in danger or risk of physical harm.

25        91.  This duty arises out of state common law, as summarized at Restatement

26   of Torts Second Section 314A, out of the general federal standard of due care to provide

27   "safe and adequate service" (49 U.S.C. 41702), under criminal statutes in Texas, California

28   and other states where AA confined passengers defining the crime of false imprisonment

1 | and/or reckless endangerment, and to the extent that AA alleges it was acting under color of

2 | federal law and government authority, it arises out of the Fourth Amendment to the United

3 | States Constitution providing that the right of people to be secure in their persons shall not

4 | be violated by unreasonable seizures.

5 | 92.  Defendant breached its duties to Plaintiffs and others similarly situated on

6 | December 29th and 30th, 2006, and its conduct was in reckless disregard of its duty owed to

7 | Plaintiffs and similarly situated passengers.

8 | 93.  Defendant's conduct was the proximate cause of damage and losses to the

9 | Plaintiffs and other class members; plaintiffs individual damages include lost earnings

10 | proximately caused by Defendant AA's negligence and reckless conduct, pain and suffering

11 | from physical and emotional injury caused by Defendant AA's negligence.

12 | 94.  Defendant is guilty of negligence and/or gross negligence.

13 | Wherefore, Plaintiffs pray for judgement as hereinafter set forth.

14 | **SECOND CAUSE OF ACTION, BREACH OF CONTRACT**

15 | 95.  Plaintiffs repeat and re-allege paragraphs 1 through 94 as if fully stated

16 | herein.

17 | 96.  Defendant has filed with the US Department of Transportation, published

18 | on its web site, and referenced on its tickets "conditions of carriage" and a "Customer

19 | Service Plan" which states in part *"Your ticket and the following Conditions of Carriage*

20 | *constitute the Contract between You, the Passenger, and American Airlines, Inc./American*

21 | *Eagle/American and apply to all transportation provided by American (including*

22 | *transportation on codeshare Partners) between points in the United States."* .

23 | 97.  The contract between the Plaintiffs and other class members and

24 | Defendant AA includes the following relevant terms and each were violated by Defendant

25 | AA as indicated below:

26 | a) *"When cancellations and major delays are experienced, you will be*

27 | *rerouted on our next flight with available seats."*  Plaintiffs and many other class members

28 | could have been rerouted on other AA flights that were taking off from Austin and other

1  airports with diverted flights for DFW and other destinations or allowed to exit the aircraft

2  when the diverted airport was at or near their destination, but Defendant AA in breach of this

3  contract term failed and refused to do so on December 29th and 30th, 2006.  AA had other

4  flights with available seats at Austin and the other 16 airports that it diverted over 100 planes

5  to on December 29th, 2006 with available seats that it could have rerouted Plaintiff and other

6  passengers to DFW and other destinations but instead confined Plaintiff and others on the

7  ground in aircraft for 3 to 10 hours.

8          b)  *"In extreme circumstances, it is possible that a flight will cancel while on*

9  *the ground in the city to which it was diverted.  When this happens you will be rerouted on*

10 *the next American Airlines or American Eagle flight with available seats, or in circumstances*

11 *on alterative means of transportation,  If we are unable to reroute you, reasonable overnight*

12 *accommodations will be provided by American Airlines or American Eagle, subject to*

13 *availability."*  Defendant AA failed and refused to provide for or reimburse Plaintiff and most

14 other class members for overnight accommodations at diverted locations on December 29th,

15 2006 and in Dallas on December 30th, 2006 in breach of this contract term, or provide

16 alternate transportation or reroute.  The great majority of diverted flights from DFW on

17 December 29th, 2006 were defacto canceled when they did not fly to DFW and the flight

18 crews left the aircraft.  The mislabeling of such flights as "continued" the next day was an

19 deceptive and unauthorized practice by Defendant AA to avoid its obligations under this and

20 other contract provisions.

21          c)  *"American Airlines and American Eagle will provide amenities for delayed*

22 *passengers, necessary to maintain the safety and/or welfare of certain passengers such as*

23 *customers with disabilities, unaccompanied children, the elderly and others to whom such*

24 *amenities will be furnished consistent with special needs and/or circumstances."*  Many class

25 members had special needs and circumstances including the Plaintiff and her family

26 members, but Defendant breached this provision of its contract by failing to provide such

27 "amenities" as potable water, adequate food, access to medications (Plaintiff had anti-seizure

28

1   medications in her baggage that she was deprived of for about 57 hours), baby formula,

2   diapers, breathable air during the on ground confinements of over 3 hours.

3           d) *"If a flight is oversold (more passengers hold confirmed reservations than*

4   *there are seats available), and you are denied boarding involuntarily at the airport, you will*

5   *be entitled to Denied Boarding Compensation from American Airlines…"* (and if American

6   *cannot arrange alternate transportation for you to arrive within 2 hours of your scheduled*

7   *arrival time, you will be offered a payment of double the value of your flight coupon up to*

8   *$400.)* Par. 5 of Contract of Carriage (COC).  Defendant AA breached this term of its contract

9   with Plaintiffs and many other class members when it denied her boarding involuntarily on

10  December 30th at the airport in DFW because the her flight to Mobile Alabama was oversold

11  and failed to pay her Denied Boarding Compensation (for Plaintiff $400 per ticket times 4

12  tickets for herself and three family members traveling with her, or if the aircraft was an

13  American Eagle flight with under 60 seats a full refund of the ticket price up to $100 per

14  ticket).  Plaintiff had complied with the check in requirements as set forth in Par. 7 of the

15  COC, none of the five exceptions in Par. 5 of the COC is applicable and she was present at

16  least 15 minutes prior to the scheduled boarding time for her flight from DFW to Mobile

17  Alabama on December 30th, 2006.

18          98.  Defendant's conduct on December 29th, 2006 and subsequent thereto

19  breached its Contract with Plaintiff and other class members and caused them damages and

20  entitles them to general damages as provided by law.

21          99. Intentionally omitted.

22          WHEREFORE, Plaintiffs pray for judgement as hereinafter set forth.

23          **THIRD CAUSE OF ACTION, CONVERSION**

24          100.  Plaintiffs repeat and re-allege paragraphs 1 through 99 as if fully set forth

25  herein.

26          101.  Defendant AA wrongfully exercised dominion over the baggage of

27  Plaintiffs and other class members when it refused to return their baggage to them that was

28

1  readily available to be returned to Plaintiffs and other class members on December 29th and

2  30th, 2006.

3        102.  Plaintiffs and other class members were damaged thereby and some

4  were endangered by being denied access to necessary medications, including anti-seizure

5  medicine in Plaintiff's baggage that she was deprived of by AA for over 57 hours causing her

6  pain, emotional distress, and anxiety and related damages.

7        103.  Defendant AA is guilty of the tort of conversion.

8        WHEREFORE, plaintiffs pray for judgement as hereinafter set forth.

9                **FOURTH CAUSE OF ACTION, CIVIL CONSPIRACY**

10       104.  Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 103

11  as if fully set forth herein.

12       105.  Defendants Doe #1, Al Tinsley, AA manager at the Austin airport on

13  December 29th, 2006,  Doe #2, Don Dillman, managing director of AA's operations center,

14  Doe #3, Bonnie Sutton, AA's general manager at the Little Rock, Arkansas airport on

15  December 29th, 2006 and Does #4 through #18, consisting of the operations or general

16  managers of AA on duty on December 29th and 30th, 2006, upon information and belief,

17  knowingly agreed to participate in committing torts against Plaintiffs and others similarly

18  situated, and knowingly or recklessly breached the standard of care owed to Plaintiffs and

19  others similarly situated, and knowingly undertook a course of conduct that threatened the

20  physical safety and emotional well being of Plaintiffs and others similarly situated by

21  knowingly confining Plaintiffs and others similarly situated for 3-10 hours in aircraft against

22  their will and without adequate necessities of potable water, toilet facilities, food, access to

23  medications, exercise to avoid blood clots from confinements over 4 hours, and/or

24  breathable air, for Defendant Does #1-#18 commercial convenience and pecuniary gain.

25       106.  Unlawful overt acts done in furtherance of this conspiracy included:

26       a) by Defendant Doe #2 instructing and coordinating with Defendant Does #1,

27  and #3 through #18,  operations managers at 17 or more airport locations where over 100

28

1   aircraft were diverted from DFW on December 29th, 2006, to involuntarily confine

2   passengers for 3 to 11 hours in AA aircraft on the ground;

3            b) by Defendant Does #1-#18 intentionally and repeatedly making

4   misrepresentations to the AA pilots of diverted aircraft over many hours including Plaintiff

5   and others similarly situated, knowing and intending that AA pilots would then pass on these

6   misrepresentations and false information to the Plaintiff and others similarly situated that i)

7   no gates or buses were available to permit  passengers to safely exit the aircraft; ii) that

8   Plaintiff's and other diverted aircraft were cleared for takeoff or would be taking off shortly

9   for DFW; iii) that DFW airport was closed;

10            c) by Defendant Does #1 - #18 intentionally withholding and refusing to deliver

11   to Plaintiff's and others similarly situated available or reasonably available essential survival

12   supplies or services of potable water, working toilet facilities, food, and access to medications

13   or exercise after over 3 hours of confinement on the diverted airport tarmacs;

14            d) by Defendant Doe #1 Al Tinsley telling AA customer service agents under

15   his supervision to go home and close the customer service center in Austin, so that there

16   would be inadequate or no personnel to provide services to Plaintiff and others similarly

17   situated after they were finally allowed to deplane at the Austin airport after many hours of

18   confinement;

19            e) by Defendant Does #1-#18 intentionally and fraudulently miscoding diverted

20   flight delays of Plaintiff and others similarly situated as due to weather or other reasons not

21   within the control of AA, so as to wrongfully and in bad faith deny overnight lodging, meal

22   and other compensation due to Plaintiff and others similarly situated who were stranded

23   overnight on December 29th, 2006 under a Force Majeur clause in the Contract of Carriage

24   rather than give the true reason which was for the commercial convenience and pecuniary

25   gain to AA and its employees;

26            f) by Defendant Does #1- #18 wrongfully and intentionally refusing and

27   denying requests  AA pilots of Plaintiff's aircraft and others similarly situated to come to open

28

1  gates to discharge passengers even after many hours of confinement and when they knew

2  passengers were suffering from severe physical and emotional distress.

3        107.  Defendant Doe #2 Don Dillman has publicly admitted that he knowingly

4  sacrificed the diverted flights of Plaintiff and others similarly situated and was quoted in a

5  November 15th, 2007 New York Times article on the December 29th , 2006 incident that is

6  the subject of the Plaintiff's complaint saying, "We had an attitude that was pretty much a

7  brick wall.  You don't want the diverted flights to pull your normal flights down."

8        108.  The aforementioned conspirators, upon information and belief, all had

9  personal financial reasons for engaging in such aforementioned wrongful and unlawful

10  conduct in that their bonuses from AA are determined in part based on how little was paid

11  out for diversions and delays, and pilots and other flight crew members who continuously

12  provided the false information and misrepresentations to Plaintiff and others similarly receive

13  much higher flight pay when the aircraft doors are locked and closed and little to no pay

14  when aircraft doors are opened to allow passengers to exit the aircraft.

15        109.  Plaintiff and others similarly situated suffered damages and losses as a

16  result of Defendant Does #1-#18 wrongful and unlawful conduct.

17        WHEREFORE, Plaintiffs pray for damages as follows:

18        **DAMAGES/RELIEF SOUGHT**

19        110.  Plaintiffs repeat and re-allege paragraphs 1 through 109 as if fully stated

20  herein.

21        111.  Plaintiff is a consumer and class representative of all others similarly

22  situated who suffered losses and were damaged by Defendant's misconduct on December

23  29th and 30th, 2006 in the aforementioned diversions from Dallas (DFW) airport and the

24  subsequent, delays, injuries, confinements, and indignities suffered as a result of Defendant's

25  conduct.

26        112.  The Plaintiff  seeks individual damages of $1,000,000 plus an amount in

27  excess of  $5,000,000 for the proposed class for negligence, breach of contract, conversion

28

1   and civil conspiracy, for compensatory, special, actual, and consequential damages, plus

2   exemplary and punitive damages.

3        113.   Punitive damages are warranted in this case as the acts and/or omissions

4   of the Defendants were intentional and the Defendants knew, or in light of the surrounding

5   circumstances ought to have known, that their conduct would naturally and probably result in

6   injury and yet the Defendants continued this course of conduct with malice or in reckless

7   disregard of the consequences from which malice may be inferred.

8        114.   The Defendants, motivated by greed and a desire for profit, continued the

9   actions as set for above in reckless disregard of the consequences from which malice may be

10  inferred.

11       115.   The Defendant continues the practices detailed above and therefore

12  punitive damages are necessary in order to deter like conduct in the future.

13       116.   Plaintiff also seeks the opportunity to be heard as to being named

14  representative of a class of all passengers similarly situated and will seek an incentive amount

15  for such representational duties as the court may determine.

16       117.   Wherefore, Plaintiff requests that this honorable Court appoint the

17  Plaintiff as class representative, certify this case a class action pursuant to the Federal Rules

18  of Civil Procedure, order the Defendant to preserve all records relating the incidents

19  complained of, and otherwise issue orders and relief as the court deems just and proper in the

20  circumstances.

21       118.   Plaintiffs also request attorney fees, expenses, costs, disbursements, and

22  interest as provided by law.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

**DEMAND FOR JURY TRIAL**

2              Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal

3    Rules of Civil Procedure.

4

5

6    Dated: August 13, 2008                    LAW OFFICES OF PAUL S. HUDSON PC
                                               LAW OFFICES OF DAVID G. RAMOS
7

8                                              By: _____/s/_____
                                                      Paul S. Hudson
9                                              Attorneys for Plaintiff KATHLEEN HANNI
                                               Individually and on behalf of all others
10                                                    similarly situated

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28